# EXHIBIT 2

## In The Matter Of:

### JOY CREWS
v.
### DOLGENCORP, INC.

### NO. 3:06-CV-00047-MEF-VPM

---

### JOY CREWS
### September 14, 2006

---



**TYLER EATON**

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

## THE HIGHEST QUALITY IN COURT REPORTING

205.252.9152 • Toll-Free 800.458.6031 • Fax 205.252.0196
One Federal Place, Suite 1020 • 1819 Fifth Avenue North • Birmingham, Alabama 35203
———————— www.TylerEaton.com ————————

Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

CIVIL ACTION NO. 3:06-CV-00047-MEF-VPM

JOY CREWS,
    Plaintiff,
vs.
DOLGENCORP, INC.,
    Defendant.

DEPOSITION
OF
JOY CREWS
September 14, 2005

REPORTED BY: Gail B. Pritchett
    Certified Realtime Reporter,
    Registered Professional
    Reporter and Notary Public

Page 2

STIPULATION

IT IS STIPULATED AND AGREED, by and between the parties, through their respective counsel, that the deposition of JOY CREWS may be taken before Gail B. Pritchett, Commissioner, Certified Realtime Reporter, Registered Professional Reporter and Notary Public;

That it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of trial, or at the time said deposition is offered in evidence, or prior thereto.

Page 3

APPEARANCES

FOR THE PLAINTIFF:
    Mr. Roman A. Shaul
    Attorney at Law
    Beasley, Allen, Crow,
        Methvin, Portis & Miles, P.C.
    P. O. Box 4160
    281 Commerce Street
    Montgomery, Alabama 36103-4160

FOR THE DEFENDANT:
    Mr. Christopher W. Deering
    Attorney at Law
    Ogletree, Deakins, Nash,
        Smoak & Stewart, P.C.
    One Federal Place, Suite 1000
    1819 5th Avenue North
    Birmingham, AL 35203

Page 4

INDEX

PAGE:
EXAMINATION BY MR. DEERING        6
EXAMINATION BY MR. SHAUL        147
REEXAMINATION BY MR. DEERING      151

EXHIBITS
Defendant's Exhibit 1        37
Defendant's Exhibit 2        38
Defendant's Exhibit 3        39
Defendant's Exhibit 4        62
Defendant's Exhibit 5        68
Defendant's Exhibit 6        127
Defendant's Exhibit 7        129
Defendant's Exhibit 8        136
Defendant's Exhibit 9        137
Defendant's Exhibit 10       138
Defendant's Exhibit 11       139
Defendant's Exhibit 12       141
Defendant's Exhibit 13       143

**Page 5**

1          I, Gail B. Pritchett, a
2     Certified Realtime Reporter and Registered
3     Professional Reporter of Birmingham,
4     Alabama, and a Notary Public for the State
5     of Alabama at Large, acting as
6     Commissioner, certify that on this date,
7     as provided by the Federal Rules of Civil
8     Procedure of the United States District
9     Court, and the foregoing stipulation of
10    counsel, there came before me at One
11    Federal Place, Suite 1020, 1819 5th Avenue
12    North, Birmingham, Alabama, on the 14th
13    day of September, 2006, commencing at 9:10
14    a.m., JOY CREWS, witness in the above
15    cause, for oral examination, whereupon the
16    following proceedings were had:
17
18          JOY CREWS,
19    being first duly sworn, was examined and
20    testified as follows:
21
22          THE COURT REPORTER:  Usual
23    stipulations?

**Page 6**

1          MR. DEERING:  Yes.
2          MR. SHAUL:  That's fine.
3
4     EXAMINATION BY MR. DEERING:
5     Q.    Ms. Crews, my name is Chris
6     Deering, I'm one of the attorneys that
7     represents DOLGENCORP, Inc. in this case
8     that you brought against the company.
9     When I say DOLGENCORP, Inc., that's the
10    formal name for the company.  We will call
11    it Dollar General, I will call it DG --
12    A.    I understand.
13    Q.    -- it's all the same thing as
14    far as the deposition goes.  Okay.  And
15    you understand the oath that you have
16    given this morning, correct?
17    A.    I do.
18    Q.    Okay.  Have you ever been
19    deposed before?
20    A.    Been what?
21    Q.    Deposed.  Have you ever sat
22    for a deposition like this where --
23    A.    No.

**Page 7**

1     Q.    This is the first time you
2     have ever done anything like this?
3     A.    Uh-huh.
4     Q.    All right.  Well, you
5     understand that the purpose of a
6     deposition like this is to elicit
7     information from you about the claims you
8     have against Dollar General, correct?
9     A.    Yes, sir.
10    Q.    Okay.  There is going to be a
11    series of questions that I am going to ask
12    you.  The court reporter is going to be
13    taking everything down, so it is important
14    to answer out loud and to try to
15    articulate as best you can so she can
16    understand what you are saying.  And she
17    can only take down one person talking at a
18    time --
19    A.    Okay.
20    Q.    -- so if possible -- and I
21    will do my best as well to try not to talk
22    over you, if you will try not to talk over
23    me.  Also it's important to not use

**Page 8**

1     uh-huhs or uh-uhs, try to say yes or no --
2     A.    Yes or no, okay.
3     Q.    -- so she can take that down
4     properly.
5     A.    Okay.
6     Q.    If you don't understand a
7     question or if you need me to rephrase or
8     whatever, just let me know, is that fair?
9     A.    Okay, uh-huh.
10    Q.    All right.  Would you please
11    state your full name for the record?
12    A.    Rilla Joy Crews.
13    Q.    Any other names that you have
14    been known as or gone as?
15    A.    I was born Rilla Joy Hollaway
16    and I was married once before and I was
17    Rilla Joy Crews.  And my husband calls me
18    June Bug, and Aunt Bug by all of the kids.
19    Q.    Okay.  And what was your
20    maiden name?
21    A.    Hollaway.
22    Q.    And I have your Social
23    Security number as 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.

JOY CREWS
DOLGENCORP, INC.

JOY CREWS
September 14, 2006

(Pages 9 to 12)

## Page 9

1   A.   That's it.
2   Q.   Okay.  And you haven't had any
3   other Social Security numbers?
4   A.   No, sir.  That's it.  Well, I
5   had another Social Security name, it was
6   Rilla Joy Sutton, but it was the same
7   number.
8   Q.   Okay.  And do you have a
9   current driver's license?
10  A.   Yes, sir.
11  Q.   Alabama?
12  A.   Uh-huh, Randolph County.
13  Q.   Is that a regular driver's
14  license?
15  A.   It is.
16  Q.   It's not a commercial driver's
17  license?
18  A.   No, sir.
19  Q.   Has there ever been a time
20  when you did not have a valid driver's
21  license subsequent to your first getting
22  one?
23  A.   No, sir.

## Page 10

1   Q.   I have your date of birth as
2   October 5th, 1963.
3   A.   And that's not right.  It's
4   January 5th of 1963.
5   Q.   Okay.  What is your current
6   address?
7   A.   773 County Road 435, Graham,
8   Alabama 36263.
9   Q.   Okay.  And how long have you
10  lived there?
11  A.   About twenty years, but I have
12  been in Graham all of my life.
13  Q.   Okay.  And what county is that
14  in?
15  A.   Randolph.
16  Q.   And who owns that house?
17  A.   Me and my husband.
18  Q.   And what is his name?
19  A.   Clark Crews.
20  Q.   Are you currently on any
21  medications?
22  A.   Yes, sir.  I take -- I think
23  it's Verelan, it's a blood pressure pill.

## Page 11

1   Q.   Anything else?
2   A.   No, sir.  Occasional Benadryl,
3   but that's about it.
4   Q.   Okay.  Is it fair to say that
5   your taking Verelan or Benadryl doesn't
6   have any effect on your ability to testify
7   truthfully or accurately today?
8   A.   No, sir.
9   Q.   It is fair -- it does not
10  affect your ability?
11  A.   That's right, it does not
12  affect it.
13  Q.   All right.
14  A.   Yes, sir and no, sir.
15  Q.   Okay.  And you don't have any
16  physical condition that affects your
17  memory, is that fair to say?
18  A.   No, sir, I don't, not any that
19  I know of.
20  Q.   Did you get a good night's
21  sleep?
22  A.   Until about 4 this morning,
23  yes, sir.

## Page 12

1   Q.   What time do you normally wake
2   up in the morning?
3   A.   About 5 to get Clark off.
4   Q.   Okay.  Have you ever had any
5   emotional problems?
6   A.   Not any that I have been
7   diagnosed with, uh-uh.
8   Q.   Okay.  And I believe you said
9   that your husband's name is Clark Crews?
10  A.   Uh-huh.
11  MR. SHAUL:  You have to say
12  yes or no.
13  A.   Yes, sir.  I'm sorry.  Yes,
14  sir.
15  Q.   And what is his occupation?
16  A.   He is a welder.
17  Q.   How long have you been married
18  to him?
19  A.   Since '96, but we lived
20  together twelve years before that, so
21  about the last twenty years.
22  Q.   And I believe you testified
23  earlier that you were previously married

JOY CREWS
DOLGENCORP, INC.

JOY CREWS
September 14, 2006

(Pages 13 to 16)

---

Page 13

1  to someone else?
2      A.    I was.
3      Q.    Who was that?
4      A.    He was Richard Sutton.
5      Q.    How long were you married to
6  him?
7      A.    Just over a year.
8      Q.    And is it fair to say y'all
9  got a divorce?
10     A.    Yes, sir.
11     Q.    Do you remember what year that
12  was?
13     A.    Probably '83, '84.  And that's
14  guessing.
15     Q.    Okay.
16     A.    Everybody needs one bad one to
17  know when they got a good one.
18     Q.    Do you have any children?
19     A.    No, sir.  Just two rotten
20  dogs.
21     Q.    Does Clark have any children?
22     A.    No, sir.
23     Q.    Where do you currently work?

Page 14

1      A.    At Super 10 in Bowdon,
2  Georgia.  That's Variety Warehouse or --
3  Variety Warehouse I think is the name of
4  it, their main office name.  But they have
5  several different stores under them, like
6  Bill's Dollar, Super 10.
7      Q.    Okay.  So that's a retail
8  store that you work at?
9      A.    Yes, sir.
10     Q.    And how long have you been
11  there at the Super 10?
12     A.    July the 18th was a year.
13     Q.    And what is your job there?
14     A.    I'm assistant manager.
15     Q.    Have you been the assistant
16  manager there --
17     A.    Ever since I went in, yes,
18  sir.
19     Q.    Can you describe for me what
20  your job duties typically are In that
21  position?
22     A.    Putting up stock, seeing after
23  the public, counting drawers down at

Page 15

1  night, going to the bank.
2      Q.    Okay.  Who is your supervisor?
3      A.    Charlotte Powers.
4      Q.    Is she the store manager?
5      A.    Yes, sir.
6      Q.    And what is your hourly rate
7  there?  Or is it a salary position?
8      A.    No, it's hourly.  Six fifty.
9  I had to take a dollar cut.
10     Q.    What do you mean by that?
11     A.    I was making seven fifty when
12  I worked at Dollar General.
13     Q.    Okay.  Are you full time there
14  at the Variety store?
15     A.    Yes, sir.
16     Q.    Super 10 I guess, rather?
17     A.    Yes, Super 10.
18     Q.    Okay.  And how far is that
19  Super 10 from your residence?
20     A.    About six miles.  That's one
21  way.
22     Q.    Okay.  Did you go to the Super
23  10 immediately after you resigned your

Page 16

1  employment with Dollar General?
2      A.    Yes, sir, I did.  I quit on
3  Friday and started a week later.
4      Q.    How did you come to get that
5  job at Super 10?
6      A.    I was in there talking to the
7  manager one day, I know her, and --
8      Q.    Charlotte?
9      A.    Uh-huh, Charlotte.  She was
10  looking for an assistant.  And at the time
11  they had cut my hours at Dollar General
12  from forty to fifteen, and there went my
13  benefits and insurance and -- you know,
14  fifteen hours a week don't buy much
15  groceries.
16     Q.    Now, tell me about your
17  husband's job.  You say he is a welder.
18  Is he self-employed?
19     A.    No, he is employed with -- the
20  man who owns the company is Roger Stapler,
21  but the name of it is -- I think it's
22  Parker's -- not Parker's, it's -- I can't
23  think of the name of it right off.

JOY CREWS
DOLGENCORP, INC.

JOY CREWS
September 14, 2006

(Pages 17 to 20)

Page 17

1    Q.    How long has he been with that
2  company?
3    A.    Nearly four years.  Four
4  years.  It was four years in -- will be
5  four years -- it was four years in August.
6    Q.    And is that a full-time job
7  for him?
8    A.    Yes, sir, it is.
9    Q.    Do you know -- what is his
10  salary or what does he typically earn a
11  year in that job?
12    A.    I think it's about eighteen,
13  nineteen dollars an hour.
14    Q.    He works about forty hours a
15  week?
16    A.    Yes, sometimes a little more.
17    Q.    All right.  Now, do you recall
18  when it was that you first became employed
19  by Dollar General?
20    A.    I do.  It was in January of --
21  I had just turned forty.  '02, is that
22  what I have wrote down, Roman?
23    MR. SHAUL:  He has it written

Page 18

1  down.
2    A.    It was in January.  So this
3  January would have been three years.
4    Q.    So January of '03?
5    A.    Yeah, there you go, '03,
6  uh-huh.
7    Q.    If I told you our records
8  reflect it was about January 17 of 2003,
9  does that sound about right?
10    A.    Yeah.  I would have guessed
11  the 18th, but, yeah, that's about right,
12  yes, sir.
13    Q.    Okay.  Prior to coming to work
14  for Dollar General in January of '03, do
15  you recall where you worked immediately
16  preceding coming to Dollar General?
17    A.    It had been twenty years since
18  I had worked.  I mostly seen after my
19  mama.
20    Q.    Is that right?
21    A.    Uh-huh.  She died the first of
22  January.
23    Q.    Of 2003?

Page 19

1    A.    Uh-huh.  And I went to work
2  three weeks later.
3    Q.    Okay.  Do you have any
4  military experience?
5    A.    No, sir.
6    Q.    Ever apply for disability from
7  the government or a private insurance
8  carrier?
9    A.    No, sir.
10    Q.    Did you graduate high school?
11    A.    Yes, sir.  Bowdon High School
12  in '81.
13    Q.    That's Bowdon, Georgia?
14    A.    Yes, sir.  Graham is just on
15  the line.  So I'm like five miles from the
16  line.
17    Q.    Okay.  Is Graham, is that in
18  Central Standard Time or Central Time?
19    A.    It's on -- it should be on
20  Central Time, but we go by Eastern Time.
21    Q.    Is that right?
22    A.    Yeah, because mostly -- we are
23  right on the line, our TV is from Georgia,

Page 20

1  our phones, we work in Georgia, so we just
2  use that time.
3    Q.    I got you.  Do you have any
4  post high school education?
5    A.    That means after high school?
6    Q.    Right.
7    A.    No, sir.
8    Q.    Now, you worked at Dollar
9  General from January 17, 2003 until your
10  employment ended when, in July of '05?
11    A.    It was July 15th, uh-huh.
12    Q.    Of 2005?
13    A.    Or the 18th.  Yes, sir of '05.
14    Q.    After July 15th, 2005?
15    A.    That would be on a Friday,
16  then.  Yes, that was it.
17    Q.    Okay.  And when you were
18  initially hired back in January of '03,
19  what position did you hire in to?
20    A.    I was just a plain clerk.
21    Q.    Store clerk?
22    A.    Uh-huh, yes, sir.
23    Q.    Was that at Store 4800 in

JOY CREWS
DOLGENCORP, INC.

JOY CREWS
September 14, 2006

(Pages 21 to 24)

Page 21

1    Bowdon?
2        A.   Yes, sir, it was.
3        Q.   And at some point you were
4    promoted to lead store clerk at that
5    store, correct?
6        A.   Yes, sir, about two months
7    later.
8        Q.   If I told you that I have that
9    you were promoted on May 10, 2003 --
10       A.   That sounds about right.
11       Q.   Sounds about right?
12       A.   Yes, sir.
13       Q.   And you continued in that job
14   at the Bowdon store until you ultimately
15   transferred to 5842 in Ranburne, Alabama,
16   correct?
17       A.   Yes, sir.
18       Q.   Okay.  How did that transfer
19   to the other store come about?
20       A.   Well, I had said something
21   about it a time or two.  And one day the
22   district manager from that area was in our
23   store and my manager told him that I was

Page 22

1    interested in it.  And they said if I was,
2    just to come over there and apply like
3    everybody else.
4        Q.   Okay.
5        A.   And I did to get away from
6    Vivian, so --
7        Q.   Okay.  And Vivian was your
8    store manager at the time?
9        A.   Yes, sir.
10       Q.   Was Vivian -- is that Vivian
11   Keith?
12       A.   It is, uh-huh.
13       Q.   Was Vivian the store manager
14   during the entire time you worked at 4800?
15       A.   Yes, sir, she was.
16       Q.   Okay.  Did you have some bad
17   blood between the two of y'all?
18       A.   Yes, sir, a little bit.
19       Q.   What was that about?
20       A.   Well, it was several different
21   things.  Where to start?  She hollered at
22   an eighty-year-old woman one day -- well,
23   about an eighty-five-year-old woman, and I

Page 23

1    didn't like that.
2        Q.   Did you confront her?
3        A.   Oh, yeah.  Yes.  That was
4    somebody's grandma.
5        Q.   What happened?
6        A.   Well, we had words about it.
7    And I never have been one -- I don't like
8    bullies, so I will stand up to them, it
9    don't matter.  And to me she was a bully.
10       Q.   You felt Ms. Keith was a
11   bully?
12       A.   In some sense, yes.  And there
13   was lots of other things.  Do you want me
14   to go into all of them?
15       Q.   No, just kind of wanted to get
16   some background on your relationship with
17   Ms. Keith.
18            Did she hire you in to that
19   job?
20       A.   Yes, sir, she did.
21       Q.   And she was the one who went
22   to Mr. Kennessey, was he the district
23   manager that you were referring to?

Page 24

1        A.   Norman -- in the Ranburne
2    district, yes, sir.
3        Q.   Is that the DM that you were
4    referring to that she talked to?
5        A.   Yes, sir.
6        Q.   And you had asked her to
7    mention it to him, is that right?
8        A.   No.  She did that on her own.
9        Q.   Okay.
10       A.   I had told her I had thought
11   about transferring to Ranburne.
12       Q.   Was that going to be a new
13   store that was opening?
14       A.   It was a new store, yes, sir.
15   Go ahead, I'm listening.
16       Q.   Okay.  Is that a diary that
17   you brought with you today?
18       A.   Somewhat, yes, sir.
19            MR. SHAUL:  I was sitting here
20   looking at it.  We can talk about it off
21   the record.
22            MR. DEERING:  That's fine.
23       A.   There is another section in

Page 25

1 there. I'm sorry.
2    Q.    So tell me about that. Tell
3 me about what conversations you may have
4 had with Mr. Kennessey about possibly
5 transferring from the Bowdon store to the
6 new Ranburne store.
7    A.    Well, they were holding job
8 tryouts in Ranburne, and I went over there
9 and just tried out like everybody else.
10 And that day he told me he would take me,
11 so I transferred.
12    Q.    Was Ranburne a closer store to
13 your home?
14    A.    It's about the same distance.
15 It's a little smaller community.
16    Q.    How far was the Bowdon from
17 your house?
18    A.    About six miles. And the
19 Ranburne store was probably four or five.
20 So there is not that much difference in
21 it.
22    Q.    But it was a new store, right?
23    A.    Yes, sir. I helped them put

Page 26

1 it together.
2    Q.    Okay. Now, do you recall when
3 it was that you transferred to that
4 Ranburne store?
5    A.    Now that I don't remember.
6 No, sir, I don't.
7    Q.    Now, if I told you that our
8 records show that Mr. Kennessey approved
9 your transfer to that store about April
10 30th of 2005, does that sound about right
11 to you?
12    A.    I would say that is about
13 right. I can't swear to it, but, yes -- I
14 don't remember that date.
15    Q.    And you were part of the new
16 store setup crew, correct?
17    A.    I sure was, yes, sir.
18    Q.    And about how many employees
19 were a part of that crew?
20    A.    And this is just a guess,
21 fifteen. And they was going to pick like
22 seven or eight out of that to stay.
23    Q.    Okay. Tell me what all went

Page 27

1 on during that setup time period and how
2 long it lasted.
3    A.    It was just an empty store.
4 We brought all of the shelves in and
5 unloaded them and put them all together.
6 There was even a day I stayed as the
7 assistant manager, and they all went to
8 eat and I met all of the vendors bringing
9 in machines, Coke -- well, Pepsi machines.
10 And then we just put everything together,
11 and the trucks came in with all of the
12 merchandise and we unloaded them and
13 stocked it.
14    Q.    How long did that whole
15 process take before the store opened up to
16 the public?
17    A.    I'm guessing, about three
18 weeks, three or four weeks. It wasn't
19 very long. That might be a little more.
20    Q.    Okay. Who was in charge of
21 that setup process?
22    A.    She was a -- it wasn't Norman
23 or Lynda. It was a lady that her job was

Page 28

1 to go around and do that. And I can't
2 remember her name, but they called her
3 Froggy -- Frog.
4    Q.    Now, you mentioned someone by
5 the name of Lynda. Who was that?
6    A.    She was the manager of the
7 Ranburne store and the Lineville store at
8 the same time.
9    Q.    Is that Lynda Hall?
10    A.    That's her.
11    Q.    L-y-n-d-a Hall, is that how
12 she spells it?
13    A.    (Nodding head affirmatively.)
14    Q.    Is that a yes?
15    A.    That's how she spells it, yes.
16 Red-headed woman, that's her.
17    Q.    By the way, was Vivian Keith
18 African-American?
19    A.    No, sir. She was white.
20    Q.    How about Lynda Hall?
21    A.    No, sir. She was white.
22    Q.    Now, you went over to the
23 Ranburne store to help with setup, I think

Page 29

1  by our best judgment I think you testified
2  end of April 2005, correct?
3      A.   Yes, sir.
4      Q.   After the setup process played
5  out, you had mentioned that a certain
6  number of employees would have been
7  retained to continue forward with
8  operation of the store, correct?
9      A.   Yes, sir.
10     Q.   Were you one of those
11 individuals?
12     A.   Yes, sir, I was.
13     Q.   And what position did you end
14 up working in after the setup, once it was
15 open to the public?
16     A.   Assistant manager.
17     Q.   You were actually the
18 assistant manager?
19     A.   That's what -- that was the
20 job I did, yes, sir.
21     Q.   Was that the job that -- that
22 was your actual job title with Dollar
23 General at that time?

Page 30

1      A.   I went in as third key, and
2  she told me that I would be the assistant,
3  uh-huh.
4      Q.   That you would be or that you
5  were?
6      A.   That I was, yes, sir.  She
7  asked me to be her assistant.
8      Q.   Who was that?
9      A.   Lynda Hall.
10     Q.   Now, was that a salaried
11 position or was that an hourly position?
12     A.   It was hourly.
13     Q.   Do you know what your hourly
14 rate was at that time?
15     A.   It was seven fifty.  And that
16 figures in with the -- their -- you got so
17 many hours a week, and you figure the
18 hours and your pay and all of that is a
19 percentage, how many hours you get
20 according to your sales.
21     Q.   During the setup process, was
22 there an individual who served as an
23 assistant manager at that store in

Page 31

1  Ranburne?
2      A.   No, sir.  It was just Frog,
3  she was over all of it.  She had to okay
4  anything.  So I guess she was over Norman
5  too, I don't know.  Because he had to
6  answer to her too.
7      Q.   When you say Norman, that's
8  Norman Kennessey, correct?
9      A.   Yes, sir.
10     Q.   District manager?
11     A.   I never knew his last name.  I
12 thought it was Kessler, but, yes, that's
13 it.
14     Q.   Okay.  Now, at some point you
15 went on vacation and came back and
16 resigned, right?
17     A.   I did, a week after I came
18 back, uh-huh.
19     Q.   Do you recall when it was that
20 you went on vacation?
21     A.   July the 15th was on a Friday,
22 and it was that week before that.
23     Q.   Okay.  So if you went to the

Page 32

1  Ranburne store to help with setup in late
2  April of '05, that would have only left
3  basically May and June and maybe that very
4  first part of July that you would have
5  been at the Ranburne store, correct?
6      A.   Yes, sir.
7      Q.   And some of that time would
8  have been attributed to setup at the
9  beginning, correct?
10     A.   Yeah, about the first two
11 weeks, three weeks.  It wasn't very long.
12     Q.   Right.  And then it was opened
13 up to the public?
14     A.   Yes, sir.
15     Q.   And that's when you say that
16 Ms. Hall designated you as the assistant
17 manager of the store, correct?
18     A.   Uh-huh.  Well, I acted as her
19 assistant while it was being put together
20 too.  Because like I say, I received the
21 vendors as the assistant manager.
22     Q.   Did you receive any pay
23 increase as a result of that?

Page 33

1  A.   No, sir.
2  Q.   When was the last pay increase
3  you received, do you remember?
4  A.   I got it when I was still in
5  Bowdon.
6  Q.   So during the time you were at
7  Ranburne, you never received a pay
8  increase?
9  A.   No, sir.  They wasn't even
10 going to give me my vacation pay.
11 Q.   But they did ultimately?
12 A.   Yes, after I called Norman
13 about seven or eight times and left him
14 some pretty good voicemails.
15 Q.   Okay.
16 A.   Lynda never put in for it, I
17 will put it that way.  And that was her
18 job.  And she knew thirty -- you are
19 supposed to give a thirty-day notice, and
20 I did give her a thirty-day notice.
21 Q.   But you did get your vacation
22 pay?
23 A.   Yes, after worrying Norman for

Page 34

1  two weeks.  Yes, sir, I did.
2  Q.   Now, just for the record so
3  that we have it in the record, Dollar
4  General is a retail store chain that is
5  based in Goodlettsville, Tennessee,
6  correct?
7  A.   Yes, sir.
8  Q.   And operates stores throughout
9  the Unites States, including here in
10 Alabama?
11 A.   Yes, sir.
12 Q.   Tell me about your job duties
13 that you performed as the assistant
14 manager at the Ranburne store.  What were
15 some of the things that you typically did?
16 A.   Just opening up the store,
17 counting the drawers, unloading the truck,
18 stocking shelves, getting change, going to
19 the bank.
20 Q.   What would you do when you
21 went to the bank?
22 A.   Well, to this day, Lynda still
23 hasn't told me which bank we used, so I

Page 35

1  just had to pick one.  We would like --
2  you would have to have extra change for
3  your drawers, you know, extra quarters,
4  dimes, nickels, dollars, and I would take
5  out of the safe and go to the bank and get
6  extra change.  Swapping big money for
7  little money.
8  Q.   Did you ever make any store
9  deposits at a bank?
10 A.   Yeah, I made one.
11 Q.   Just one?
12 A.   Yeah.  And like I say, I had
13 to get -- Lynda still hadn't told me which
14 bank we used, and there is two in
15 Ranburne, but she got on to me for not
16 making the deposit on time.  And I'm like
17 well, which bank do we use?  She still
18 hasn't told me.
19 Q.   Did you have a deposit slip
20 that you used?
21 A.   Yes, sir.
22 Q.   Doesn't the deposit slip have
23 the bank's name on it?

Page 36

1  A.   I don't know if it did or not.
2  It was a new store, all of that was new,
3  so I don't remember.
4  Q.   Okay.  Anything else that you
5  did in your job as the assistant there at
6  the Ranburne store that you can remember?
7  A.   I swept the parking lot,
8  rolled in buggies.  Oh, we had a trash bin
9  out back, and the lady that lived behind
10 Dollar General, her name is Mama
11 Dalrymple, that's what everybody calls
12 her, and she was real funny about her
13 yard.  And I always, always made sure
14 there was no trash in Mama Dalrymple's
15 yard.
16 Q.   Did you ever deal with her
17 when she came in the store and complained?
18 A.   Oh, yes, sir, all the time.
19 Like I said, I made sure there wasn't any
20 trash in her yard.  You can't blame her.
21 I wouldn't have wanted it --
22 Q.   And that was in Ranburne,
23 right?

Page 37

1    A.   Yes, sir.
2    (Whereupon, Defendant's
3    Exhibit 1 was marked for
4    identification.)
5    Q.   I'm going to show you, Ms.
6  Crews, what I'm marking as Defendant's
7  Exhibit 1 and let you look at that
8  multipage exhibit.  And let me know if you
9  recognize that as being some of the
10  deposit slips that you completed --
11    A.   Yes, sir, that looks like my
12  writing.
13    Q.   -- and submitted to Colonial
14  Bank?  Do you see that?
15    A.   Yes, sir.
16    Q.   So would that be the bank
17  where you deposited that money?
18    A.   It was, uh-huh.
19    Q.   Okay.  And did Ms. Hall ever
20  meet with you about these deposits not
21  being done properly?
22    A.   She said something one time,
23  one was did wrong.  I messed something up

Page 38

1  on it, I don't even remember.
2    Q.   Okay.  So she counseled you
3  about that?
4    A.   She said something about it
5  one time.  I wouldn't call it counseling.
6    Q.   What would you call it?
7    A.   She talked to me about it.
8    Q.   Okay.  About your error?
9    A.   Uh-huh.
10    Q.   Is that a yes?
11    A.   Yes, sir.
12    Q.   Now, when you were first hired
13  back in January of 2003, you signed an
14  acknowledgment form stating that you
15  received and understood Dollar General's
16  employment handbook, correct?
17    A.   Yes, sir, we all had to.
18    (Whereupon, Defendant's
19    Exhibit 2 was marked for
20    identification.)
21    Q.   Let me show you what I'm
22  marking as Defendant's Exhibit 2, and it's
23  a multipage exhibit, and ask that you

Page 39

1  please take a look at that and let me know
2  if you recognize that as being several
3  various employee acknowledgments that you
4  signed during your employment with Dollar
5  General.
6    A.   (Reviewing document.)  Yes,
7  sir.
8    Q.   Each page of Defendant's
9  Exhibit 2?
10    A.   (Reviewing document.)  Yes,
11  sir.
12    (Whereupon, Defendant's
13    Exhibit 3 was marked for
14    identification.)
15    Q.   I'm going to show you what I'm
16  marking as Defendant's Exhibit 3.  You
17  received Dollar General's employee
18  handbook itself, correct?
19    A.   Yes, sir, I did.
20    Q.   Does Defendant's Exhibit 3
21  look like the one you received during your
22  employment?
23    A.   (Reviewing document.)  It

Page 40

1  looks kind of like this, uh-huh.
2    Q.   And I will represent to you
3  that is just a Xerox copy of an original.
4    A.   Uh-huh.  I don't remember it
5  being this thick, but it just may be the
6  paper.
7    Q.   Yes, I will represent -- the
8  original probably -- you correct me if I
9  am wrong, but the original probably had
10  front and back printing on the pages.
11  That one is just a duplicate that was
12  printed off using just one side of each
13  page, so it probably is thicker in that
14  sense.  Is that --
15    A.   Yes, that's probably true,
16  yes, sir.
17    Q.   I notice you made a notation
18  on there?
19    A.   Oh, I'm sorry.  I don't get to
20  keep this?
21    Q.   Well, no, you don't.  But what
22  did you just circle?
23    MR. SHAUL:  Go ahead and

JOY CREWS
DOLGENCORP, INC.

JOY CREWS
September 14, 2006

(Pages 41 to 44)

Page 41

1    initial that so you will know --
2        Q.    What page is that?
3        A.    Forty-four.
4        Q.    What are you are circling?
5        A.    Unwanted touching of another
6    person or unwanted intentional physical
7    contact, including patting, pinching,
8    brushing up against another person's body.
9        Q.    Why did you circle that?
10        A.    Vivian grabbed me by my breast
11    one day.
12        Q.    Was it intentional?
13        A.    Yes, sir.
14        Q.    How do you know it was
15    intentional?
16        A.    Because she was standing there
17    in front of me and went like that, I mean
18    (indicating).  That's hard not to be
19    intentional.
20        Q.    What was -- I mean, what was
21    the reason for doing it, if you know?
22        A.    Yes, I do.  There was a couple
23    in the parking lot, evidently they were

Page 42

1    making out, and she came back there and
2    told me about it and was showing me what
3    the man done.  And that's what she done.
4        Q.    Okay.  How did you respond?
5        A.    I was floored.  I didn't know
6    what to say.  I just turned around and
7    left.
8        Q.    When did that happen?
9        A.    I don't know, about a year
10    before I went to Ranburne.
11        Q.    Okay.  Did you complain to
12    anybody about it?
13        A.    Just my husband.
14        Q.    Did it offend you?
15        A.    Very much so.
16        Q.    Any particular reason why you
17    didn't call the ERC line, if you know what
18    that is?  Do you know what I mean by the
19    ERC line?
20        A.    I didn't then, but I do now,
21    yes, sir.
22        Q.    You had signed off on the
23    acknowledgments on Defendant's Exhibit

Page 43

1    2 --
2        A.    I know what the EEOC is.  Is
3    that the same --
4        Q.    Well, no.  Let me ask you if
5    you know what I mean by the ERC line?
6        A.    I don't.
7        Q.    Employee Relations -- I'm
8    sorry, Employee Response Center at Dollar
9    General has a toll-free number you can
10    call and complain about anything.  Do you
11    know what I'm talking about?
12        A.    No, sir.
13        Q.    Have you ever called the
14    Employee Response Center?
15        A.    I did one time.
16        Q.    I'm going to show you what has
17    been marked as Defendant's Exhibit 2, and
18    it is the third and fourth pages of
19    Defendant's Exhibit 2 where you signed off
20    your written acknowledgment stating that
21    you understand that you are to complain to
22    that toll-free number at the Employee
23    Response Center, you see there at the top

Page 44

1    paragraph?
2        A.    I see it, yes, sir.
3        Q.    Okay.  But it's your testimony
4    today that after Ms. Keith in your view
5    inappropriately touched you, you never
6    called that number to complain?
7        A.    No, sir, I didn't.
8        Q.    Okay.  Any particular reason
9    why?
10        A.    I needed my job for the
11    insurance.
12        Q.    Did she ever do that again to
13    you?
14        A.    No, sir.
15        Q.    Did you tell her not to do it
16    again?
17        A.    I didn't say anything.
18        Q.    Did anybody witness it?
19        A.    No, sir, I don't think they
20    did.
21        Q.    Anybody else in the store at
22    the time?
23        A.    Yes, sir.  I was in the back,

Tyler Eaton Morgan Nichols & Pritchett, Inc.

JOY CREWS
DOLGENCORP, INC.

JOY CREWS
September 14, 2006

(Pages 45 to 48)

Page 45

1 in the stockroom loading the float to be
2 stocking shelves.
3     Q.   Who else was in the store
4 besides you and Vivian?
5     A.   There was a clerk up front.
6 There was probably somebody else on the
7 floor stocking, I'm just guessing, I can't
8 remember.  But that was like -- on days we
9 stocked there was usually two or three
10 stocking.
11     Q.   Okay.  Now, as part of that
12 Defendant's Exhibit 2 on the first page
13 there, you signed -- at the top do you see
14 the Wage and Hour acknowledgment?
15     A.   Uh-huh.
16     Q.   -- stating your understanding
17 that working off the clock is a violation
18 of company policy, among other things,
19 correct?
20     A.   I see that, yes, sir.
21     Q.   Okay.  And you signed that
22 back in January of 2003, correct?
23     A.   Yes, sir.

Page 46

1     Q.   During your employment with
2 Dollar General, did you ever have a
3 positive drug test?
4     A.   No, sir.
5     Q.   Did you --
6     A.   Well, they said I did the last
7 one that I took, but they never showed me,
8 let's put it that way.  And it was like a
9 hundred and thirty days after I drug
10 tested.
11     Q.   A hundred and thirty days
12 after you tested --
13     A.   Drug tested, yes, sir.  Okay.
14 Let me back up.  When I went to the
15 Ranburne store to be -- to move up in
16 position, to go from third key to
17 assistant manager, I had to take a drug
18 test.  And I did, I went to Carrollton and
19 took it.  And the day I quit, which was
20 July the 15th -- 18th -- 15th, 18th, I
21 called Norman that day to ask him about my
22 vacation pay again, and he told me that I
23 had failed that drug test.  And I just

Page 47

1 told him flat out he was lying.  Why wait
2 a hundred and thirty something, forty
3 something days and tell me?  I don't
4 believe that.  It don't take a hundred and
5 forty days to get a drug test back.
6     Q.   So what is your best judgment
7 -- if that was in mid-July of 2005 when
8 you had that conversation with Mr.
9 Kennessey, what is your best judgment as
10 to when you took that drug test?
11     A.   It was right -- it was when
12 the store -- I'm sorry.  It was when the
13 store in Ranburne first started up is when
14 I took my drug test.
15     Q.   When you were there for the
16 setup process?
17     A.   Yes, sir.
18     Q.   So that would have been end of
19 April, early May 2005?
20     A.   Uh-huh.
21     Q.   And that's when you took that
22 drug test and failed?
23     A.   Uh-huh.

Page 48

1     Q.   Is that right?
2     A.   That's the drug test I took
3 that they said I failed.  I haven't seen
4 any of it and I have asked for it.
5     Q.   Okay.  Who did you ask for it?
6     A.   Norman.  I called the place I
7 drug tested too.  And they said they
8 weren't allowed to give it to me.  And I'm
9 like well, why not?  It's my drug test.
10 And I still haven't seen it.
11     Q.   Okay.  Well, you weren't
12 terminated for a positive drug test, were
13 you?
14     A.   No, I quit, but he told me I
15 was going to be terminated because of
16 that.
17     Q.   Okay.  And did you go take a
18 retest?
19     A.   Uh-uh.
20     Q.   You never retested?
21     A.   Uh-uh.  I took two that day.
22 But, no, I never went back, uh-uh.
23     Q.   Well, the two that you took

Page 49

1  that day, do you know if one of the two
2  was a negative test?
3      A.   It was too warm, she said.
4  And she asked me if I was sick.  And I
5  told her I was, I was very sick.  I had an
6  allergy infection.  And I told her she was
7  more than welcome to take my temperature
8  or whatever she needed to do.  And she
9  wanted me to sit in the lobby and drink a
10  bunch of water, and I did.  I sat in the
11  front of a big fan and drank a bunch of
12  water.  It was real hot that day, and
13  there was no air in that building that
14  day.
15      Q.   That was in Carrollton?
16      A.   Yes, sir.  And I went -- I sat
17  right there a while and drunk a bunch of
18  water, and I went and took another one.
19      Q.   Took another test?
20      A.   Yes, sir.
21      Q.   Okay.  Do you know what the
22  results of that test were?
23      A.   No, sir, other than what they

Page 50

1  told me.
2      Q.   Did they tell you?
3      A.   They didn't.  Norman told me I
4  had failed.
5      Q.   Okay.  Did Norman tell you
6  that you had failed both of them or just
7  the first one?
8      A.   No, he just said I had failed
9  my drug test.
10      Q.   Okay.  And you didn't get any
11  other specific information as to whether
12  you failed the second test, for example?
13      A.   No, I just told him he was
14  lying.
15      Q.   Okay.  And as best as you
16  recall, you were not terminated for
17  failing a drug test, correct?
18      A.   No, I quit.  But he told me
19  they were going to terminate me because of
20  it.
21      Q.   Okay.  Now, I think you
22  testified earlier that your ending rate of
23  pay with Dollar General was seven fifty an

Page 51

1  hour, is that right?
2      A.   It was, yes, sir.
3      Q.   I'm just -- you know, I will
4  take you at your word, obviously, but my
5  records show that it was actually seven
6  twenty-five per hour was your ending rate
7  of pay.
8      A.   Maybe that was it.  It has
9  been a while.  I thought it was seven
10  fifty.
11      Q.   Okay.  Is it possible it was
12  seven twenty-five?
13      A.   That is possible, yes, sir, it
14  is.
15      Q.   Okay.  And that last raise to
16  seven twenty-five per hour, would that
17  have been back in mid-January of 2005?
18      A.   It was, because it was right
19  after my hire-on date, yes, sir.  So you
20  are probably right, then.
21      Q.   Now, how was your time at
22  Dollar General kept?  In other words, your
23  hours worked, how were they kept track of

Page 52

1  by the company?
2      A.   We clocked in on a register.
3      Q.   Did you have a code or -- how
4  did you clock in on the register?
5      A.   By the last four numbers of
6  our Social Security number.
7      Q.   So it was your responsibility
8  to clock in and then clock out?
9      A.   Uh-huh.
10      Q.   Is that a yes?
11      A.   Yes, sir, it is.  But Vivian
12  changed that, I mean -- she did.
13      Q.   Tell me about the change.
14  Vivian Keith changed that?
15      A.   Yes.  She had main access to
16  the whole computer, she could look at any
17  of it.  And I have never been one to be
18  late.  I have always been on time and
19  always will be there ten or fifteen
20  minutes early, and I just clock in and go
21  to work.  And she would change that a lot
22  of times to straight up 4 or straight up 8
23  or whatever time it was I was supposed to

JOY CREWS
DOLGENCORP, INC.

JOY CREWS
September 14, 2006

(Pages 53 to 56)

Page 53

1  be there.  But if you are there and people
2  are asking you to do stuff, you need to
3  get paid for it.  And Dollar General runs
4  a tight budget on their payroll hours.  I
5  mean, very tight.  It's ridiculous.
6      Q.    Okay.  From the beginning of
7  your employment at Dollar General, you
8  understood that you were supposed to
9  formally complain about any discrimination
10  that you were subjected to, correct?
11      A.    I understood that, yes.  But I
12  knew how Vivian was.  She was a very
13  vindictive woman.  I seen her accuse
14  several of stealing until it run them off.
15  If she didn't like you, that was just it.
16      Q.    You understood that you could
17  complain to the Equal Employment
18  Opportunity Commission, correct?
19      A.    The EEOC?
20      Q.    Right.
21      A.    Yes.  That was later, though.
22      Q.    Okay.  And you understood that
23  the EEOC would investigate any age

Page 54

1  discrimination claims that you would
2  bring?
3      A.    Yes, sir.  That was later,
4  yes, sir, way later.  It was towards the
5  end of my employment with Dollar General
6  that I found out about the EEOC.
7      Q.    And during your employment
8  with Dollar General, did you ever complain
9  to the Employee Response Center at Dollar
10  General about the --
11      A.    I did call them about Vivian
12  one time, I sure did.
13      Q.    About age discrimination?
14      A.    No.
15      Q.    Okay.  What did you complain
16  about Vivian about?
17      A.    Money missing out of the safe.
18      Q.    Do you remember when that was?
19      A.    No, sir, I don't.  She wrote
20  me up for it.  You should have a record of
21  it.
22      Q.    Did you see that in the
23  documents that Dollar General produced to

Page 55

1  your lawyer?
2      A.    No, sir.  I probably got a
3  copy of it, though, in some of my papers.
4  No?  Okay.  No, I don't.
5      Q.    This diary that you brought
6  with you today --
7      A.    It's just stuff that happened
8  over two years that I worked there.
9      Q.    When did you start keeping
10  that diary?
11      A.    Oh, a long time ago.  This one
12  -- well, this one I just wrote, but I had
13  one I kept up with all kind of stuff in.
14      Q.    Where is that one now?
15      A.    You still got it, the copies
16  out of that page -- out of that notebook?
17  I gave them with --
18          MR. SHAUL:  I will have to
19  call and check.
20      Q.    Let me ask you this.  When did
21  you first start keeping that diary?  Was
22  that in regard to your employment with
23  Dollar General?

Page 56

1      A.    It was, yes, sir.
2      Q.    When did you first start
3  keeping that diary, making notations?
4      A.    I don't remember the exact
5  date.  I just remember when things kind of
6  got ugly, I started keeping up with
7  things.
8      Q.    When did things start getting
9  ugly?
10      A.    I don't remember the exact
11  date.
12      Q.    How did things start getting
13  ugly?
14      A.    Just with Vivian making side
15  remarks, talking about me to other
16  employees.  Like I told you, her getting
17  ugly with an eighty-five-year-old woman,
18  just stuff like that.
19      Q.    And this was back at the
20  Georgia store?
21      A.    Bowdon store, yes, sir.
22      Q.    And what were some of the
23  things that you put in the notebook or the

Page 57

1  diary?
2     A.   Well, that about the -- her
3  grabbing me by the breast and -- I don't
4  know, I will just have to look at it.
5  Changing hours and all kind of stuff that
6  I didn't think was right, I mean --
7     Q.   Anything in there about age
8  discrimination?
9     A.   Uh-uh. That didn't happen in
10  the Bowdon store.
11     Q.   Anything in that diary with
12  regard to when you clocked in, when you
13  clocked out or when you reported to work
14  or when you didn't report to work on
15  particular days?
16     A.   Yeah. Yes, sir.
17     Q.   Okay. And is that information
18  contained in this diary you brought with
19  you today?
20     A.   Some of it is, yes, sir.
21     Q.   Why don't we take a quick look
22  at that, if we can.
23     MR. SHAUL: Stay on the record

Page 58

1  a second. Let me ask you a question. We
2  keep referencing a diary. And this green
3  book or whatever this is, it's a spiral
4  notebook with green and there are notes in
5  here, when did you start writing notes in
6  this book?
7     A.   In this one in particular?
8     MR. SHAUL: Yes.
9     A.   I don't know, probably three
10  or four months ago in that one.
11     MR. SHAUL: So that was after
12  we filed the lawsuit?
13     A.   Yes, sir.
14     MR. SHAUL: So I don't think
15  you are entitled to any of this
16  information.
17     MR. DEERING: Okay, that's
18  fine. But she has already testified about
19  a diary that she produced to her lawyer.
20     MR. SHAUL: Certainly you are
21  entitled to that. Let me call Beth and
22  see if we got that -- let's go off the
23  record.

Page 59

1     (Off-the-record discussion.)
2     Q.   Now, with regard to that, the
3  earlier diary before you filed this
4  lawsuit that you testified about that you
5  ripped pages out and gave to your lawyer,
6  about how many pages did you rip out of
7  the diary to give to your lawyer?
8     A.   I'm guessing now.
9     Q.   Just your best judgment.
10     A.   Seven, eight.
11     Q.   Is that front and back? Did
12  you write on the front and back?
13     A.   I'm thinking, I'm thinking.
14  It might have been. That's just guessing,
15  though.
16     Q.   Okay. Sitting here today, do
17  you wish you had called the Employee
18  Response Center to complain about age
19  discrimination?
20     A.   Well, like I said, that came
21  later in the Ranburne store. But, yeah,
22  hindsight is 20/20, and I wish I had done
23  a whole lot of things different.

Page 60

1     Q.   Had you ever worked as an
2  assistant manager or a lead store clerk
3  before you came to Dollar General?
4     A.   No, sir. But I'm so good with
5  the public.
6     Q.   Now, the EEOC investigated
7  your complaint of age discrimination,
8  correct?
9     A.   She did or -- yes, sir.
10     Q.   And the EEOC did not conclude
11  that discrimination occurred, right?
12     A.   That is what she said, yes,
13  sir. But she did grant me the right to
14  sue.
15     Q.   Well -- okay. And during the
16  time that you worked at Store 5842, the
17  one there in Ranburne, who were the other
18  Dollar General employees that you mainly
19  worked with after setup?
20     A.   Okay. Carly Cornwell,
21  Jennifer -- I can't think of her last
22  name, and Mildred -- I can't think of her
23  last name. And John, I can't think of his

Page 61

1  last name.  And there was a couple more.
2  That's all I can think of just right now.
3  I will think on it for you.
4      Q.    During your time -- the time
5  you worked at Dollar General, did you ever
6  receive any reprimands or counseling with
7  regard to your job performance?
8      A.    While I was in Ranburne?
9      Q.    While you were employed by
10  Dollar General.
11      A.    There was that one time I told
12  you about I was wrote up.
13      Q.    By Vivian?
14      A.    Yes, sir.
15      Q.    And what was the substance of
16  that write-up?
17      A.    There was forty dollars
18  missing out of the safe.
19      Q.    That you were responsible for?
20      A.    Yes, sir.
21      Q.    And that's the only time that
22  you were disciplined or counseled?
23      A.    That's the only time that I

Page 62

1  had ever signed anything being wrote up,
2  yes, sir.  Sunday was our truck day, and
3  that was when we all was there to unload
4  the truck.  And then we took turns working
5  on that Sunday.  After we got the truck
6  unloaded, you could go home unless it was
7  your turn to work all day.  And the day
8  the money went missing was my day to be
9  there all day.
10      And another note, it was Dollar
11  General's policy not to bring your purses
12  into the work area with you, and I always
13  left mine in the trunk of the car.  And
14  Vivian Keith and Talisha Blackwelder both
15  left theirs in the office that day.  So
16  both of them had to go back in the office
17  to get their purse before they left.
18      (Whereupon, Defendant's
19      Exhibit 4 was marked for
20      identification.)
21      Q.    Okay.  I am going to show you
22  what I marked as Exhibit 4.  If you will
23  take a look at that two-page exhibit and

Page 63

1  let me know if you recognize these --
2      A.    I do.  And I did not sign it.
3  I told you that other one is the only one
4  I signed.
5      Q.    Is there any reason why you
6  did not sign the first page of Defendant's
7  Exhibit 4?
8      A.    Uh-huh.
9      Q.    Why?
10      A.    Okay.  This was on a Monday --
11  yeah, okay.  Our truck came in on Sunday
12  and we unloaded it, and we made it a habit
13  to come in on Monday morning at 6:00.  And
14  I went in on Monday morning at 6:00 and we
15  just went straight to work and I never
16  thought any more about it.  Well, in the
17  same breath, my assistant manager came in,
18  which was Gigi, and she didn't take it
19  either.  And she didn't write her up.
20  They -- let me back up.  Norman -- not
21  Norman.  Jerry Payne, which was the DM in
22  that area at the time, told Vivian to
23  write me up, that he would handle Gigi,

Page 64

1  and I thought that wasn't fair.  If you
2  are going to write me up for it, write her
3  up for it.  So when they didn't write Gigi
4  up, I told her flat out I refused to sign
5  it.
6      Q.    Well, didn't you just testify
7  that the district manager was going to
8  write up Gigi?
9      A.    No, he said he would handle
10  it.
11      Q.    Do you know whether he handled
12  it in any way?
13      A.    No, he never did.  He never
14  said anything to Gigi.
15      Q.    Did you ever ask him if he
16  said anything to --
17      A.    I asked Gigi.  And me and her
18  is friends to this day.
19      Q.    Okay.  But you were
20  responsible for getting that deposit to
21  the bank on -- was it on Monday?
22      A.    I was until Gigi got there at
23  whatever time she was, and then it was on

JOY CREWS
DOLGENCORP, INC.

Page 65

1  her.
2      Q.    Let's look at the second page
3  of Defendant's Exhibit 4.  And this is a
4  progressive counseling record you
5  receive --
6      A.    This is the one I signed, yes,
7  sir, about the money being short.
8      Q.    Okay.  I believe you testified
9  earlier that you thought it was forty
10  dollars that was short.  It was actually
11  sixty, is that correct?
12      A.    I thought it was forty, but
13  our safe was supposed to be kept at a
14  certain amount, and I have seen Vivian
15  borrow money from it time and time again
16  to eat lunch on, so you never could count
17  on what exactly was supposed to be in that
18  safe.  I've also seen her put two hundred
19  dollars back in it at two different times
20  too.  So, you know --
21      Q.    Okay.  But you signed this
22  particular --
23      A.    Yes, I signed this one.  And

Page 66

1  if you see at the bottom I said if you
2  want a comment from me, call me and I will
3  be glad to tell you.  And they never
4  called.  So if you will check your records
5  at home office, you will find out I did
6  call the home office and talked to them
7  about this.  Okay.  They told me that I
8  would have to talk to Jerry Payne and he
9  would call me within three days.  He did
10  call me within three days, and he told me
11  no matter how many times I called
12  corporate, I would always have to go
13  through him.  So that told me all I needed
14  to know.  I was wasting my time.
15          MR. DEERING:  Move to strike
16  as not responsive.
17      Q.    Ms. Crews, it was shortly
18  after, like within a couple to three weeks
19  after that counseling that you signed off
20  on from Ms. Keith, that you transferred to
21  the Ranburne store, correct?
22      A.    Uh-huh.
23      Q.    Prior to going to the Ranburne

Page 67

1  store --
2      A.    Yes, sir.
3      Q.    -- do you recall ever
4  explaining to Mr. Kennessey that you had
5  just received a written counseling from
6  Ms. Keith with regard to money missing in
7  the safe?
8      A.    Ask me that again.  Did I tell
9  Norman what?
10      Q.    Did you ever tell Mr.
11  Kennessey prior to your going to Ranburne
12  that you had been written up in April of
13  2000 --
14      A.    Now, that I don't remember.  I
15  don't know if he asked me, I don't
16  remember.  I don't know.
17      Q.    Okay.  But you made it clear
18  to Mr. Kennessey that you wanted to
19  transfer to that Ranburne store, correct?
20      A.    Yes, sir.  Like I told you, if
21  Vivian didn't like you, she would accuse
22  you of stealing until you were out of
23  there.

Page 68

1      Q.    She never did that, did she --
2      A.    Yes, sir.
3      Q.    -- in regard to you?
4      A.    Right there it is
5  (indicating).
6      Q.    Okay.  But you voluntarily
7  transferred to the Ranburne store,
8  correct?
9      A.    Yeah, to get out from under
10  her.  That's the way she run Robin off,
11  that's the way she run Vanessa Johnson
12  off.  I seen it too many times.  Power
13  goes to a lot of people's heads.
14          (Whereupon, Defendant's
15          Exhibit 5 was marked for
16          identification.)
17      Q.    I want to show you what I'm
18  marking as Defendant's Exhibit 5 and let
19  you take a look at that.  Let me know if
20  you recognize that as being the charge of
21  discrimination that you filed with the
22  EEOC back in June of 2005 against Dollar
23  General.

JOY CREWS
DOLGENCORP, INC.

JOY CREWS
September 14, 2006

(Pages 69 to 72)

Page 69

1    A.    It looks like it, yes, sir.
2    Q.    I would like to direct your --
3  by the way, you signed this on June 29,
4  2005, stating that you declare under
5  penalty of perjury that everything above
6  it is true and correct, is that right?
7    A.    To the best of my ability,
8  yes, sir.
9    Q.    Do you see that last sentence
10  of the first paragraph, I have never been
11  disciplined for performance or attendance
12  related problems since being employed with
13  the company?
14    A.    I see that.
15    Q.    That's not true, that's
16  inaccurate, correct?
17    A.    Well, I guess according to
18  that over there, I guess that would be
19  incorrect.
20    Q.    Is there anything else that's
21  incorrect in that Defendant's Exhibit 5?
22    A.    If you will hold on a minute,
23  I will read it.  (Reviewing document.)  I

Page 70

1  told her about these dates was on or
2  about, that I, you know, was just guessing
3  at them.  Okay.  What do you want to know?
4  Ask me that again.
5    MR. DEERING:  Can you read
6  that back for her?
7    (Record read.)
8    A.    Not that I can see right off,
9  no, sir.  I'm still looking.
10    Q.    Thank you.  Did you get along
11  with Lynda Hall okay?
12    A.    To start with I did.
13    Q.    And at some point something
14  happened?
15    A.    Yeah, it was after Norman went
16  to the Bowdon store.
17    Q.    Norman went to the Bowdon
18  store?
19    A.    Uh-huh.
20    Q.    Tell me what happened between
21  you and Ms. Hall that you described.
22    A.    Well, she just told me one day
23  that she didn't no longer want me as part

Page 71

1  of her management team.
2    Q.    Did she give you a reason?
3    A.    No.
4    Q.    Did she and Mr. Kennessey meet
5  with you with regard to why they didn't
6  want you as part --
7    A.    They did, in the office,
8  uh-huh.
9    Q.    Do you remember what day it
10  was?
11    A.    No, sir, I don't.
12    Q.    When was the last time you saw
13  Lynda Hall?
14    A.    It was one day at the store
15  before I quit.
16    Q.    You haven't seen her since?
17    A.    Uh-uh.  No, sir.
18    Q.    How about Vivian Keith, when
19  was the last time you saw her?
20    A.    The other day in Bowdon, she
21  was sitting on the sidewalk smoking.
22    Q.    At the store?
23    A.    No, sir, at a restaurant.

Page 72

1    Q.    Did you talk to her?
2    A.    No, sir.
3    Q.    Now, you resigned your
4  employment with Dollar General effective
5  July 15, 2005, correct?
6    A.    Yes, sir, it was the 15th or
7  the 18th one, thereabout.
8    Q.    I think you said it was a
9  Friday, is that right?
10    A.    The 15th was on a Friday.  And
11  it was either that Friday or Monday the
12  18th.  I can't remember which day I quit.
13    Q.    Okay.  Why did you quit?  Did
14  you already have a job lined up?
15    A.    Well, not to start with, no, I
16  didn't.  She cut my hours from forty to
17  fifteen a week.  And like I say, fifteen
18  hours a week don't buy a lot of groceries.
19    Q.    Is that -- when you say she,
20  you are talking about Ms. Hall?
21    A.    Lynda Hall, uh-huh.
22    Q.    And that was after she and Mr.
23  Kennessey met with you as to why they

Page 73

1    didn't want you as part of the management
2    team?
3        A.    It was before then she cut my
4    hours.
5        Q.    How soon before?
6        A.    I don't know, a couple of
7    weeks. I don't remember. It was -- I
8    didn't work in Ranburne that long.
9        Q.    Right.
10       A.    Three, four months, I don't
11   remember how long I worked there exactly.
12   Maybe four months that I worked there.
13       Q.    Well, you went on vacation on
14   July 9, 2005, correct?
15       A.    Yes, sir, to the 15th.
16       Q.    To the 15th?
17       A.    Yes, sir.
18       Q.    And we have already
19   established that you went to the Ranburne
20   store to help with setup about April 30th
21   of 2005, correct?
22       A.    Yes, sir, thereabout, uh-huh.
23       Q.    So we've got the full month of

Page 74

1    May, the full month of June and a little
2    bit more than the first week of July that
3    you would have been at that Ranburne
4    store, correct?
5        A.    Yes, sir.
6        Q.    Who did you tell that you
7    wanted to resign?
8        A.    I told Lynda Hall.
9        Q.    Did you call her on the phone?
10       A.    I did.
11       Q.    And was she at the store when
12   you called?
13       A.    I think she was, uh-huh.
14       Q.    But you called her at the
15   store, correct?
16       A.    Yes, sir, I think it was at
17   the store. I'm not sure, but I think so.
18       Q.    Okay. And tell me what was
19   discussed between the two of y'all during
20   that telephone conversation.
21       A.    I just told her that I didn't
22   like working for liars and I quit.
23       Q.    Anything else?

Page 75

1        A.    That was about it.
2        Q.    Did she say anything else?
3        A.    Not that I remember.
4        Q.    Did you raise your voice to
5    Ms. Hall?
6        A.    No, sir.
7        Q.    Make any threats?
8        A.    No, sir.
9        Q.    Now, correct me if I am wrong,
10   but my understanding was that you are
11   contending in this lawsuit that you were
12   not promoted to an assistant manager
13   position because of your age; is that your
14   claim in this case?
15       A.    I was her assistant for
16   several weeks while the store was being
17   brought up. And then she told me she no
18   longer wanted me as part of her management
19   team, that she didn't have time to
20   properly train me is what she told me.
21       Q.    Okay. And was this when she
22   was counseling you on your substandard job
23   performance when she said that to you?

Page 76

1        A.    No, it was just in the middle
2    of the floor in the store one day.
3        Q.    Okay.
4        A.    Well, they was -- let me back
5    up. They was training a man for an
6    assistant job in another store, and she
7    had borrowed my keys from me to give to
8    him to open that store with, and that was
9    when she told me.
10       Q.    Do you remember when that was,
11   specifically?
12       A.    No, I don't.
13       Q.    Do you remember what month it
14   was?
15       A.    It wasn't but about, I don't
16   know, probably three or four weeks before
17   I quit.
18       Q.    Okay.
19       A.    It wasn't long after she cut
20   my hours I quit. I mean, when you cut
21   your hours from full time to part time,
22   there went my 401-K, my insurance, all of
23   that.

JOY CREWS
DOLGENCORP, INC.

JOY CREWS
September 14, 2006

Page 77

1    Q.    Okay.  Now, did that change --
2    now, I'm trying to get a time line here.
3          Do you recall when it was that
4    Mr. Kennessey and Ms. Hall met with you
5    with regard to them not wanting you to be
6    part of the management team?  That did
7    happen, correct?
8    A.    It did, uh-huh.
9    Q.    If I told you that our records
10   show that that occurred on June 3rd of
11   2005, would that be about --
12   A.    That would be about right.
13   About right.  Yeah, I can't swear either
14   way --
15   Q.    Sure.
16   A.    -- you know, to one date or
17   another, but I'm saying yes, that would be
18   about right.
19   Q.    Okay.  And before that meeting
20   with Mr. Kennessey and Ms. Hall, is it
21   fair to say that Ms. Hall had previously
22   verbally counseled you on your substandard
23   job performance at the Ranburne store?

Page 78

1    A.    She had told me -- I never
2    closed the store to suit her, I will put
3    it that way.  She always had complaints
4    about my recovery, the floor wasn't
5    mopped, which I did every night.  And we
6    was open several weeks before we had our
7    grand opening, and I closed the store the
8    day of the grand opening.  And the next
9    morning me and her was there together and
10   I said Lynda, you have -- every time that
11   I have closed this store, it has never
12   suited you.  Since you are here with me
13   right now, walk me through this store and
14   show me what you don't like.  And we did.
15   We walked through the whole store, and she
16   couldn't show me not one thing.
17   Q.    Don't you recall Ms. Hall
18   going up and down the aisles with you and
19   walking you through the store and asking
20   you why trash was still in the floor --
21   A.    There wasn't any trash in the
22   floor.  No, sir, there was not.
23   Q.    Do you recall --

Page 79

1    A.    I picked all of my trash up.
2    When I stocked the shelves, I put it back
3    on the float and took it to the back.
4    Q.    And it is your testimony under
5    oath that she never talked with you about
6    trash being in the floor after she told
7    you --
8    A.    She told me about trash -- no,
9    not in the floor.  She said something
10   about me not breaking the boxes down.  But
11   I did break them down.  What I'd do was
12   leave one big one and break all of the
13   other ones down and put it in that big one
14   until it was full.  So I took it that was
15   what it was about.
16   Q.    And do you recall Ms. Hall
17   going over the deposits for which you were
18   responsible that were done incorrectly?
19   A.    Yes.  Now, that we did go
20   over.
21   Q.    Do you recall Ms. Hall walking
22   the store with you to go over the face
23   fronting of merchandise after she

Page 80

1    discovered you had not been properly
2    making sure the task was being done?
3    A.    We walked the store that
4    morning after the grand opening, and she
5    couldn't show me anything I had not done.
6    Q.    So it is your testimony that
7    she did not show you that you were not
8    properly face fronting merchandise?
9    A.    She told me what face fronting
10   and all of that meant and her definition,
11   and I did it.  Like I said, she couldn't
12   show me not one thing the morning after
13   that that was not to her liking.
14   Q.    Do you recall an occasion when
15   you were working as the lead and a DG -- a
16   Dollar General employee was using
17   profanity in front of customers --
18   A.    I wasn't there that day.  Are
19   you talking about -- what was her name?
20   She fired her because of it.
21   Q.    Right.
22   A.    No, I did not hear that that
23   day.

JOY CREWS
DOLGENCORP, INC.

Page 81

1     Q.    It is your testimony under
2 oath today that you were not there when
3 she was using profanity in front of
4 customers --
5     A.    If I was, I didn't hear it.
6 I'm saying I didn't hear it. I don't know
7 if I was there or not. That was the talk
8 of the store the next day, and I knew
9 Lynda had fired her. But I don't remember
10 if I was there or not. I didn't hear the
11 cussing.
12     Q.    Do you recall Ms. Hall asking
13 you about the incident the following day?
14     A.    Yes. She asked me about it.
15     Q.    How did you respond?
16     A.    I think I told her the same
17 thing I just told you, because I didn't
18 hear it.
19     Q.    But you were the supervisor on
20 duty when that occurred, correct?
21     A.    No, I can't swear that I was.
22 I don't remember. I remember hearing
23 everybody talk about the girl cussing and

Page 82

1 Lynda firing her. But, no, I didn't hear
2 any of that.
3     Q.    Okay. Did Ms. Hall have a
4 conversation with you about what happened?
5     A.    She did tell me that she
6 wasn't going to tolerate cussing, yeah.
7     Q.    Did she counsel you in any way
8 verbally with regard to how you handled
9 it --
10     A.    We talked about it. Now, if
11 that is her way of saying counseling, it
12 may be. It wasn't mine. I don't know.
13     MR. SHAUL: You know what
14 question he is going to ask you, but let
15 him finish it before you start your
16 answer. It makes it hard on her. Okay?
17     A.    Okay. I'm sorry, Gail.
18     MR. SHAUL: He will give you
19 plenty of time to answer after the
20 question. You are kind of talking over
21 each other.
22     A.    Okay.
23     Q.    Now, it's because of all of

Page 83

1 those issues that Ms. Hall had with you
2 that -- with your job performance that you
3 were not promoted to that assistant
4 manager position, correct, or that you
5 were not retained in that position?
6     A.    I don't know. That's -- you
7 will have to ask her that.
8     Q.    Okay. But it is your
9 testimony that district manager Norman
10 Kennessey and Lynda Hall both met with you
11 and explained that your poor job
12 performance was the reason you were not
13 going to be in that position?
14     A.    She didn't say poor job
15 performance. She was upset about that
16 deposit slip, and that was all they talked
17 to me about other than she didn't want me
18 as part of her management crew because she
19 didn't have time to properly train me.
20     Q.    And you have already testified
21 that she had a problem with how you were
22 closing the store down, correct?
23     A.    Yes. And in that, let me tell

Page 84

1 you this. I asked her time and time again
2 to stay with me and close that store, show
3 me exactly how she wanted it. And she
4 never once stayed with me.
5     Q.    Well, you had worked for -- as
6 a lead store clerk with the same sort of
7 duties closing a store --
8     A.    Exactly.
9     Q.    -- for two years at the
10 Georgia store, correct?
11     A.    Exactly. And I did it the
12 same way in Ranburne as I did in Bowdon.
13     Q.    Well, did Ms. Keith and Ms.
14 Hall have different management styles?
15     A.    Very much so.
16     Q.    How would you characterize
17 their management styles compared to one
18 another?
19     A.    I don't know how to answer
20 that. I don't know.
21     Q.    Well, let me ask it this way.
22 Was Ms. Hall more of a stickler for rules
23 and following Dollar General policy than

JOY CREWS
DOLGENCORP, INC.

JOY CREWS
September 14, 2006

(Pages 85 to 88)

Page 85

1  Ms. Keith was?
2      A.  To some extent, yeah.  She
3  wasn't about the smoking, though.  She
4  didn't mind smoking in front of the store,
5  and that was a rule too.
6      Q.  Did you smoke in front of the
7  store?
8      A.  No, sir.
9      Q.  Now, during that meeting that
10  you had with Mr. Kennessey and Ms. Hall --
11  and again, I think we established that was
12  somewhere in the early part of June 2005,
13  correct?
14      A.  Yes, sir.
15      Q.  During that meeting did Mr.
16  Kennessey tell you that the possibility of
17  promoting you in the future was always
18  going to be there as long as -- it was
19  going to be open if your job performance
20  improved?
21      A.  I don't remember.
22      Q.  Is it possible he said
23  something like that?

Page 86

1      A.  It's possible he could have.
2  I don't remember.  I was real upset that
3  day.
4      Q.  Is that why you started
5  planning your vacation, to resign?
6      A.  I don't remember when I
7  started planning to resign.
8      Q.  When did you -- where you did
9  go for your vacation, if you went
10  anywhere?
11      A.  Oh, yeah, I went to Helen,
12  Georgia.
13      Q.  Okay.  Now, I'm just trying to
14  understand what your claim is in this
15  case.  Is it fair to say that you are
16  claiming that you believe that you were
17  discriminated against based on your age
18  with regard to being taken off of the
19  management team, is that correct?  Is that
20  how -- what you are claiming?
21      A.  I feel that way, yes, sir.
22      Q.  Okay.  But you never received
23  a cut in pay for that, correct?

Page 87

1      A.  No, she never gave me a pay
2  increase to be the assistant.
3      Q.  Okay.  Anything else you are
4  claiming was discriminatory on the basis
5  of your age?
6      A.  I felt that way, yes, sir.
7      Q.  All right.
8      A.  She told me herself she wanted
9  cute and perky.
10      Q.  Who said that?
11      A.  Lynda Hall.  And I passed that
12  stage about twenty something years ago.
13      Q.  Well, when did she say that?
14      A.  When the store first got
15  started.
16      Q.  The Ranburne store?
17      A.  Uh-huh.
18      Q.  Where did she say that?
19      A.  In the store one day.  There
20  was one particular girl that worked with
21  us through the setup that was real young
22  and cute, and she wanted her in particular
23  in the store.  And she told me that she

Page 88

1  wanted cute and perky, and she wanted that
2  girl bad in there.  And she never hired
3  on.
4      Q.  Okay.  Anybody else hear her
5  say cute and perky?
6      A.  I don't know.
7      Q.  Anybody else within earshot of
8  her when she said that?
9      A.  I don't know.  Might have
10  been, I don't know.  There was always
11  somebody in the store.
12      Q.  There were other employees in
13  that store that were older than you or Ms.
14  Hall, correct?
15      A.  There was Mildred, uh-huh.
16  And she also told her she could probably
17  be third key, but that didn't happen
18  neither.
19      Q.  Ms. Hall never said she wanted
20  young employees, is that right?
21      A.  She said cute and perky.
22      Q.  Did she say she wanted to get
23  rid of all of the old employees, anything

Page 89

1  like that?
2      A.   (Shaking head negatively.)
3      Q.   Is that a no?
4      A.   Not to me she didn't.
5      Q.   Okay.  Anything else other
6  than what we have already talked about
7  that you are claiming was age
8  discrimination directed toward you?
9      A.   Other than her putting a
10 twenty-year-old over me, no.
11     Q.   Well, tell me about that.  I
12 have never heard that before.  What do you
13 mean by putting a twenty-year-old over
14 you?
15     A.   When she took me off of
16 management, she put Carly Cornwell as her
17 third key -- her third key was Carly
18 Cornwell, and she was twenty years old.
19 And she made her assistant Jennifer, and
20 she was twenty-one.  So every time I asked
21 them something, they would say yes, ma'am,
22 no, ma'am.
23     Q.   Okay.  Were they being

Page 90

1  professional toward you?
2      A.   Oh, yes.
3      Q.   Okay.  There was nothing
4  unprofessional the way Carly --
5      A.   Not either one of those, no.
6  And I still see both of them, speak to
7  them regular.
8      Q.   Okay.  Anything else you are
9  claiming was age discrimination directed
10 toward you by Dollar General?
11     A.   Not that I can think of just
12 right off, uh-uh.
13     Q.   Well, think about it, because
14 this is your opportunity.  We want to
15 discuss everything that you think was
16 discriminatory on the basis of your age.
17 We have already talked about your not
18 being retained as what you consider a
19 management level employee at that store in
20 Ranburne, that Ms. Hall elevated Carly
21 Cornwell and Jennifer --
22     A.   I can't think of her last
23 name.

Page 91

1      Q.   Okay.
2      A.   I will try to.  Maybe it will
3  come to me.  It's not right now.
4      Q.   That's fine.  But that's your
5  age discrimination claim in this case,
6  correct?
7      A.   Yes, sir.
8      Q.   All right.  Now, do you know
9  how old Mr. Kennessey was at the time he
10 told you in June of 2005 that you were not
11 going to be retained in that management
12 position?
13     A.   No, sir.
14     Q.   You know he is older than you,
15 is that correct?
16     A.   If I had to guess, I would say
17 him and Lynda both was older than me.
18     Q.   All right.  Well, if I told
19 you that both of them were older than you,
20 would that surprise you or would you have
21 any basis to dispute that?
22     A.   No, it wouldn't surprise me.
23     Q.   Do you have any basis to

Page 92

1  dispute they are older than you, both of
2  them?
3      A.   No, sir.
4      Q.   Okay.  Well, what makes you
5  believe that age had anything to do with
6  them not retaining you in a management
7  level position at that Ranburne store?
8      A.   Well, just what she told me.
9  And then after that it wasn't long she cut
10 my hours and --
11     Q.   Well, isn't it true that Ms.
12 Hall verbally counseled you on multiple
13 occasions throughout May 2005 with regard
14 to your not doing your job properly as a
15 lead?
16     A.   No, sir.  I'm disagreeing with
17 that.
18     Q.   So it's your testimony under
19 oath today --
20     A.   We did have that one talk that
21 me and you discussed with her and Norman
22 in the office and the one she talked to me
23 about the deposit slip.  But other than

Page 93

1 that, there wasn't numerous -- no, not any
2 more, I mean --
3      Q.   Well, I think you testified
4 earlier that she met with you about those
5 erroneous deposits that you made, correct?
6      A.   Yeah, I just said about the
7 deposit stuff, uh-huh.
8      Q.   All right.  And did she ever
9 meet with you and talk to you about
10 drawers not being counted down properly?
11      A.   Now, me and her did have a
12 talk one day about her messing up the
13 money in the safe.
14      Q.   But that's not my question.
15 My question is with regard to your drawers
16 not being counted down properly, the ones
17 you were responsible for.
18      A.   I counted both of them down
19 when it was my job.
20      Q.   Do you recall ever having a
21 conversation where she explained to you
22 that she was having problems with your
23 drawers not being counted down properly?

Page 94

1      A.   Uh-uh, no.  I remember me and
2 her talking about her messing up the safe,
3 you know.  If you want me to do my job,
4 she is going to have to do hers too.
5      Q.   It is your testimony under
6 oath that she never talked to you about
7 counting the drawers down properly?
8      A.   I don't --
9      Q.   Is it possible that she did?
10      A.   It's possible, but I can't
11 swear to it.  I mean, I don't know.  I
12 don't remember.
13      Q.   Do you recall having a
14 conversation with Ms. Hall where she
15 explained to you that you were not face
16 fronting or recovering the store properly?
17      A.   That's one me and you talked
18 about a while ago when I asked her the
19 next morning, yes, sir.  That's the one
20 that we talked about a while ago.
21      Q.   Okay.  Do you recall when that
22 occurred?  Was that before Norman and she
23 had met with you?

Page 95

1      A.   I don't remember if it was
2 before or after that.  It was around the
3 grand opening.
4      Q.   Okay.  And when was the grand
5 opening?  Was that in May 2005?
6      A.   I think it was around the
7 first week in May.  Because it was like --
8 I worked in Ranburne like two, three weeks
9 before the grand opening, or maybe four,
10 because we opened a week or so before they
11 had the so-called grand opening.  It
12 wasn't the first day the store was open, I
13 will put it that way.
14      Q.   Okay.  And do you recall Ms.
15 Hall speaking with you about the safe fund
16 and the deposits and then responding
17 something to the effect of the safe was
18 never right and her explaining to you that
19 that is why it is supposed to be counted
20 down every morning and every night?
21      A.   I did count it every morning
22 and every night.
23      Q.   Do you recall having that

Page 96

1 conversation with her?
2      A.   I remember me and her talking
3 about her messing up a safe, but -- let me
4 back up here.  When you run a drawer a
5 certain length of time, you pull money
6 from it, there is a certain amount in it,
7 and you put it in the safe.  And she had
8 the money in the safe for the deposit
9 messed up with the money in the safe for
10 change.  Now, we did have that
11 conversation, but she is the one that
12 messed it up, not me.
13      MR. DEERING:  Move to strike.
14      Q.   Ms. Crews, do you recall when
15 she discussed with you the problems with
16 those deposits that you made saying that
17 you really don't have anything to say
18 about it other than you were just nervous?
19      A.   I don't remember any of that.
20 I remember me and her talking about that
21 one deposit that I messed up.  But other
22 than that, I don't remember what we said
23 about it.  I mean, that's -- I don't

JOY CREWS
DOLGENCORP, INC.

Page 97

1  remember.
2      Q.    Okay.  Who got your job after
3  you left, if you know?
4      A.    The assistant or the third
5  key?
6      Q.    Well, whatever job that you
7  claim that you should have had.
8      A.    I came in as third key.  Carly
9  Cornwell got that.  And I should have been
10 the assistant, and that was Jennifer, she
11 got it.
12     Q.    And you were never formally
13 promoted to the assistant manager position
14 by Dollar General, correct?
15     A.    Not through the salary, no,
16 sir.
17     Q.    All right.  So you were
18 technically a lead store clerk during the
19 time you were at Ranburne, right?
20     A.    Technically, yes, sir.  Even
21 though I did the assistant's job.
22     Q.    Okay.
23     A.    And never was paid for it.

Page 98

1      Q.    You never received a raise
2  during the time you were at Ranburne?
3      A.    No, sir.
4      Q.    Never received a pay cut while
5  you were at Ranburne?
6      A.    No, sir.
7      Q.    Now, tell me the name of this
8  store clerk again, if you know, that you
9  claim had your job after you left.
10     A.    The lead clerk or the
11 assistant?
12     Q.    Well, whatever job you claim
13 you should have had.
14     A.    I came in as lead clerk, Carly
15 Cornwell got that one.  And the assistant
16 was Jennifer -- Davis, Jennifer Davis.
17 One was twenty years old and one was
18 twenty-one.
19     Q.    Okay.  And do you know how
20 Carly Cornwell came to get that position?
21     A.    No, sir.
22     Q.    How about Jennifer Davis, do
23 you know how she came to get that

Page 99

1  position?
2      A.    I don't know.  It was between
3  them and Lynda.
4      Q.    Do you know anything about
5  either one of their prior job experience?
6      A.    No, sir.
7      Q.    Or their experience within
8  Dollar General prior to their being put
9  into those positions?
10     A.    As far as I know, that was
11 both of them's first job for Dollar
12 General, and they can't have a whole lot
13 of experience at twenty years old.
14     Q.    Okay.  But you don't know one
15 way or the other?
16     A.    No, not one way or another,
17 no, sir.
18     Q.    All right.  Do you know if
19 either one of them still works at Dollar
20 General?
21     A.    No, don't either one of them.
22 And both of them said they would testify
23 if I needed them.

Page 100

1      Q.    Okay.  What do you mean by
2  that?
3      A.    They knew I had filed charges,
4  and both of them said that they would
5  testify if I needed them.
6      Q.    When was the last time you
7  talked to Ms. Davis?
8      A.    She came in my store a while
9  back hunting a job.  And she stood right
10 there in front of the milkman, the chip
11 man and the world and everybody and told
12 them I failed a drug test.
13     Q.    Who, Jennifer did?
14     A.    Yes.
15     Q.    Did she feel bad about that?
16     A.    I don't know.  I wasn't in
17 there.  A friend of mine told me about it,
18 she heard it.
19     Q.    Okay.  How about Carly
20 Cornwell?
21     A.    She hated all of it happened.
22 Me and -- you know, I still like Carly.  I
23 mean, I don't have anything against either

Page 101

1  one them, I mean --
2      Q.    So neither one of them are
3  employed by Dollar General now?
4      A.    No, both of them quit.
5      Q.    Do you know what happened to
6  Carly?
7      A.    No.  Her grandmother or
8  something up North died and she went up
9  and then she just quit.  I don't know what
10  happened.
11      Q.    How about Jennifer Davis, do
12  you know what happened to her employment?
13      A.    She stayed longer after I
14  left.  I don't know what happened between
15  them, no, sir, I don't.  I didn't ask her.
16      Q.    Okay.  Do you know whether
17  either Carly or Jennifer had any similar
18  problems that Kennessey and Hall had with
19  you prior to their being put in those
20  positions?
21      A.    I do know Lynda made a remark
22  that Carly couldn't take the pressure.
23      Q.    I'm sorry?

Page 102

1      A.    Lynda Hall made the remark
2  that Carly couldn't take the pressure.
3      Q.    Okay.  This was before that
4  she put Carly into that position or after?
5      A.    It was after she put Carly in
6  that position.
7      Q.    Okay.
8      A.    And she made that comment to
9  the whole -- everybody that worked there
10  during a store meeting.
11      Q.    How long after Carly had been
12  in that position did Ms. Hall make that
13  comment?
14      A.    I don't know.  It wasn't very
15  long, because she didn't work there that
16  long.  I don't remember how long.
17      Q.    And you weren't there very
18  long after that, correct?
19      A.    No, sir.  I didn't stay long
20  after she cut my hours.
21      Q.    Right.  And is it fair to say
22  that your hours being cut was about the
23  time that you were told that they were

Page 103

1  going to take you off of the management
2  team?
3      A.    It was about the same time,
4  uh-huh.  Well, they cut my hours right
5  after the store got up and going.  So,
6  yeah, that was about the same time.
7      Q.    Who made out the schedules
8  that would designate how many hours you
9  were going to work?
10      A.    Lynda Hall.
11      Q.    And she was the store manager
12  at the time, correct?
13      A.    Of that store and the one in
14  Lineville.
15      Q.    But you didn't work in the
16  Lineville store, did you?
17      A.    No, sir.  And that's like
18  what, two hours apart?  I don't know how
19  she had time to do it.
20      Q.    So she relied on her
21  management team pretty hard to run that
22  Ranburne store since she was managing two
23  stores?

Page 104

1      A.    The one in Lineville too, I
2  assume, I don't know.  I mean -- I've
3  never been in the Lineville store.
4      Q.    Are you claiming in this case
5  that Dollar General failed to properly
6  compensate you for time that you worked?
7      A.    Worked them banking hours, is
8  that what you are talking about?
9          MR. SHAUL:  Object to the
10  form.  You can answer the question.  I
11  just made a technical lawyer thing.  You
12  can answer his question.
13      A.    Okay.
14      Q.    Are you claiming in this case
15  that Dollar General has failed to pay you
16  for time that you worked?
17      A.    Yes, sir.
18      Q.    Tell me about that claim.
19      A.    Vivian called it banking
20  hours.
21      Q.    Vivian Keith?
22      A.    Yes, sir.
23      Q.    So this occurred while you

Page 105

1 were at Vivian's store?
2    A.   Yes, sir, not in the Ranburne.
3 Solely in the Bowdon store.
4    Q.   All right.  Tell me about what
5 you mean by that banking hour comment.
6    A.   I worked forty hours a week in
7 Bowdon, and you could only get forty,
8 Dollar General don't approve any overtime
9 whatsoever.  And there was a lot of times
10 they would need extra help through the
11 week.  You are only allowed a certain
12 amount of payroll hours.
13    Q.   The store?
14    A.   Yes, and they are very strict
15 about it.  They get real ugly about that.
16 So if somebody called in sick and my hours
17 was full, I would bank hours.  Or Jerry
18 Payne was coming to DM and she wanted the
19 store straight, or inventoried once a year
20 around Christmas, whenever she needed
21 extra, you know, things like that.  It
22 was --
23    Q.   Well, tell me about this

Page 106

1 process that you are describing of banking
2 hours.  How exactly did that work?
3    A.   Okay.  If I worked forty-eight
4 this week, I only had to work thirty-two
5 next week to get forty.
6    Q.   Okay.  So you were ultimately
7 paid for the straight time --
8    A.   Just straight time, yes, sir.
9    Q.   Okay.  Did anyone force you to
10 do that?
11    A.   No.
12    Q.   And did you clock in and clock
13 out yourself during that time period?
14    A.   No, I think -- I don't
15 remember.  I don't exactly remember how
16 she did do that.  I will have to think
17 about it.
18    Q.   During the time you were at
19 Vivian's store, just -- I'm just trying to
20 get a clear picture of what you are
21 describing.  On some occasions you would
22 clock out but then still work in the
23 store?

Page 107

1    A.   Yes, sir.
2    Q.   Okay.  And there were times
3 when you would still be on the clock but
4 not be working in the store?
5    A.   The following week when she
6 would give me my hours back, yes, sir.
7    Q.   Okay.  Was there ever a time
8 when you clocked out and you told Vivian
9 no, I can't do this, I'm going to clock
10 back in if I'm working?
11    A.   No.
12    Q.   Were there other employees
13 doing this?
14    A.   Yes, sir.
15    Q.   Who else?
16    A.   Gigi Cook did it.  Talisha
17 Blackwelder.  And I can't remember if
18 Robin was one of them or not.  She didn't
19 work a whole lot longer after I came to
20 work there, so I can't remember if Robin
21 Wiggins was one of them or not.  And
22 Vanessa Johnson, she may have a time or
23 two worked off the clock like that, or

Page 108

1 banking hours.
2    Q.   Now, Vivian would have been on
3 salary, correct?
4    A.   No, I think she was hourly.
5    Q.   She was a store manager?
6    A.   Yeah.  Some of them was salary
7 and some of them was hourly.  And I can't
8 swear to it, but I think hers was hourly.
9 I don't remember.  I never saw her
10 paycheck, so I don't -- I really don't
11 know.
12    Q.   And you didn't complain to
13 anybody about this off-the-clock scheme?
14    A.   No.
15    Q.   Why not?
16    A.   I don't know why not.
17    Q.   Because you were getting paid
18 for the time anyway, is that right?
19    A.   Yes, either way.
20    Q.   One way or the other?
21    A.   And I didn't even know it was
22 against the law until later.
23    Q.   Well, you signed that Wage and

JOY CREWS
DOLGENCORP, INC.

JOY CREWS
September 14, 2006

(Pages 109 to 112)

Page 109

1 Hour sheet that we have marked as
2 Defendant's Exhibit 2 acknowledging your
3 understanding that working off the clock
4 is a violation of company policy, correct?
5 Do you see that in Defendant's Exhibit 2?
6    A.    Yes, sir.  But when you hire
7 on, they want you to read all of this and
8 sign it in one day.  And, you know, you
9 just have to skim over it, you can't read
10 every word of it.
11    Q.    I understand.  Did you ever
12 submit any sort of like time adjustment
13 form or time adjustment request to Dollar
14 General so that your time records were
15 accurate?
16    A.    No, sir.
17    Q.    No one told you that you
18 should not be paid for work you did off
19 the clock, correct?
20    A.    No, I just remember her asking
21 me one day would I do something, and I
22 said what, just ask me.  And she hemmed
23 and hawed about it and finally she just

Page 110

1 asked me would I work extra hours this
2 week and take it off of next week's pay.
3 And I'm like well, yeah.
4    Q.    This thing that you are
5 describing where you would, you know, put
6 down every week that you worked forty
7 hours but one week you might work
8 forty-eight, the other week you might work
9 thirty-two, did that pretty much only
10 happen during like the -- like
11 Christmastime, the Christmas rush?
12    A.    It was like at Christmas, if
13 an area manager was coming, our inventory
14 was in February.  If Jerry Payne, which
15 was the DM at the time in that area, if he
16 was ever coming to the store, Vivian
17 wanted it straight and everything right,
18 and it was during the times like that.  If
19 somebody called in sick and everybody's
20 hours was maxed out, you had to have
21 somebody to run it.
22    Q.    Okay.  But it didn't happen
23 all the time while you were at that

Page 111

1 Georgia store?
2    A.    No, not all the time.
3    Q.    Did you keep a record of the
4 weeks that you worked less than forty and
5 the weeks you worked more than forty?
6    A.    No, sir.  I just know if I
7 worked forty-eight this week and
8 thirty-two next week, I got forty for both
9 weeks.
10    Q.    And Vivian didn't bust your
11 chops if you worked less than forty on
12 that following week or vice versa, she
13 didn't get on to you for that?
14    A.    I don't understand what you
15 are asking.
16    Q.    In other words, if you were
17 making up for that time -- in other words,
18 you worked forty-eight the prior week, got
19 paid for forty?
20    A.    Yeah.
21    Q.    And then you would work the
22 next week --
23    A.    For thirty-two and get paid

Page 112

1 for forty.
2    Q.    Right.  She wouldn't give you
3 a hard time for just working thirty-two
4 and getting paid for forty, right?
5    A.    No.
6    Q.    All right.  And you never told
7 anyone that you were forced to work off
8 the clock?
9    A.    No, sir.
10    Q.    And is it true that the first
11 discussion you ever had about off-the-
12 clock work was after you contacted
13 attorneys about representing you in this
14 case?
15       MR. SHAUL:  Object to the
16 form.
17    A.    Was that the first time I
18 discussed it?
19    Q.    Right.
20    A.    No.
21    Q.    When was the first time?
22    A.    Me and Gigi talked about it,
23 just me and her talking.

Page 113

1    Q.    After your employment ended?
2    A.    No, while we was at work.
3    Q.    Okay.  What did y'all discuss?
4    A.    We just talked about it.  She
5  had done it and asked me if I wanted to do
6  it, and I told her I didn't mind.
7    Q.    You didn't think it was that
8  big of a deal?
9    A.    No, I didn't at that time.
10  Like I said, I didn't know it was against
11  the law, I mean --
12    Q.    And you were violating the
13  law, correct?
14       MR. SHAUL:  Object to the
15  form.
16    A.    Pardon me?
17    Q.    He is making a formal
18  objection.  You can answer.
19    A.    Okay.  Ask me the question
20  again.
21    Q.    By working off the clock, it
22  was a violation of company policy and the
23  law, correct?

Page 114

1       MR. SHAUL:  Object to the
2  form.  You can answer.
3    A.    Yes.
4    Q.    How often during that time you
5  were at the Bowdon store did you receive a
6  paycheck, was that on a weekly basis?
7    A.    Yes, sir, it was weekly.
8    Q.    All right.  And is it fair to
9  say that you always got paid for forty
10  hours during that time when you worked
11  there?
12    A.    Mostly.  Some weeks we would
13  have a little less.
14    Q.    Okay.  What would be the
15  reason for that?
16    A.    Low weekly -- wait a minute,
17  see how to put this.  Payroll hours, low
18  payroll hours.  In other words, if they
19  gave you eighty hours, you had to split
20  that between ever how many was working.
21  Or during Christmas it would go to a
22  hundred and twenty, and that was between
23  everybody except for the manager.  So

Page 115

1  mostly it was forty hours a week.
2    Q.    Okay.  Is it fair to say that
3  you were paid for all of your time, it
4  just -- you may have worked more in one
5  week and less in another week?
6       MR. SHAUL:  Object to the
7  form.  Also calls for a legal conclusion.
8  You can answer.
9    Q.    The time that you worked?
10       MR. SHAUL:  Object to the
11  form.
12    A.    Yes, I was paid for all of my
13  pay except for the actual overtime hours.
14  I was paid for straight time, yes, sir.
15    Q.    Straight time.  All right.
16  Tell me about overtime.  What is your -- I
17  mean, are you claiming that you weren't
18  paid for overtime that you should have
19  gotten?
20    A.    Time and a half.  I never was
21  paid time and a half, no, sir.
22    Q.    Do you claim you should have
23  been paid time and a half?

Page 116

1    A.    Well, yeah.  Like I say,
2  hindsight is 20/20, but, yes.
3    Q.    And, again, this is just
4  during the time you worked at the Bowdon
5  store that you claim you should have been
6  paid for some overtime, correct?
7    A.    Yes, sir, this is solely at
8  the Bowdon store.
9    Q.    Okay.  Did you know of any
10  other stores where a store manager was
11  allowing employees to work off the clock
12  in sort of the way that your store was?
13    A.    No, sir, but that's their
14  business and not any of mine.
15    Q.    Sure.  All right.  What is
16  your best judgment as to the number of
17  overtime hours on average per month at
18  that Bowdon store that you should have
19  been paid that you were not paid?
20    A.    If I had to guess, and this is
21  just a guess, eight hours every other
22  week.  And that's a guess, I mean -- I
23  don't know.

Page 117

1    Q.   Just your best judgment.
2    A.   Yeah, that's a guess.
3    Q.   Okay.  Is that your best
4 judgment?
5    A.   Yes.
6    Q.   Okay.  About eight hours on
7 average, four per week if we average it
8 out?
9    A.   Yes, sir.
10    Q.   I think you said eight every
11 other week?
12    A.   Yes, sir.
13    Q.   So you would have been
14 compensated the following week that you
15 worked, say, thirty-two hours for the --
16    A.   Eight before, yes, sir.
17    Q.   Okay.  But you wouldn't have
18 gotten the extra half of your hourly rate
19 for those eight hours, is that what you
20 are claiming?
21    A.   That's what I'm saying,
22 uh-huh.
23    Q.   And when did that first start

Page 118

1 going on?  Did that go on as soon as you
2 started working for --
3    A.   It was not long after I
4 started.  Because I started in January and
5 our inventory is in February.  And I think
6 the first time they asked me our first
7 inventory.  January, February, March --
8 inventory might have been in March, I'm
9 not sure.  It was around inventory time.
10 And inventory was just the first -- I
11 hadn't been working but a couple of months
12 on our first inventory.
13    Q.   And I think we have already
14 established that you just said that you
15 were hired at that Bowdon store I think
16 you testified earlier about mid-January of
17 2003, correct?
18    A.   Towards the end of January.
19    Q.   And Vivian Keith, was she the
20 store manager at that time?
21    A.   Yes, she was.
22    Q.   And she was there as store
23 manager during the entire time you were

Page 119

1 there up until you left in late April of
2 2005 to go to the other store, correct?
3    A.   Yes, sir.
4    Q.   Now, is it your testimony that
5 during that entire length of time, just
6 over two years, from 2003 to 2005 that you
7 were at the Bowdon store, was this
8 off-the-clock stuff going on during that
9 entire time?
10    A.   Except for about the first two
11 months I was there, yes, sir.
12    Q.   And as far as you know,
13 neither you nor anyone else complained to
14 the district manager about that practice?
15    A.   No, sir.
16    Q.   I mean, that did not happen,
17 correct?
18    A.   No, didn't anybody tell Jerry,
19 uh-uh.
20    Q.   All right.  Did Vivian ever
21 tell anybody not to tell the district
22 manager that --
23    A.   Yes, sir.

Page 120

1    Q.   Okay.  Did she specifically
2 tell you not to tell --
3    A.   She told me and Gigi at the
4 same time.
5    Q.   And what is Gigi's last name?
6    A.   Cook.
7    Q.   Do you know if she is still
8 there?
9    A.   No, she is not.  She is
10 working at Spratlin's Grocery in Hawk,
11 Alabama.
12    Q.   How did y'all respond to that?
13    A.   I said whatever, you know,
14 okay.  I mean, it's --
15    Q.   Okay.  Is that your best
16 judgment that it was typically about eight
17 hours every other week that you claimed --
18    A.   That's me guessing, yes, sir.
19 Because I didn't keep up with it.
20    Q.   Was there ever a time that it
21 was less than that during a two-week
22 period?
23    A.   Possibly, but there was times

JOY CREWS
DOLGENCORP, INC.

Page 121

1  it would be more too, so that's just --
2  that's just a guesstimate on average is
3  what I gave you.
4      Q.    During that time you were at
5  the Bowdon store, did you ever typically
6  have a day that you had off or a couple of
7  days that you had off where you wouldn't
8  even go to the store as an employee?
9      A.    Yes.
10     Q.    What day or days --
11     A.    It rotated around different.
12  It was usually two days a week you were
13  off.
14     Q.    And you would work typically
15  five days a week?
16     A.    Yes, sir.  Unless I worked all
17  day on a truck day which was like from
18  8:30 to 9:30 that night, and then it was
19  usually just four days that week that you
20  had to work.
21     Q.    Was truck day on Sundays, is
22  that right?
23     A.    It was on Wednesday when I

Page 122

1  first came there, but it was moved to
2  Sunday before I left, yes, sir.
3      Q.    Ever file for unemployment
4  comp benefits?
5      A.    One time.
6      Q.    When was that?
7      A.    Probably '86, '87.
8      Q.    Which employer was the charged
9  employer for that?
10     A.    Trintex.
11     Q.    Ever been arrested?
12     A.    No, sir.  I had a speeding
13  ticket one time and running a stop sign.
14     Q.    Those are the only tickets you
15  have ever got?
16     A.    That's it.
17     Q.    That's pretty good.  I have
18  more than that, I can tell you right now.
19         MR. SHAUL:  I'm going to take
20  the Fifth on that one.
21         MR. DEERING:  Not much more.
22     Q.    Ever go by any aliases other
23  than June Bug?

Page 123

1      A.    No, sir, other than I was a
2  Hollaway and a Sutton at one time.  And
3  that's all my aliases together.
4      Q.    Ever sued anyone other than
5  Dollar General?
6      A.    No, sir.  I have never had a
7  lawyer.  Even when I divorced, I didn't
8  have a lawyer.
9      Q.    Ever been sued by anyone?
10     A.    No, sir.
11     Q.    And this is, of course,
12  excluding divorces.  Is that a no?
13     A.    No, sir, I have never sued
14  anyone.
15     Q.    Have you ever been sued by
16  anyone?
17     A.    No, sir.
18     Q.    Okay.  Other than the charge
19  of discrimination you filed against Dollar
20  General, have you ever filed any other
21  EEOC charge?
22     A.    No, sir.  That's the first
23  time I was ever even in the EEOC.

Page 124

1      Q.    Ever filed for bankruptcy?
2      A.    No, sir.
3      Q.    What is your best judgment as
4  to how much income from all sources you
5  have earned in 2006 to date?
6      A.    I can guess at it.
7      Q.    Give me your best judgment.
8      A.    Ten thousand dollars a year.
9  I don't make a whole lot, I mean, it's --
10     Q.    And tell me again, are you
11  hourly at the Super 10?
12     A.    I am, yes, sir.
13     Q.    Do you expect to hang on to
14  that job for a while?
15     A.    I don't know.
16     Q.    Is it going all right?
17     A.    Yeah, I enjoy my job.  I enjoy
18  working for the public.
19     Q.    For the public?
20     A.    Uh-huh.
21     Q.    Or with the public?
22     A.    With the public.  I'm a very
23  good people person.  I knew everybody that

JOY CREWS
DOLGENCORP, INC.

Page 125

1  came in that Bowdon store, I knew
2  seventy-five percent of them by name.  And
3  there ain't a lot of people can tell you
4  that.
5      Q.    And that's one of the things
6  that Dollar General strives for is
7  customer recognition when they come in on
8  a regular basis?
9          MR. SHAUL:  Object to the
10  form.
11      A.    I don't know if they do or
12  not.  That's just the kind of person I am.
13  If I'm taking your money, I need to be
14  nice to you.  And you don't need to have
15  to stand in line to give your money away.
16      Q.    And that's something Ms. Hall
17  tried to get her employees to do, correct?
18      A.    This has nothing to do with
19  Ms. Hall or Ms. Keith.  This is solely me
20  telling you this is how I feel.
21      Q.    Do you recall an occasion when
22  Ms. Hall wrote out a sheet for you and I
23  believe another employee at that Ranburne

Page 126

1  store about when you were at the cash
2  register, how you are supposed to behave
3  and act towards customers?
4      A.    She never wrote me one out.
5      Q.    And you never signed a sheet
6  like that?
7      A.    I might have did like some of
8  this.  But as far as her hand writing me
9  one, I don't remember, no.
10      Q.    Okay.  Was it your testimony
11  you don't remember that that ever happened
12  or that it did not happen?
13      A.    I'm telling you that I don't
14  remember it happening.
15      Q.    Is it possible that it
16  happened?
17      A.    Anything is possible.  I'm
18  saying I don't remember.  God, Dollar
19  General wants you to sign everything.
20          MR. DEERING:  Off the record.
21          (Off-the-record discussion.)
22          (Whereupon, a break was had
23          from 10:50 a.m. until 10:57

Page 127

1  a.m.)
2          (Whereupon, Defendant's
3  Exhibit 6 was marked for
4  identification.)
5      Q.    Ms. Crews, I'm going to show
6  you what I have marked as Defendant's
7  Exhibit 6, which is a two-page exhibit.
8  Let me know if you recognize that as being
9  a cashier to-do list that was prepared by
10  store manager Lynda Hall in which you
11  signed there at the bottom of the second
12  page as having read --
13      A.    Mildred Calhoun, that's her
14  name.  Yes, I do remember this now, yes,
15  sir.  Like I said, I didn't remember, but
16  I do when you showed it to me.
17      Q.    And you see number nine where
18  it says most importantly greet and thank
19  each customer; customers are greeted when
20  they enter the store and thanked at the
21  checkout counter?
22      A.    Yes, sir.
23      Q.    That's something Ms. Hall

Page 128

1  wanted all of her cashiers to do, correct?
2      A.    Yes, sir.
3      Q.    Including everything else on
4  this Defendant's Exhibit 6?
5      A.    (No response.)
6      Q.    Is that a yes?
7      A.    Yes, it is so far, uh-huh.
8  And I did all of this.  Well, except for
9  number ten.  I wasn't real big on that
10  one, that's begging.
11      Q.    Number ten is --
12      A.    Each cashier must ask each
13  customer if they would like to donate
14  their change to the Literacy Fund.  And as
15  far as I know, she never did number
16  eleven.
17      Q.    What is number eleven?
18      A.    Each cashier will choose each
19  day an item they would like to promote and
20  sell on their shift.  As far as I know,
21  she never did that.
22      Q.    Okay.  But she expected her
23  cashiers to do that, correct?

JOY CREWS
DOLGENCORP, INC.

Page 129

1    A.    Yes.
2         (Whereupon, Defendant's
3         Exhibit 7 was marked for
4         identification.)
5    Q.    All right.  I want to go ahead
6    and mark this exhibit.  It's a multipage
7    document that you produced to us today in
8    this deposition for the first time.  I'm
9    going to mark it Defendant's Exhibit 7.
10   It is a --
11   A.    Can I take something for a
12   headache?
13        MR. SHAUL:  What are you
14   taking?
15   A.    Anacin.
16        MR. SHAUL:  Yeah, I don't mind
17   if you take it if it's over-the-counter.
18   Never been asked that question before.
19        MR. DEERING:  Off the record.
20        (Off-the-record discussion.)
21   Q.    Ms. Crews, I'm going to show
22   you what I have marked as Defendant's
23   Exhibit 7, and it's a multipage exhibit

Page 131

1    A.    Yes, sir, that probably would
2    be a fair thing to say.
3    Q.    Well, the first page -- does
4    this go in chronological order from the
5    first page to last page of Defendant's
6    Exhibit 7?
7    A.    So far it does, uh-huh.  Yes,
8    sir.
9    Q.    When was the last time you
10   actually saw this Defendant's Exhibit 7,
11   this document?
12   A.    This?  I don't know the last
13   time me and Roman met.
14   Q.    When you gave it to your
15   lawyer?
16   A.    Yes, sir.
17   Q.    Do you have a judgment as to
18   how long ago that was?
19   A.    No, sir.  It was hot weather,
20   sometime back in the summer.  Well, let's
21   see.  No, I don't know.  I don't know.
22   Q.    More than three months ago?
23   A.    Yes.

Page 130

1    which I believe you characterized -- and I
2    will show it to you in a second,
3    characterized as a log or diary that you
4    maintained during your employment with
5    Dollar General, correct?
6    A.    Yes, sir.
7    Q.    It's a two, four --
8    A.    Did I put dates on it?
9    Because I can't remember.
10   Q.    It's a nine-page exhibit by my
11   count.  And that document, Defendant's
12   Exhibit 7, what prompted you to begin
13   keeping this diary of sorts?
14   A.    I don't know.  I used to keep
15   one when I was younger.
16   Q.    When was the first entry made
17   on this document?
18   A.    The first date I'm showing is
19   6/9/05.  I don't know.  That might have
20   been when I started it.
21   Q.    Is it fair to say you started
22   keeping this diary at some point while you
23   were employed at the Ranburne store?

Page 132

1    Q.    Let's talk just a minute more
2    about your vacation pay issue, because I
3    notice in your diary here, Defendant's
4    Exhibit 7, that you have got a few entries
5    in late July concerning your attempts to
6    get your vacation pay while you were gone.
7    A.    Yeah, took me a while to get
8    it.
9    Q.    Okay.  But you ultimately got
10   it, right?
11   A.    Yes, I did.
12   Q.    Okay.  Do you recall an
13   occasion in which you told Norman
14   Kennessey that he wasn't going to leave
15   the town until you got your due or
16   something like that?
17   A.    Tell me that again, I don't --
18   I didn't hear it.  What did you say?
19   Q.    Do you ever recall having a
20   conversation about your vacation pay with
21   Mr. Kennessey in which you explained to
22   him that neither you nor your husband were
23   going to let him leave the town until you

Page 133

1   got your due or anything like that?
2       A.   No, I never told Norman that.
3       Q.   Did your husband ever say
4   something like that?
5       A.   My husband has never even
6   talked to Norman.
7       Q.   Was there an occasion in which
8   your husband was in the room with you
9   while you were on the phone with Mr.
10  Kennessey discussing your vacation pay?
11      A.   I don't know about that.
12      Q.   Is it possible?
13      A.   Anything's possible, but I
14  can't remember.  Like I told you, I called
15  him probably seven or eight times before
16  he ever gave me my vacation pay.  And that
17  last week that I called him, he was on
18  vacation himself and I didn't know it.  So
19  I left him a voicemail on his cell phone
20  every day.
21      Q.   While he was on vacation?
22      A.   Yes.  But I didn't know he was
23  on vacation.  I just know he wasn't

Page 134

1   calling me back, and I didn't have my
2   vacation pay that I had put in for thirty
3   days ahead of time like I was supposed to.
4       Q.   Okay.  But you finally got
5   ahold of someone at corporate and got it,
6   correct?
7       A.   No.
8       Q.   How did you ultimately get
9   your vacation pay?
10      A.   Norman done it.
11      Q.   Okay.  So after he came back
12  from vacation, he was able to deal with
13  that issue?
14      A.   Yes, uh-huh.
15      Q.   Norman Kennessey told Lynda
16  that you would have to call payroll and
17  track your check down for that vacation
18  pay, didn't he?
19      A.   That sounds familiar, but I
20  really don't remember.  I just remember
21  calling him every day worrying him about
22  my check.
23      Q.   And then you called customer

Page 135

1   service at Dollar General about your
2   check?
3       A.   I might have did.  I very well
4   may have.
5       Q.   Well, that's what you wrote in
6   your diary, Defendant's Exhibit 7.
7       A.   Well, then, I guess I did.
8   Like I say, I don't remember.  That has
9   been over a year ago.  I shouldn't have to
10  run my check down.  I think I might have
11  told all of them that too.  That's Lynda's
12  job.
13      Q.   Who is Sally?
14      A.   She is a friend of mine.
15      Q.   What is her last name?
16      A.   Sally Shelton.
17      Q.   Where do you know her from?
18      A.   We have been friends for about
19  the last ten years.  She owns a dog
20  grooming place in Ranburne.
21      Q.   Did Lynda Hall back in June of
22  2005, early June -- well, June 9, 2005
23  specifically, tell you that she would take

Page 136

1   you as far as you wanted to go with regard
2   to your job?
3       A.   She did make that statement.
4   But Lynda lied a few times.
5       Q.   Do you get along with
6   everybody at that Ranburne store?
7       A.   I did.
8       Q.   Anybody you didn't
9   particularly get along with?
10      A.   No, sir.  I never had any
11  trouble even with those young girls over
12  me.  I mean, I -- still don't.
13           (Whereupon, Defendant's
14           Exhibit 8 was marked for
15           identification.)
16      Q.   I'm going to show you what I
17  have marked as Defendant's Exhibit 8, Ms.
18  Crews.  Do you recognize that multipage
19  exhibit as being your 2003 tax returns and
20  supporting documentation?
21      A.   Yes, sir.
22      Q.   And everything on there is
23  true and accurate to your best ability?

JOY CREWS
DOLGENCORP, INC.

JOY CREWS
September 14, 2006

(Pages 137 to 140)

Page 137

1    A.   To the best of my knowledge,
2  yes, sir.
3    Q.   Okay.
4    A.   Kingsbridge, that's the name
5  of his employer.
6    Q.   Talking about your husband's
7  employer?
8    A.   Yes, sir.  You asked me
9  earlier and I couldn't think of it.
10   Q.   That's Kings Bridge --
11   A.   Yes, sir.
12   Q.   -- Ventilation?  What is that
13  Vent, Kings Bridge Vent?
14   A.   Let me get back to it.  Well,
15  I can't even --
16   Q.   That's okay.  Don't worry
17  about it.
18   A.   They do a lot of pipe work,
19  shutdown work.
20   Q.   That's fine.
21       (Whereupon, Defendant's
22       Exhibit 9 was marked for
23       identification.)

Page 138

1    Q.   I'm going to show you what I
2  have marked as Defendant's Exhibit 9,
3  another multipage exhibit that I will
4  represent to you is some documents that
5  your lawyer produced to us.
6        Is that a true and accurate
7  copy of your 2004 income tax return with
8  supporting documentation?
9    A.   Yes, sir.  As far as I know,
10  yes, sir.  If I didn't get them out of
11  order when I sent it to them.  I had
12  trouble with the fax machine that day.
13       (Whereupon, Defendant's
14       Exhibit 10 was marked for
15       identification.)
16   Q.   I'm showing you what I marked
17  as Defendant's Exhibit 10.  And is that a
18  copy of your 2005 income tax return with
19  supporting documentation that you filed
20  with the IRS?
21   A.   Yes, sir, as far as I know.
22   Q.   Well, is there any reason why
23  it would not be?

Page 139

1    A.   No.  Like I say, if I didn't
2  get all of it out of order that day, it
3  would be all right, yes, sir.
4    Q.   And Defendant's Exhibit 10,
5  does that accurately reflect the amount of
6  income that you earned during the year
7  2005?
8    A.   It should, yes, sir.
9    Q.   Is there any reason why it
10  would not?
11   A.   No.
12   Q.   Okay.
13   A.   Yeah, that's about right.
14  That should be it, yes, sir.
15   Q.   You didn't have any other
16  income from any other sources?
17   A.   No, sir.
18       (Whereupon, Defendant's
19       Exhibit 11 was marked for
20       identification.)
21   Q.   I'm going to show you what I
22  have marked as Defendant's Exhibit 11, Ms.
23  Crews.  Will you take a look at that and

Page 140

1  let me know if you have ever seen that
2  Dollar General job description for a lead
3  store clerk before?
4    A.   (Reviewing document.)  I
5  probably have at one time.  I don't
6  remember it right off.  But like I said,
7  they're paperwork poor.
8    Q.   Let me ask you this.  You see
9  down at the bottom of the first page of
10  Defendant's Exhibit 11 where it says in
11  the absence of the store manager or
12  assistant manager, there is a list of
13  things that a lead store clerk is
14  responsible for, do you see that?
15   A.   Yes, sir.
16   Q.   And all of those things, like
17  authorizing and signing for refunds and
18  overrides and counting the register,
19  making bank deposits, are the sort of job
20  duties that a lead store clerk is
21  responsible for when other management
22  staff is not in the store, correct?
23   A.   Yes, sir.

Page 141

1     Q.    Including all of the other
2  things that are listed on that Defendant's
3  Exhibit 11?
4     A.    Uh-huh.
5     Q.    Is that a yes?
6     A.    Yes, sir.  I'm sorry.
7         (Whereupon, Defendant's
8         Exhibit 12 was marked for
9         identification.)
10    Q.    Ms. Crews, I'm going to show
11 you what I am marking as Defendant's
12 Exhibit 12.  If you will take a look at
13 that and let me know if you recognize this
14 as being your response to defendant's
15 first request for production of documents
16 in this case?
17    A.    (Reviewing document.)  Oh,
18 this is my suit against Dollar General is
19 what you are asking me?
20    Q.    I'm just asking you if you
21 have ever seen that document before, this
22 response to the defendant's first request
23 for production of documents?

Page 142

1     A.    This is the one we looked at,
2  isn't it?  Yes.
3     Q.    I would like to direct your
4  attention to number eleven, which is -- it
5  is on the --
6     A.    I have got it.
7     Q.    -- the fifth page.  Okay.  On
8  the top, it requests all diaries and notes
9  and other things made or kept by the
10 plaintiff, you, concerning your employment
11 with Dollar General, matters alleged in
12 the complaint, any purported
13 discriminatory or illegal conduct; do you
14 see that there?
15    A.    I do.
16    Q.    Do you have any personal
17 knowledge as to why Dollar General did not
18 get this diary, Defendant's Exhibit 7,
19 prior to today?
20    A.    Nobody never asked me for one.
21    Q.    Okay.  But you see there in
22 number eleven it is requesting all
23 diaries?

Page 143

1     A.    Uh-huh.
2     Q.    Is that a yes?
3     A.    Yes, sir, I see the -- where
4  it says all diaries, yes, I do.
5     Q.    Okay.  And you gave all your
6  diaries and notes with regard to this
7  lawsuit to your lawyer, correct?
8     A.    I did.
9     Q.    All right.  And I think you
10 said it was more than three months ago
11 when you did that, correct?
12    A.    Yes.
13        (Whereupon, Defendant's
14        Exhibit 13 was marked for
15        identification.)
16    Q.    Let me show you what I have
17 marked as Defendant's Exhibit 13.  Do you
18 recognize this as being your responses to
19 Dollar General's first interrogatories
20 that were directed to you --
21    A.    Yes, sir.
22    Q.    -- that you signed under
23 penalty of perjury back on February 27,

Page 144

1  2006?
2     A.    Yes, sir.
3     Q.    Do you know who Samantha Hill
4  is?
5     A.    I do.
6     Q.    Who is that?
7     A.    She is a girl I worked with.
8     Q.    Which store?
9     A.    Bowdon.
10    Q.    What was her position?
11    A.    She was a clerk.
12    Q.    When was the last time you
13 talked to her?
14    A.    Probably nine months ago.
15 Last summer maybe.
16    Q.    Did you talk about this
17 lawsuit with her?
18    A.    No.  I went swimming.  Uh-uh,
19 it was just a swimming and playing with
20 the kids thing.
21    Q.    Did she work off the clock at
22 that Bowdon store?
23    A.    Yes, I think she did.  I can't

JOY CREWS
DOLGENCORP, INC.

Page 145

1  swear to it, but I think she did.
2      Q.   How about Talisha Blackwelder,
3  who is that?
4      A.   She was a clerk there too.
5      Q.   Did she work off the clock at
6  that Bowdon store?
7      A.   Yes, sir.
8      Q.   You know that for a fact?
9      A.   Yeah, I'm pretty sure that's a
10 fact, yes, sir.  She did work off the
11 clock, and Gigi too.
12     Q.   How about Robin Wiggins?
13     A.   I can't swear to her.  Like I
14 say, she wasn't there long after I came to
15 work.  I know Robin well, but I -- I think
16 she did, but I don't want to swear to
17 nothing I don't know for sure.
18     Q.   Okay.  What was Robin's
19 position?
20     A.   She was third key when I came
21 to work there.
22     Q.   Did her position change while
23 you were there?

Page 146

1      A.   Yeah, she quit after Vivian
2  accused her of stealing.
3      Q.   How about Joyce Soling?
4      A.   It's Saling, S-a-l-i-n-g.
5      Q.   Who was she?
6      A.   She was a part-time clerk.  I
7  don't know if she ever worked off the
8  clock or not, but she knew what was going
9  on.
10     Q.   She was only at that Bowdon --
11     A.   Bowdon store.  She also worked
12 in the Carrollton store.
13     Q.   How about Vanessa Johnson?
14     A.   She worked in the Bowdon
15 store.  And I think she worked off the
16 clock some too, but she didn't stay long
17 after Vivian accused her of stealing
18 either, so I don't -- I can't really
19 remember if she did or not.
20     Q.   Did anybody ever complain, as
21 far as you know, to Dollar General
22 corporate about Vivian Keith falsely
23 accusing employees of stealing?

Page 147

1      A.   I don't know if any of them
2  did or not.
3      Q.   You never did, though?
4      A.   No, I didn't.
5          MR. DEERING:  Roman, I think
6  that's all I have.
7          MR. SHAUL:  I have just a few
8  follow-ups.
9
10 EXAMINATION BY MR. SHAUL:
11     Q.   Ms. Crews, have you ever
12 received time and a half for any hours
13 that you worked over forty in a given week
14 while you were employed at Dollar General?
15     A.   No, sir.  I don't think I ever
16 got paid one overtime hour.
17     Q.   Explain how you first came in
18 contact with a lawyer in this case.
19     A.   Me and Sally was talking one
20 day and -- no, let me back up.  I was in
21 the store I'm in now talking to Charlotte,
22 and she had -- I told her what had
23 happened about Lynda taking me down from

Page 148

1  assistant back to a lead -- I mean, just a
2  plain clerk and cutting my hours.  And she
3  told me that that was strictly against the
4  law and me over forty.  And it just
5  started from there.
6      Q.   Okay.  What did you do after
7  she told you that?
8      A.   I got to talking to my friend
9  Sally about it.  And me and her called the
10 EEOC and found out it was true.  And I
11 just -- it went from there.
12     Q.   Okay.  At any time were you
13 afraid that your store manager would take
14 any type of action against you if you
15 refused to work off the clock?
16         MR. DEERING:  Object to the
17 form.
18     A.   I was always afraid of her
19 firing me because of the insurance.
20 That's why I went back to work.
21     Q.   You were talking to Mr.
22 Deering about a conversation between you
23 and your store manager on face fronting.

Page 149

1  In your opinion, was she disciplining you
2  on the issue of face fronting or was she
3  just training you on what face fronting
4  means?
5  MR. DEERING:  Object to the
6  form.
7  A.  My opinion was that she was
8  showing me the way she wanted it done.
9  Q.  Okay.  Was she getting on to
10  you or was she just training you, in your
11  opinion?
12  A.  Well, I really felt like she
13  was just showing me how she wanted it
14  done.  She may have been getting on to me,
15  I --
16  Q.  You mentioned earlier that
17  your store manager told you that she
18  wanted someone cute and perky.  In your
19  opinion, did that belief that she wanted
20  someone cute and perky, did that have
21  anything to do with her decreasing your
22  hours from forty to fifteen?
23  MR. DEERING:  Object to the

Page 150

1  form.
2  A.  I don't know if it did or not.
3  It may have, may not, I don't know.
4  Q.  Well, let me ask it another
5  way.
6  A.  Okay.
7  Q.  What is your belief on why you
8  were reduced from forty hours to fifteen
9  hours?  That's probably a better question.
10  MR. DEERING:  Object to the
11  form.  Asked and answered.
12  A.  I don't know how to answer
13  that, Roman.
14  Q.  Just the best of your ability.
15  MR. DEERING:  Same objection.
16  A.  I think it had a lot to do
17  with the kind of person I am, and I think
18  she cut my hours because she wanted to get
19  rid of me.  And she was solely weeding out
20  the older ones so it was all young people,
21  except for John.  But she had made a
22  remark she needed a man around for the
23  heavy lifting, so that was --

Page 151

1  MR. SHAUL:  That's all I have
2  got.
3  A.  Okay.
4
5  REEXAMINATION BY MR. DEERING:
6  Q.  Ms. Crews, I think you just
7  testified that you felt that Ms. Hall was
8  weeding out the older ones.  What do you
9  mean by that?
10  A.  Well, all the older ones went
11  first.
12  Q.  Okay.
13  A.  We had one -- let me back up.
14  We had one lady that was on up in the
15  years that was a real good worker for us,
16  her name was Mary, I really liked her.
17  Out of all of the people that applied for
18  that job, I picked her out of all of them
19  because I liked her and she was a hard
20  worker.  And she was the first one to go.
21  And the reason she went was a young girl
22  twenty years old telling her what to do.
23  Q.  What was Mary's last name?

Page 152

1  A.  I can't think of it for
2  nothing.
3  Q.  What was her position?
4  A.  She was just a clerk.  She was
5  the first one to go.
6  Q.  And this was at the Ranburne
7  store?
8  A.  Yes, sir, it was.
9  Q.  Did Mary stay on after setup
10  was all over and --
11  A.  Yes, she was one of the ones
12  picked to stay, until they put a young
13  girl over, and then she was out of there.
14  Q.  Mary didn't want to have to
15  report to someone who was younger than
16  her?
17  A.  No.
18  Q.  Is that correct?
19  A.  Yes, that's correct.
20  Q.  Okay.  Do you know who took
21  Mary's spot?
22  A.  No, sir, I don't.  Well, let
23  me back up again.  Yes, I do.  They didn't

JOY CREWS
DOLGENCORP, INC.

JOY CREWS
September 14, 2006

(Pages 153 to 156)

Page 153

1  anybody take it.  When they hired -- when
2  they picked like nine out of the bunch
3  that stayed, they knew some -- that was
4  more than enough for the job.
5      Q.   Okay.
6      A.   So I felt like they was
7  weeding some out, I mean --
8      Q.   Anybody else that you felt
9  like they were weeding out that was older
10  like Mary?
11      A.   Yes, Mildred Calhoun.
12      Q.   How old was Mildred?
13      A.   She was close to fifty.
14      Q.   What happened to her?
15      A.   She was like me, she was
16  offered the lead clerk when we first
17  started to work, and then they just cut
18  her hours back until she quit too.
19      Q.   Was she gone by the time you
20  left?
21      A.   No, she left right after I
22  did.
23      Q.   So do you have any personal

Page 154

1  knowledge as to why she left?
2      A.   No.  Well, let me back up
3  there.  Some of the hours had a lot to do
4  with it.  She wasn't getting many.
5      Q.   Did she tell you that?
6      A.   Yes.
7      Q.   Okay.
8      A.   Because I saw her after she
9  quit.
10      Q.   Where did you see her?
11      A.   Just in town.  Ranburne is a
12  small town.
13      Q.   Do you recall where
14  specifically it was?
15      A.   It might have been in the
16  grocery store.  I don't -- no, I don't
17  remember.
18      Q.   What was her position?
19      A.   She was -- she was hired in
20  just as a clerk, but she was offered lead
21  clerk.
22      Q.   I think you said sort of like
23  you were at one time?

Page 155

1      A.   Yes.
2      Q.   Was she offered the position
3  after you left?
4      A.   No.  When I was offered the
5  assistant manager's position, they told
6  her that if -- she could possibly have the
7  lead clerk.
8      Q.   Okay.  Sort of like you could
9  possibly have the assistant manager
10  position, correct?
11      A.   Yes.  And then, you know, they
12  put the twenty years over us -- twenty-
13  year-old over us.
14      Q.   And that was after weeks of
15  Lynda Hall and Norman Kennessey knowing
16  what was going on in the store, correct?
17      A.   Yes.
18      Q.   All right.  So other than
19  Mildred and Mary, anybody else that you
20  claim they were weeding out the older
21  ones?
22      A.   That was all -- all the rest
23  of them were young people.

Page 156

1      Q.   Is it your testimony that no
2  other under-forty employees were
3  terminated or resigned at the Ranburne
4  store during that same time period?
5      A.   I don't remember another one.
6  John Pritchard was the man that worked
7  there.  He might have been over forty, I
8  don't know.  I don't -- he didn't last
9  long.  He was still there when I quit,
10  but --
11      Q.   Do you know how long Mr. --
12  what did you say, John --
13      A.   John Pritchard.  It's
14  Pritchard or Prater -- I believe it's
15  Pritchard.
16      Q.   John Pritchett?
17      A.   Pritchett, that may be it.
18      Q.   That was Mary Bishop, was that
19  her name?
20      A.   That's her, Mary Bishop.
21      Q.   That is the Mary you were
22  talking about earlier?
23      A.   That is, uh-huh.  And Mildred



Page 157

1    Calhoun.
2        Q.    Do you have a judgment as to
3    how many employees were working for Dollar
4    General at that Ranburne store during the
5    setup period?
6        A.    I can guess it was about
7    fourteen or fifteen during the setup
8    period.
9        Q.    Okay.  Full time or were some
10   of those part time?
11       A.    The first two weeks was forty
12   hours for everybody, because they wanted
13   the store opened as quickly as possible.
14       Q.    Okay.
15       A.    Within ten days I think it was
16   supposed to be, so that would be two
17   workweeks.
18       Q.    Okay.  If I told you that
19   twelve of the employees who worked during
20   that setup time were under the age of
21   forty and were not retained to work at the
22   Ranburne store permanently after setup,
23   would you have any reason to dispute that?

Page 158

1        A.    Tell me that again.
2            MR. DEERING:  Can you read
3    that back, please?
4            (Record read.)
5        A.    No.
6            MR. DEERING:  That's all I
7    have.
8            MR. SHAUL:  That's all I have.
9
10           FURTHER THE DEPONENT SAITH NOT
11
12       (Whereupon, the deposition of
13   Joy Crews was concluded at
14   11:33 a.m. on September 14,
15   2006.)
16
17
18
19
20
21
22
23

Page 159

1            DEPONENT'S CERTIFICATE
2
3        I, JOY CREWS, the witness herein,
4    have read the transcript of my testimony
5    and the same is true and correct, to the
6    best of my knowledge.  Any corrections
7    and/or additions, if any, are listed
8    separately.
9
10
11
12           JOY CREWS
13
14       Sworn to and subscribed before me,
15   this the      day of         , 2006, to
16   certify which witness my hand and seal of
17   office.
18
19
20
21
22
23           NOTARY PUBLIC

Page 160

1            C E R T I F I C A T E
2
3    STATE OF ALABAMA
4    JEFFERSON COUNTY
5
6        I hereby certify that the
7    above and foregoing deposition was taken
8    down by me in stenotypy, and the questions
9    and answers thereto were reduced to
10   typewriting under my supervision, and that
11   the foregoing represents a true and
12   correct transcript of the deposition given
13   by said witness upon said hearing.
14       I further certify that I am
15   neither of counsel nor of kin to the
16   parties to the action, nor am I in anywise
17   interested in the result of said cause.
18
19
20
21
22
23           COMMISSIONER-NOTARY PUBLIC

JOY CREWS
DOLGENCORP, INC.

| A | | | | |
|---|---|---|---|---|
| **ability** | 2:2 | 105:8 | 5:14 126:23 127:1 158:14 | 117:3 120:15 124:3,7 |
| 11:6,10 69:7 136:23 | **ahead** | **approved** | | 136:23 137:1 150:14 |
| 150:14 | 24:15 40:23 129:5 134:3 | 26:8 | **B** | 159:6 |
| **able** | **ahold** | **April** | 1:20 2:5 4:7 5:1 | **Beth** |
| 134:12 | 134:5 | 26:9 29:2 32:2 47:19 | **back** | 58:21 |
| **absence** | **ain't** | 67:12 73:20 119:1 | 20:18 31:15,18 36:9 38:13 | **better** |
| 140:11 | 125:3 | **area** | 40:10 42:1 44:23 45:22 | 150:9 |
| **access** | **air** | 21:22 62:12 63:22 110:13 | 46:14 47:5 48:22 51:17 | **big** |
| 52:15 | 49:13 | 110:15 | 56:19 59:11,12 62:16 | 35:6 49:11 79:12,13 113:8 |
| **accurate** | **aisles** | **arrested** | 63:20 65:19 68:22 | 128:9 |
| 109:15 136:23 138:6 | 78:18 | 122:11 | 70:6 76:4 79:2,3 96:4 | **Bill's** |
| **accurately** | **AL** | **articulate** | 100:9 107:6,10 131:20 | 14:6 |
| 11:7 139:5 | 3:19 | 7:15 | 134:1,11 135:21 137:14 | **bin** |
| **accuse** | **Alabama** | **asked** | 143:23 147:20 148:1,20 | 36:8 |
| 53:13 67:21 | 1:2 3:10 5:4,5,12 9:11 | 24:6 30:7 48:4 49:4 | 151:13 152:23 153:18 | **Birmingham** |
| **accused** | 10:8 21:15 34:10 120:11 | 64:17 67:15 81:14 84:1 | 154:2 158:3 | 3:19 5:3,12 |
| 146:2,17 | 160:4 | 89:20 94:18 110:1 113:5 | **background** | **birth** |
| **accusing** | **aliases** | 118:6 129:18 137:8 | 23:16 | 10:1 |
| 146:23 | 122:22 123:3 | 142:20 150:11 | **bad** | **Bishop** |
| **acknowledging** | **alleged** | **asking** | 13:16 22:16 88:2 100:15 | 156:18,20 |
| 109:2 | 142:11 | 53:2 78:19 81:12 109:20 | **bank** | **bit** |
| **acknowledgment** | **Allen** | 111:15 141:19,20 | 15:1 34:19,21,23 35:5,9 | 22:18 74:2 |
| 38:14 43:20 45:14 | 3:6 | **assign** | 35:14,17 37:14,16 64:21 | **Blackwelder** |
| **acknowledgments** | **allergy** | 2:13 | 105:17 140:19 | 62:14 107:17 145:2 |
| 39:3 42:23 | 49:6 | **assistant** | **banking** | **blame** |
| **act** | **allowed** | 14:14,15 16:10 27:7 29:16 | 104:7,19 105:5 106:1 | 36:20 |
| 126:3 | 48:8 105:11 | 29:18 30:2,7,23 32:16 | 108:1 | **blood** |
| **acted** | **allowing** | 32:19,21 34:13 36:5 | **bankruptcy** | 10:23 22:17 |
| 32:18 | 116:11 | 46:17 60:2 63:17 75:12 | 124:1 | **body** |
| **acting** | **amount** | 75:15 76:6 83:3 87:2 | **bank's** | 41:8 |
| 5:5 | 65:14 96:6 105:12 139:5 | 89:19 97:4,10,13 98:11 | 35:23 | **book** |
| **action** | **Anacin** | 98:15 140:12 148:1 | **based** | 58:3,6 |
| 1:5 148:14 160:17 | 129:15 | 155:5,9 | 34:5 86:17 | **born** |
| **actual** | **and/or** | **assistant's** | **basically** | 8:15 |
| 29:22 115:13 | 159:7 | 97:21 | 32:3 | **borrow** |
| **additions** | **answer** | **assume** | **basis** | 65:15 |
| 159:7 | 7:14 31:6 82:16,19 84:19 | 104:2 | 87:4 90:16 91:21,23 114:6 | **borrowed** |
| **address** | 104:10,12 113:18 114:2 | **attempts** | 125:8 | 76:7 |
| 10:6 | 115:8 150:12 | 132:5 | **Beasley** | **bottom** |
| **adjustment** | **answered** | **attendance** | 3:6 | 66:1 127:11 140:9 |
| 109:12,13 | 150:11 | 69:11 | **begging** | **Bowdon** |
| **affect** | **answers** | **attention** | 128:10 | 14:1 19:11,13 21:1,14 25:5 |
| 11:10,12 | 160:10 | 142:4 | **beginning** | 25:16 33:5 56:21 57:10 |
| **affirmatively** | **anybody** | **Attorney** | 32:9 53:6 | 70:16,17 71:20 84:12 |
| 28:13 | 42:12 44:18,21 88:4,7 | 3:5,14 | **behave** | 105:3,7 114:5 116:4,8,18 |
| **afraid** | 108:13 119:18,21 136:8 | **attorneys** | 126:2 | 118:15 119:7 121:5 125:1 |
| 148:13,18 | 146:20 153:1,8 155:19 | 6:6 112:13 | **belief** | 144:9,22 145:6 146:10 |
| **African-American** | **Anything's** | **attributed** | 149:19 150:7 | 146:11,14 |
| 28:18 | 133:13 | 32:8 | **believe** | **Box** |
| **age** | **anyway** | **August** | 12:8,22 47:4 65:8 86:16 | 3:8 |
| 53:23 54:13 57:7 59:18 | 108:18 | 17:5 | 92:5 125:23 130:1 | **boxes** |
| 60:7 75:13 86:17 87:5 | **anywise** | **Aunt** | 156:14 | 79:10 |
| 89:7 90:9,16 91:5 92:5 | 160:17 | 8:18 | **Benadryl** | **break** |
| 157:20 | **apart** | **authorizing** | 11:2,5 | 79:11,12 126:22 |
| **ago** | 103:18 | 140:17 | **benefits** | **breaking** |
| 55:11 58:10 87:12 94:18 | **applied** | **Avenue** | 16:13 122:4 | 79:10 |
| 94:20 131:18,22 135:9 | 151:17 | 3:18 5:11 | **best** | **breast** |
| 143:10 144:14 | **apply** | **average** | 7:15,21 29:1 47:6,9 50:15 | 41:10 57:3 |
| **AGREED** | 19:6 22:2 | 116:17 117:7,7 121:2 | 59:9 69:7 116:16 117:1 | **breath** |
| | **approve** | **a.m** | | 63:17 |

JOY CREWS
DOLGENCORP, INC.

JOY CREWS
September 14, 2006

Bridge
137:10,13
bring
54:2 62:11
bringing
27:8
brought
6:8 24:17 27:4 55:5
57:18 75:17
brushing
41:8
budget
53:4
Bug
8:18,18 122:23
buggies
36:8
building
49:13
bullies
23:8
bully
23:9,11
bunch
49:10,11,17 153:2
business
116:14
bust
111:10
buy
16:14 72:18

_____ C _____
C
3:1 160:1,1
Calhoun
127:13 153:11 157:1
call
6:10,11 38:5,6 42:17
43:10 54:11 55:19
58:21 66:2,6,9,10 74:9
134:16
called
28:2 33:12 43:13 44:6
46:21 48:6 59:17 66:4
66:11 74:12,14 104:19
105:16 110:19 133:14,17
134:23 148:9
calling
134:1,21
calls
8:17 36:11 115:7
car
62:13
Carly
60:20 89:16,17 90:4,20
97:8 98:14,20 100:19
100:22 101:6,17,22
102:2,4,5,11
carrier

19:8
Carrollton
46:18 49:15 146:12
case
6:7 75:14 86:15 91:5
104:4,14 112:14 141:16
147:18
cash
126:1
cashier
127:9 128:12,18
cashiers
128:1,23
cause
5:15 160:18
cell
133:19
Center
43:8,14,23 54:9 59:18
Central
19:18,18,20
certain
29:5 65:14 96:5,6 105:11
Certainly
58:20
CERTIFICATE
159:1
Certified
1:21 2:6 5:2
certify
5:6 159:16 160:7,15
chain
34:4
change
34:18 35:2,6 52:13,21
77:1 96:10 128:14
145:22
changed
52:12,14
Changing
57:5
characterize
84:16
characterized
130:1,3
charge
27:20 68:20 123:18,21
charged
122:8
charges
100:3
Charlotte
15:3 16:8,9 147:21
check
55:19 66:4 134:17,22
135:2,10
checkout
127:21
children
13:18,21

chip
100:10
choose
128:18
chops
111:11
Chris
6:5
Christmas
105:20 110:11,12 114:21
Christmastime
110:11
Christopher
3:13
chronological
131:4
circle
40:22 41:9
circling
41:4
Civil
1:5 5:7
claim
75:14 86:14 91:5 97:7
98:9,12 104:18 115:22
116:5 155:20
claimed
120:17
claiming
86:16,20 87:4 89:7 90:9
104:4,14 115:17 117:20
claims
7:7 54:1
Clark
10:19 12:3,9 13:21
clear
67:17 106:20
clerk
20:20,21 21:4 45:5 60:2
84:6 97:18 98:8,10,14
140:3,13,20 144:11
145:4 146:6 148:2
152:4 153:16 154:20,21
155:7
clock
45:17 52:4,8,8,20 106:12
106:12,22 107:3,9,23
109:3,19 112:8,12 113:21
116:11 144:21 145:5,11
146:8,16 148:15
clocked
52:2 57:12,13 107:8
close
84:2 153:13
closed
78:2,7,11
closer
25:12
closing
83:22 84:7

code
52:3
Coke
27:9
Colonial
37:13
come
16:4 21:19 22:2 63:13
91:3 125:7
coming
18:13,16 105:18 110:13,16
commencing
5:13
comment
66:2 102:8,13 105:5
Commerce
3:9
commercial
9:16
Commission
53:18
Commissioner
2:6 5:6
COMMISSIONER-NOTARY
160:23
community
25:15
comp
122:4
company
6:8,10 16:20 17:2 45:18
52:1 69:13 109:4
113:22
compared
84:17
compensate
104:6
compensated
117:14
complain
42:11 43:10,21 44:6 53:9
53:17 54:8,15 59:18
108:12 146:20
complained
36:17 119:13
complaint
60:7 142:12
complaints
78:3
completed
37:10
computer
52:16
concerning
132:5 142:10
conclude
60:10
concluded
158:13
conclusion

115:7
condition
11:16
conduct
142:13
confront
23:2
consider
90:18
contact
41:7 147:18
contacted
112:12
contained
57:18
contending
75:11
continue
29:7
continued
21:13
conversation
47:8 74:20 82:4 93:21
94:14 96:1,11 132:20
148:22
conversations
25:3
Cook
107:16 120:6
copies
55:15
copy
40:3 55:3 138:7,18
Cornwell
60:20 89:16,18 90:21
97:9 98:15,20 100:20
corporate
66:12 134:5 146:22
correct
6:16 7:8 21:5,16 26:16
29:2,8 31:8 32:5,9,17
34:6 38:16 39:18 40:8
45:19,22 50:17 53:10,18
60:8 65:11 66:21 67:19
68:8 69:6,16 72:5
73:14,21 74:4,15 75:9
77:7 81:20 83:4,22
84:10 85:13 86:19,23
88:14 91:6,15 93:5
97:14 102:18 103:12
108:3 109:4,19 113:13
113:23 116:6 118:17
119:2,17 125:17 128:1
128:23 130:5 134:6
140:22 143:7,11 152:18
152:19 155:10,16 159:5
160:13
corrections
159:6
counsel

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

JOY CREWS
DOLGENCORP, INC.

2:4,10,12  5:10  82:7
160:16

**counseled**
38:2  61:22  77:22  92:12

**counseling**
38:5  61:6  65:4  66:19
67:5  75:22  82:11

**count**
65:16  95:21  130:11

**counted**
93:10,16,18,23  95:19

**counter**
127:21

**counting**
14:23  34:17  94:7  140:18

**county**
9:12  10:7,13  160:5

**couple**
41:22  61:1  66:18  73:6
118:11  121:6

**course**
123:11

**court**
1:1  5:9,22  7:12

**crew**
26:16,19  83:18

**Crews**
1:7,16  2:5  5:14,18  6:5
8:12,17  10:19  12:9  37:6
66:17  96:14  127:5
129:21  136:18  139:23
141:10  147:11  151:6
158:13  159:3,12

**Crow**
3:6

**current**
9:9  10:5

**currently**
10:20  13:23

**cussing**
81:11,23  82:6

**customer**
125:7  127:19  128:13
134:23

**customers**
80:17  81:4  126:3  127:19

**cut**
15:9  16:11  72:16  73:3
76:19,20  86:23  92:9
98:4  102:20,22  103:4
150:18  153:17

**cute**
87:9,22  88:1,5,21  149:18
149:20

**cutting**
148:2

---
**D**
---
**D**
4:1

**Dalrymple**
36:11

**Dalrymple's**
36:14

**date**
5:6  10:1  26:14  51:19
56:5,11  77:16  124:5
130:18

**dates**
70:1  130:8

**Davis**
98:16,16,22  100:7  101:11

**day**
5:13  16:7  21:21  22:22
25:10  27:6  34:22  41:11
46:19,21  48:21  49:1,12
49:14  62:2,7,7,8,9,15
64:18  70:22  71:9,14,20
72:12  76:2  78:8  80:18
80:23  81:8,13  86:3
87:19  93:12  95:2
109:8,21  121:6,10,17,17
121:21  128:19  133:20
134:21  138:12  139:2
147:20  159:15

**days**
45:8  46:9,11  47:3,5
57:15  66:9,10  121:7,10
121:12,15,19  134:3
157:15

**Deakins**
3:15

**deal**
36:16  113:8  134:12

**declare**
69:4

**decreasing**
149:21

**Deering**
3:13  4:3,5  6:1,4,6  24:22
58:17  66:15  70:5  96:13
122:21  126:20  129:19
147:5  148:16,22  149:5
149:23  150:10,15  151:5
158:2,6

**Defendant**
1:11  3:12

**defendant's**
4:8,9,10,11,12,13,14,15,16
4:17,18,19,20  37:2,6
38:18,22  39:8,12,16,20
42:23  43:17,19  45:12
62:18  63:6  65:3  68:14
68:18  69:21  109:2,5
127:2,6  128:4  129:2,9
129:22  130:11  131:5,10
132:3  135:6  136:13,17
137:21  138:2,13,17
139:4,18,22  140:10
141:2,7,11,14,22  142:18

143:13,17

**definition**
80:10

**DEPONENT**
158:10

**DEPONENT'S**
159:1

**deposed**
6:19,21

**deposit**
35:16,19,22  37:10  64:20
83:16  92:23  93:7  96:8
96:21

**deposited**
37:17

**deposition**
1:14  2:4,15  6:14,22  7:6
129:8  158:12  160:8,13

**deposits**
35:9  37:20  79:17  93:5
95:16  96:16  140:19

**describe**
14:19

**described**
70:21

**describing**
106:1,21  110:5

**description**
140:2

**designate**
103:8

**designated**
32:16

**DG**
6:11  80:15

**diagnosed**
12:7

**diaries**
142:8,23  143:4,6

**diary**
24:16  55:5,10,21  56:3
57:1,11,18  58:2,19  59:3
59:7  130:3,13,22  132:3
135:6  142:18

**died**
18:21  101:8

**difference**
25:20

**different**
14:5  22:20  59:23  65:19
84:14  121:11

**dimes**
35:4

**direct**
69:2  142:3

**directed**
89:8  90:9  143:20

**disability**
19:6

**disagreeing**
158:1

**92:16**

**disciplined**
61:22  69:11

**disciplining**
149:1

**discovered**
80:1

**discriminated**
86:17

**discrimination**
53:9  54:1,13  57:8  59:19
60:7,11  68:21  89:8
90:9  91:5  123:19

**discriminatory**
87:4  90:16  142:13

**discuss**
90:15  113:3

**discussed**
74:19  92:21  96:15  112:18

**discussing**
133:10

**discussion**
59:1  112:11  126:21  129:20

**dispute**
91:21  92:1  157:23

**distance**
25:14

**district**
1:1,2  5:8  21:22  23:22
24:2  31:10  64:7  83:9
119:14,21

**DIVISION**
1:3

**divorce**
13:9

**divorced**
123:7

**divorces**
123:12

**DM**
24:3  63:21  105:18  110:15

**document**
39:6,10,23  69:23  129:7
130:11,17  131:11  140:4
141:17,21

**documentation**
136:20  138:8,19

**documents**
54:23  138:4  141:15,23

**dog**
135:19

**dogs**
13:20

**doing**
41:21  92:14  107:13

**DOLGENCORP**
1:10  6:7,9

**dollar**
6:11  7:8  14:6  15:9,12
16:1,11  17:19  18:14,16

20:8  29:22  34:3  36:10
38:15  39:4,17  43:8
46:2  50:23  51:22  53:3
53:7  54:5,8,9,23  55:23
60:3,18  61:5,10  62:10
68:22  72:4  80:16
84:23  90:10  97:14  99:8
99:11,19  101:3  104:5,15
105:8  109:13  123:5,19
125:6  126:18  130:5
135:1  140:2  141:18
142:11,17  143:19  146:21
147:14  157:3

**dollars**
17:13  35:4  61:17  65:10,19
124:8

**donate**
128:13

**drank**
49:11

**drawer**
96:4

**drawers**
14:23  34:17  35:3  93:10
93:15,23  94:7

**drink**
49:9

**driver's**
9:9,13,16,20

**drug**
46:3,9,13,17,23  47:5,10,14
47:22  48:2,7,9,12  50:9
50:17  100:12

**drunk**
49:17

**due**
132:15  133:1

**duly**
5:19

**duplicate**
40:11

**duties**
14:20  34:12  84:7  140:20

**duty**
81:20

---
**E**
---
**E**
3:1,1  4:1,7  160:1,1

**earlier**
12:23  50:22  59:3  65:9
93:4  118:16  137:9
149:16  156:22

**early**
47:19  52:20  85:12  135:22

**earn**
17:10

**earned**
124:5  139:6

**earshot**

JOY CREWS
DOLGENCORP, INC.

88:7
Eastern
1:3  19:20
eat
27:8  65:16
education
20:4
EEOC
43:2  53:19,23  54:6  60:6
60:10  68:22  123:21,23
148:10
effect
11:6  95:17
effective
72:4
eight
26:22  33:13  59:10  116:21
117:6,10,16,19  120:16
133:15
eighteen
17:12
eighty
114:19
eighty-five-year-old
22:23  56:17
eighty-year-old
22:22
either
63:19  72:11  77:13  90:5
99:5,19,21  100:23
101:17  108:19  146:18
elevated
90:20
eleven
128:16,17  142:4,22
elicit
7:6
emotional
12:5
employed
16:19  17:18  61:9  69:12
101:3  130:23  147:14
employee
39:3,17  43:7,8,14,22  54:9
59:17  80:16  90:19
121:8  125:23
employees
26:18  29:6  56:16  60:18
88:12,20,23  107:12
116:11  125:17  146:23
156:2  157:3,19
employer
122:8,9  137:5,7
employment
16:1  20:10  38:16  39:4,22
46:1  53:7,17  54:5,7
55:22  72:4  101:12  113:1
130:4  142:10
empty
27:3

ended
20:10  113:1
enjoy
124:17,17
enter
127:20
entire
22:14  118:23  119:5,9
entitled
58:15,21
entries
132:4
entry
130:16
Equal
53:17
ERC
42:17,19  43:5
erroneous
93:5
error
38:8
established
73:19  85:11  118:14
everybody
13:16  22:3  25:9  36:11
81:23  100:11  102:9
114:23  124:23  136:6
157:12
everybody's
110:19
evidence
2:16
evidently
41:23
exact
56:4,10
exactly
65:17  73:11  84:3,8,11
106:2,15
examination
4:3,4  5:15  6:4  147:10
examined
5:19
example
50:12
excluding
123:12
exhibit
4:8,9,10,11,12,13,14,15,16
4:17,18,19,20  37:3,7,8
38:19,22,23  39:9,13,16
39:20  42:23  43:17,19
45:12  62:19,22,23  63:7
65:3  68:15,18  69:21
109:2,5  127:3,7,7  128:4
129:3,6,9,23,23  130:10
130:12  131:6,10  132:4
135:6  136:14,17,19
137:22  138:2,3,14,17

139:4,19,22  140:10
141:3,8,12  142:18
143:14,17
expect
124:13
expected
128:22
experience
19:4  99:5,7,13
Explain
147:17
explained
83:11  93:21  94:15  132:21
explaining
67:4  95:18
extent
85:2
extra
35:2,3,6  105:10,21  110:1
117:18

_____F_____

F
160:1
face
79:22  80:8,9  94:15
148:23  149:2,3
fact
145:8,10
failed
46:23  47:22  48:3  50:4,6
50:8,12  100:12  104:5,15
failing
50:17
fair
8:8  11:4,9,17  13:8  64:1
77:21  86:15  102:21
114:8  115:2  130:21
131:2
falsely
146:22
familiar
134:19
fan
49:11
far
6:14  15:18  25:16  99:10
119:12  126:8  128:7,15
128:20  131:7  136:1
138:9,21  146:21
fax
138:12
February
110:14  118:5,7  143:23
Federal
3:17  5:7,11
feel
86:21  100:15  125:20
felt
23:10  87:6  149:12  151:7

153:6,8
fifteen
16:12,14  26:21  52:19
72:17,17  149:22  150:8
157:7
fifth
122:20  142:7
fifty
15:8,11  30:15  50:23  51:10
153:13
figure
30:17
figures
30:16
file
122:3
filed
58:12  59:3  68:21  100:3
123:19,20  124:1  138:19
finally
109:23  134:4
find
66:5
fine
6:2  24:22  58:18  91:4
137:20
finish
82:15
fired
80:20  81:9
firing
82:1  148:19
first
5:19  7:1  9:21  17:18  18:21
32:4,10  38:12  45:12
47:13  50:7  55:21  56:2
63:6  69:10  74:2  87:14
95:7,12  99:11  112:10,17
112:21  117:23  118:6,6,10
118:12  119:10  122:1
123:22  129:8  130:16,18
131:3,5  140:9  141:15,22
143:19  147:17  151:11,20
152:5  153:16  157:11
five
19:15  25:19  121:15
flat
47:1  64:4
float
45:1  79:3
floor
45:7  76:2  78:4,20,22
79:6,9
floored
42:5
following
5:16  81:13  84:23  107:5
111:12  117:14
follows
5:20

follow-ups
147:8
force
106:9
forced
112:7
foregoing
5:9  160:8,12
form
2:11  38:14  104:10  109:13
112:16  113:15  114:2
115:7,11  125:10  148:17
149:6  150:1,11
formal
6:10  13:17
formally
53:9  97:12
forty
16:12  17:14,21  47:2,5
61:17  65:9,12  72:16
105:6,7  106:5  110:6
111:4,5,8,11,19  112:1,4
114:9  115:1  147:13
148:4  149:22  150:8
156:7  157:11,21
forty-eight
106:3  110:8  111:7,18
Forty-four
41:3
forward
29:7
found
54:6  148:10
four
17:3,3,4,5,5  25:19  27:18
52:5  58:10  73:10,12
76:16  95:9  117:7  121:19
130:7
fourteen
157:7
fourth
43:18
Friday
16:3  20:15  31:21  72:9,10
72:11
friend
100:17  135:14  148:8
friends
64:18  135:18
Frog
28:3  31:2
Froggy
28:3
front
40:10  41:17  45:5  49:11
59:11,12  80:17  81:3
85:4,6  100:10
fronting
79:23  80:8,9  94:16
148:23  149:2,3

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                                          http://www.TylerEaton.com

JOY CREWS
DOLGENCORP, INC.

JOY CREWS
September 14, 2006

full
8:11 15:13 73:23 74:1
76:21 79:14 105:17
157:9
full-time
17:6
fund
95:15 128:14
funny
36:12
further
158:10 160:15
future
85:17

**G**

Gail
1:20 2:5 5:1 82:17
General
6:11 7:8 15:12 16:1,11
17:19 18:14,16 20:9
29:23 34:4 36:10 39:5
43:9 46:2 50:23 51:22
53:3,7 54:5,8,10,23
55:23 60:3,18 61:5,10
68:23 72:4 80:16
84:23 90:10 97:14 99:8
99:12,20 101:3 104:5,15
105:8 109:14 123:5,20
125:6 126:19 130:5
135:1 140:2 141:18
142:11,17 146:21 147:14
157:4
General's
38:15 39:17 62:11 143:19
Georgia
14:2 19:13,23 20:1 56:20
84:10 86:12 111:1
getting
9:21 34:18 56:8,12,16
64:20 108:17 112:4
149:9,14 154:4
Gigi
63:18,23 64:3,8,14,17,22
107:16 112:22 120:3
145:11
Gigi's
120:5
girl
81:23 87:20 88:2 144:7
151:21 152:13
girls
136:11
give
33:10,19,20 48:8 59:7
71:2 76:7 82:18 107:6
112:2 124:7 125:15
given
6:16 147:13 160:13
glad

66:3
go
15:22 18:5 19:20 23:14
24:15 28:1 35:5 40:23
46:16 48:17 52:20
58:22 62:6,16 66:12
79:19,22 86:9 114:21
118:1 119:2 121:8
122:22 129:5 131:4
136:1 151:20 152:5
God
126:18
goes
6:14 68:13
going
7:10,11,12 15:1 24:12
26:21 33:10 34:18 37:5
39:15 43:16 48:15
50:19 62:21 64:2,7
66:23 67:11 78:18
79:17 82:6,14 83:13
85:18,19 91:11 94:4
103:1,5,9 107:9 118:1
119:8 122:19 124:16
127:5 129:9,21 132:14
132:23 136:16 138:1
139:21 141:10 146:8
155:16
good
11:20 13:17 33:14 60:4
122:17 124:23 151:15
Goodlettsville
34:5
gotten
115:19 117:18
government
19:7
grabbed
41:10
grabbing
57:3
graduate
19:10
Graham
10:7,12 19:14,17
grand
78:7,8 80:4 95:3,4,9,11
grandma
23:4
grandmother
101:7
grant
60:13
green
58:2,4
greet
127:18
greeted
127:19
groceries

16:15 72:18
grocery
120:10 154:16
grooming
135:20
grounds
2:14
guess
15:16 26:20 31:4 69:17,18
91:16 116:20,21,22
117:2 124:6 135:7 157:6
guessed
18:10
guessing
13:14 27:17 45:7 59:8,14
70:2 120:18
guesstimate
121:2

**H**

H
4:7
habit
63:12
half
115:20,21,23 117:18
147:12
Hall
28:9,11,20 30:9 32:16
37:19 70:11,21 71:13
72:20,21 74:8 75:5
77:4,20,21 78:17 79:16
79:21 81:12 82:3 83:1
83:10 84:14,22 85:10
87:11 88:14,19 90:20
92:12 94:14 95:15
101:18 102:1,12 103:10
125:16,19,22 127:10,23
135:21 151:7 155:15
hand
126:8 159:16
handbook
38:16 39:18
handle
63:23 64:9
handled
64:11 82:8
hang
124:13
happen
42:8 57:9 77:7 88:17
110:10,22 119:16 126:12
happened
23:5 55:7 70:14,20 82:4
100:21 101:5,10,12,14
126:11,16 147:23 153:14
happening
126:14
hard
41:18 82:16 103:21 112:3

151:19
hated
100:21
hawed
109:23
Hawk
120:10
head
28:13 89:2
headache
129:12
heads
68:13
hear
80:22 81:5,6,10,18 82:1
88:4 132:18
heard
89:12 100:18
hearing
81:22 160:14
heavy
150:23
Helen
86:11
help
28:23 32:1 73:20 105:10
helped
25:23
hemmed
109:22
high
19:10,11 20:4,5
Hill
144:3
hindsight
59:22 116:2
hire
20:19 23:18 109:6
hired
20:18 38:12 88:2 118:15
153:1 134:19
hire-on
51:19
hold
69:22
holding
25:7
Holloway
8:15,21 123:2
hollered
22:21
home
25:13 62:6 66:5,6
hot
49:12 131:19
hour
17:13 45:14 51:1,6,16
105:5 109:1 147:16
hourly
15:6,8 30:11,12,13 108:4,7

108:8 117:18 124:11
hours
16:11,14 17:14 30:17,18,19
51:23 53:4 57:5 72:16
72:18 73:4 76:20,21
92:10 102:20,22 103:4
103:8,18 104:7,20 105:6
105:12,16,17 106:2
107:6 108:1 110:1,7,20
114:10,17,18,19 115:1,13
116:17,21 117:6,15,19
120:17 147:12 148:2
149:22 150:8,9,18
153:18 154:3 157:12
house
10:16 25:17
hundred
46:9,11 47:2,4 65:18
114:22
hunting
100:9
husband
8:17 10:17 42:13 132:22
133:3,5,8
husband's
12:9 16:17 137:6

**I**

identification
37:4 38:20 39:14 62:20
68:16 127:4 129:4
136:15 137:23 138:15
139:20 141:9 143:15
illegal
142:13
immediately
15:23 18:15
important
7:13,23
importantly
127:18
improved
85:20
inaccurate
69:16
inappropriately
44:5
incident
81:13
including
34:9 41:7 128:3 141:1
income
124:4 138:7,18 139:6,16
incorrect
69:19,21
incorrectly
79:18
increase
32:23 33:2,8 87:2
indicating

**JOY CREWS**
**DOLGENCORP, INC.**

JOY CREWS
September 14, 2006

41:18 68:5
**individual**
30:22
**individuals**
29:11
**infection**
49:6
**information**
7:7 50:11 57:17 58:16
**initial**
41:1
**initially**
20:18
**insurance**
16:13 19:7 44:11 76:22
148:19
**intentional**
41:6,12,15,19
**interested**
22:1 160:18
**interrogatories**
143:19
**inventoried**
105:19
**inventory**
110:13 118:5,7,8,9,10,12
**investigate**
53:23
**investigated**
60:6
**IRS**
138:20
**issue**
132:2 134:13 149:2
**issues**
83:1
**item**
128:19

---
J
---

**January**
10:4 17:20 18:2,3,4,8,14
18:22 20:9,18 38:13
45:22 118:4,7,18
**JEFFERSON**
160:5
**Jennifer**
60:21 89:19 90:21 97:10
98:16,16,22 100:13
101:11,17
**Jerry**
63:21 66:8 105:17 110:14
119:18
**job**
14:13,20 16:5,17 17:6,11
21:13 23:19 25:7 27:23
29:20,21,22 33:18
34:12 36:5 44:10 61:7
72:14 75:22 76:6
77:23 83:2,11,14 85:19

92:14 93:19 94:3 97:2
97:6,21 98:9,12 99:5,11
100:9 124:14,17 135:12
136:2 140:2,19 151:18
153:4
**John**
60:23 150:21 156:6,12,13
156:16
**Johnson**
68:11 107:22 146:13
**Joy**
1:7,16 2:5 5:14,18 8:12,15
8:17 9:6 158:13 159:3
159:12
**Joyce**
146:3
**judgment**
29:1 47:6,9 59:9 116:16
117:1,4 120:16 124:3,7
131:17 157:2
**July**
14:12 20:10,11,14 31:21
32:4 46:20 72:5 73:14
74:2 132:5
**June**
8:18 32:3 68:22 69:3
74:1 77:10 85:12 91:10
122:23 135:21,22,22

---
K
---

**keep**
40:20 58:2 111:3 120:19
130:14
**keeping**
55:9,21 56:3,6 130:13,22
**Keith**
22:11 23:10,17 28:17 44:4
52:14 62:14 66:20 67:6
71:18 84:13 85:1 104:21
118:19 125:19 146:22
**Kennessey**
23:22 25:4 26:8 31:8
47:9 67:4,11,18 71:4
72:23 77:4,20 83:10
85:10,16 91:9 101:18
132:14,21 133:10 134:15
155:15
**kept**
51:22,23 55:13 65:13
142:9
**Kessler**
31:12
**key**
30:1 46:16 88:17 89:17,17
97:5,8 145:20
**keys**
76:7
**kids**
8:18 144:20
**kin**

160:16
**kind**
23:15 40:1 55:13 56:5
57:5 82:20 125:12
150:17
**Kings**
137:10,13
**Kingsbridge**
137:4
**knew**
31:11 33:18 53:12 81:8
100:3 124:23 125:1
146:8 153:3
**know**
8:8 11:19 13:17 16:7,13
17:9 30:13 31:5 35:3
36:1 37:8 39:1 41:1,14
41:21 42:5,9,17,18 43:2
43:5,11 49:1,21 51:3
57:4 58:9 63:1 64:11
65:20 66:14 67:15,16
68:19 70:2,3 73:6
76:16 77:16 81:6 82:12
82:13 83:6 84:19,20
88:6,9,10 91:8,14 94:3
94:11 97:3 98:8,19,23
99:2,4,10,14,18 100:16
100:22 105:1,5,9,12,14,16
101:21 102:14 103:18
104:2 105:21 108:11,16
108:21 109:8 110:5
111:6 113:10 116:9,23
119:12 120:7,13 124:15
125:11 127:8 128:15,20
130:14,19 131:12,21,21
133:11,18,22,23 135:17
138:9,21 140:1 141:13
144:3 145:8,15,17 146:7
146:21 147:1 150:2,3,12
152:20 155:11 156:8,11
**knowing**
155:15
**knowledge**
137:1 142:17 154:1 159:6
**known**
8:14

---
L
---

**L**
2:1
**lady**
27:23 36:9 151:14
**Large**
5:5
**lasted**
27:2
**late**
32:1 52:18 119:1 132:5
**law**
3:5,14 108:22 113:11,13,23

148:4
**lawsuit**
58:12 59:4 75:11 143:7
144:17
**lawyer**
55:1 58:19 59:5,7 104:11
123:7,8 131:13 138:5
143:7 147:18
**lead**
21:4 60:2 80:15 84:6
92:15 97:18 98:10,14
140:2,13,20 148:1
153:16 154:20 155:7
**leading**
2:12
**leave**
79:12 132:14,23
**left**
32:2 33:13 42:7 62:13,15
62:17 97:3 98:9 101:14
119:1 122:2 133:19
153:20,21 154:1 155:3
**legal**
115:7
**length**
96:5 119:5
**let's**
46:8 58:22 65:2 131:20
132:1
**level**
90:19 92:7
**liars**
74:22
**license**
9:9,14,17,21
**lied**
136:4
**life**
10:12
**lifting**
150:23
**liked**
151:16,19
**liking**
80:13
**line**
19:15,16,23 42:17,19 43:5
77:2 125:15
**lined**
72:14
**Lineville**
28:7 103:14,16 104:1,3
**list**
127:9 140:12
**listed**
141:2 159:7
**listening**
24:15
**Literacy**
128:14

**little**
17:16 22:18 25:15 27:19
35:7 74:1 114:13
**lived**
10:10 12:19 36:9
**loading**
45:1
**lobby**
49:9
**log**
130:3
**long**
10:9 12:17 13:5 14:10
17:1 27:2,14,19 32:11
55:11 73:8,11 76:19
85:18 92:9 102:11,15,16
102:16,18,19 118:3
131:18 145:14 146:16
156:9,11
**longer**
70:23 75:18 101:13
107:19
**look**
37:7 39:1,21 52:16 57:4
57:21 62:23 65:2 68:19
139:23 141:12
**looked**
142:1
**looking**
16:10 24:20 70:9
**looks**
37:11 40:1 69:1
**lot**
36:7 41:23 52:21 59:23
68:13 72:18 99:12
105:9 107:19 124:9
125:3 137:18 150:16
154:3
**lots**
23:13
**loud**
7:14
**low**
114:16,17
**lunch**
65:16
**lying**
47:1 50:14
**Lynda**
27:23 28:5,9,20 30:9
33:16 34:22 35:13
70:11 71:13 72:21 74:8
78:10 81:9 82:1 83:10
87:11 91:17 99:3 101:21
102:1 103:10 127:10
134:15 135:21 136:4
147:23 155:15
**Lynda's**
135:11
L-y-n-d-a

JOY CREWS
DOLGENCORP, INC.

28:11

**M**

machine
138:12
machines
27:9,9
maiden
8:20
main
14:4 52:15
maintained
130:4
making
15:11 35:16 42:1 56:3,14
80:2 111:17 113:17
140:19
mama
18:19 36:10,14
man
16:20 42:3 76:5 100:11
150:22 156:6
management
71:1 73:1 75:18 77:6
83:18 84:14,17 86:19
89:16 90:19 91:11 92:6
103:1,21 140:21
manager
14:14,16 15:4 16:7 21:22
21:23 22:8,13 23:23
27:7 28:6 29:16,18
30:23 31:10 32:17,21
34:14 46:17 60:2 63:17
64:7 75:12 83:4,9
97:13 103:11 108:5
110:13 114:23 116:10
118:20,23 119:14,22
127:10 140:11,12 148:13
148:23 149:17 155:9
manager's
155:5
managing
103:22
March
118:7,8
mark
129:6,9
marked
37:3 38:19 39:13 43:17
62:19,22 68:15 109:1
127:3,6 129:3,22 136:14
136:17 137:22 138:2,14
138:16 139:19,22 141:8
143:14,17
marking
37:6 38:22 39:16 68:18
141:11
married
8:16 12:17,23 13:5
Mary

151:16 152:9,14 153:10
155:19 156:18,20,21
Mary's
151:23 152:21
matter
23:9 66:11
matters
142:11
maxed
110:20
ma'am
89:21,22
mean
15:10 41:17,20 42:18 43:5
52:12 53:5 57:6 76:20
89:13 93:2 94:11 96:23
100:1,23 101:1 104:2
105:5 113:11 115:17
116:22 119:16 120:14
124:9 136:12 148:1
159:1 153:7
means
20:5 149:4
meant
80:10
medications
10:21
meet
37:20 71:4 93:9
meeting
77:19 85:9,15 102:10
memory
11:17
mention
24:7
mentioned
28:4 29:5 149:16
merchandise
27:12 79:23 80:8
messed
37:23 96:9,12,21
messing
93:12 94:2 96:3
met
27:8 72:23 77:4 83:10
93:4 94:23 131:13
Methvin
3:7
middle
1:2 76:1
mid-January
51:17 118:16
mid-July
47:7
Mildred
60:22 88:15 127:13
153:11,12 155:19 156:23
miles
3:7 15:20 19:15 25:18
military

19:4
milkman
100:10
mind
85:4 113:6 129:16
mine
62:13 82:12 100:17 116:14
135:14
minute
69:22 114:16 132:1
minutes
52:20
missing
54:17 61:18 62:8 67:6
Monday
63:10,13,14 64:21 72:11
money
35:6,7 37:17 54:17 62:8
65:7,15 67:6 93:13
96:5,8,9 125:13,15
Montgomery
3:10
month
73:23 74:1 76:13 116:17
months
21:6 58:10 73:10,12
118:11 119:11 131:22
143:10 144:14
mopped
78:5
morning
6:16 11:22 12:2 63:13,14
78:9 80:4,12 94:19
95:20,21
move
46:15 66:15 96:13
moved
122:1
multipage
37:8 38:23 129:6,23
136:18 138:3
multiple
92:12

**N**

N
2:1 3:1 4:1
name
6:5,10 8:11,20 9:5 10:18
12:9 14:3,4 16:21,23
28:2,5 31:11 35:23
36:10 60:22,23 61:1
80:19 90:23 98:7 120:5
125:2 127:14 135:15
137:4 151:16,23 156:19
names
8:13
Nash
3:15
Nearly

17:3
necessary
2:9
need
8:7 53:2 105:10 125:13,14
needed
44:10 49:8 66:13 99:23
100:5 120:50 150:22
needs
13:16
negative
49:2
negatively
89:2
neither
88:18 101:2 119:13 132:22
160:16
nervous
96:18
never
23:7 31:11 33:7,16 44:5
46:7 48:20,22 52:17
63:15 64:13,13 65:16
66:3 68:1 69:10 78:1,11
79:5 84:4 86:22 87:1
88:2,19 89:12 94:6
95:18 97:12,23 98:1,4
104:3 108:9 112:6
115:20 123:6,13 126:4,5
128:15,21 129:18 133:2
133:5 136:10 142:20
147:3
new
24:12,14 25:6,22 26:15
36:2,2
nice
125:14
nickels
35:4
night
15:1 78:5 95:20,22 121:18
night's
11:20
nine
127:17 144:14 153:2
nineteen
17:13
nine-page
130:10
Nodding
28:13
normally
12:1
Norman
24:1 27:22 31:4,7,8
33:12,23 46:21 48:6
50:3,5 63:20,21 67:9
70:15,17 83:9 92:21
94:22 132:13 133:2,6
134:10,15 155:15

North
3:18 5:12 101:8
Notary
1:23 2:8 5:4 159:23
notation
40:17
notations
56:3
note
62:10
notebook
55:16 56:23 58:4
notes
58:4,5 142:8 143:6
notice
33:19,20 40:17 132:3
number
8:23 9:7 29:6 43:9,22
62:14 64:6 116:16 127:17
128:9,11,15,17 142:4,22
numbers
9:3 52:5
numerous
93:1

**O**

O
2:1 3:8
oath
6:15 79:5 81:2 92:19
94:6
Object
104:9 112:15 113:14 114:1
115:6,10 125:9 148:16
149:5,23 150:10
objection
113:18 150:15
objections
2:10,13
obviously
51:4
occasion
80:14 125:21 132:13
133:7
Occasional
11:2
occasions
92:13 106:21
occupation
12:15
occurred
60:11 77:10 81:20 94:22
104:23
October
10:2
offend
42:14
offered
2:15 153:16 154:20 155:2
155:4

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

JOY CREWS
DOLGENCORP, INC.

office
14:4  62:15,16  66:5,6  71:7
92:22  159:17
off-the
112:11
off-the-clock
108:13  119:8
Off-the-record
59:1  126:21  129:20
Ogletree
3:15
Oh
23:3  36:8,18  40:19  55:11
86:11  90:2  141:17
okay
6:14,18  7:10,19  8:2,5,9,19
9:2,8  10:5,9,13  11:4,15
12:4,8  13:15  14:7  15:2
15:13,18,22  18:13  19:3
19:17  20:17  21:18  22:4
22:7,16  24:9,16  26:2,23
27:20  31:3,14,23  33:15
36:4  37:19  38:2,8  42:4
42:11  44:3,8  45:11,21
46:13  48:5,11,17  49:21
50:5,10,15,21  51:11,15
53:6,22  54:15  55:4
57:17  58:17  59:16
60:15,20  62:21  63:10,11
64:19  65:8,21  66:7
67:17  68:6  70:3,11
72:13  74:18  75:21  76:3
76:18  77:1,19  82:3,16
82:17,22  83:8  86:13,22
87:3  88:4  89:5,23  90:3
90:8  91:1  92:4  94:21
95:4,14  97:2,22  98:19
99:14  100:1,19  101:16
102:3,7  104:13  106:3,6
106:9  107:2,7  110:22
113:3,19  114:14  115:2
116:9  117:3,6,17  119:12
120:1,14,15  123:18
126:10  128:22  132:9,12
134:4,11  137:3,16
139:12  142:7,21  143:5
145:18  148:6,12  149:9
150:6  151:3,12  152:20
153:5  154:7  155:8
157:9,14,18
old
88:23  89:18  91:9  98:17
99:13  151:22  153:12
older
88:13  91:14,17,19  92:1
150:20  151:8,10  153:9
155:20
once
8:16  29:14  84:4  105:19
ones

79:13  93:16  150:20  151:8
151:10  152:11  155:21
open
29:15  76:8  78:6  85:19
95:12
opened
27:15  32:12  95:10  157:13
opening
24:13  34:16  78:7,8  80:4
95:3,5,9,11
operates
34:8
operation
29:8
opinion
149:1,7,11,19
opportunity
53:18  90:14
oral
5:15
order
131:4  138:11  139:2
original
40:3,8,9
overrides
140:18
overtime
105:8  115:13,16,18  116:6
116:17  147:16
over-the-counter
129:17
owns
10:16  16:20  135:19

_____

P

P
2:1  3:1,1,8
page
4:2  39:8  40:13  41:2
45:12  55:16  63:6  65:2
127:12  131:3,5,5  140:9
142:7
pages
40:10  43:18  59:5,6
paid
53:3  97:23  106:7  108:17
109:18  111:19,23  112:4
114:9  115:3,12,14,18,21
115:23  116:6,19,19
147:16
paper
40:6
papers
55:3
paperwork
140:7
paragraph
44:1  69:10
Pardon
113:16

Parker's
16:22,22
parking
36:7  41:23
part
26:15,19  32:4  45:11
70:23  71:6  73:1  75:18
76:21  77:6  83:18  85:12
157:10
particular
42:16  44:8  57:15  58:7
65:22  87:20,22
particularly
136:9
parties
2:3,13  160:17
part-time
146:6
passed
87:11
patting
41:7
pay
30:18  32:22  33:2,7,10,22
46:22  50:23  51:7
86:23  87:1  98:4  104:15
110:2  115:13  132:2,6,20
133:10,16  134:2,9,18
paycheck
108:10  114:6
Payne
63:21  66:8  105:18  110:14
payroll
53:4  105:12  114:17,18
134:16
penalty
69:5  143:23
people
53:1  124:23  125:3  150:20
151:17  155:23
people's
68:13
Pepsi
27:9
percent
125:2
percentage
30:19
performance
61:7  69:11  75:23  77:23
83:2,12,15  85:19
performed
34:13
period
27:1  106:13  120:22  156:4
157:5,8
perjury
69:5  143:23
perky
87:9  88:1,5,21  149:18,20

permanently
157:22
person
7:17  41:6  124:23  125:12
150:17
personal
142:16  153:23
person's
41:8
phone
74:9  133:9,19
phones
20:1
physical
11:16  41:6
pick
26:21  35:1
picked
79:1  151:18  152:12  153:2
picture
106:20
pill
10:23
pinching
41:7
pipe
137:18
place
3:17  5:11  48:6  135:20
plain
20:20  148:2
plaintiff
1:8  3:3  142:10
planning
86:5,7
played
29:4
playing
144:19
please
8:10  39:1  158:3
plenty
82:19
point
21:3  31:14  70:13  130:22
policy
45:18  62:11  84:23  109:4
113:22
poor
83:11,14  140:7
Portis
3:7
position
14:21  15:7  20:19  29:13
30:11,11  46:16  75:13
83:4,5,13  91:12  92:7
97:13  98:20  99:1  102:4
102:6,12  144:10  145:19
145:22  152:3  154:18
155:2,5,10

positions
99:9  101:20
positive
46:3  48:12
possibility
85:16
possible
7:20  51:11,13  85:22  86:1
94:9,10  126:15,17
133:12,13  157:13
possibly
25:4  120:23  155:6,9
post
20:4
Power
68:12
Powers
15:3
practice
119:14
Prater
156:14
preceding
18:16
prepared
127:9
pressure
10:23  101:22  102:2
pretty
33:14  103:21  110:9  122:17
145:9
previously
12:23  77:21
printed
40:12
printing
40:10
prior
2:16  18:13  66:23  67:11
99:5,8  101:19  111:18
142:19
Pritchard
156:6,13,14,15
Pritchett
1:20  2:6  5:1  156:16,17
private
19:7
probably
13:13  25:19  40:8,9,13,15
45:6  51:20  55:2  58:9
76:16  88:16  122:7  131:1
133:15  140:5  144:14
150:9
problem
83:21
problems
12:5  69:12  93:22  96:15
101:18
Procedure
5:8

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

JOY CREWS
DOLGENCORP, INC.

proceedings
5:16
process
27:15,21 29:4 30:21
    47:16 106:1
produced
54:23 58:19 129:7 138:5
production
141:15,23
profanity
80:17 81:3
professional
1:22 2:7 5:3 90:1
progressive
65:4
promote
128:19
promoted
21:4,9 75:12 83:3 97:13
promoting
85:17
prompted
130:12
properly
8:4 37:21 75:20 80:1,8
    83:19 92:14 93:10,16,23
    94:7,16 104:5
provided
5:7
public
1:23 2:8 5:4 14:23 27:16
    29:15 32:13 60:5
    124:18,19,21,22 159:23
    160:23
pull
96:5
purported
142:12
purpose
7:5
purse
62:17
purses
62:11
put
25:23 27:5,10 32:19
    33:16,17 46:8 56:23
    65:18 78:2 79:2,13
    89:16 95:13 96:7 99:8
    101:19 102:4,5 110:5
    114:17 130:8 134:2
    152:12 155:12
putting
14:22 89:9,13
P.C
3:7,16

_____
Q
_____
quarters
35:3

question
8:7 58:1 82:14,20 93:14
    93:15 104:10,12 113:19
    129:18 150:9
questions
2:11,12 7:11 160:9
quick
57:21
quickly
157:13
quit
16:2 46:19 48:14 50:18
    71:15 72:12,13 74:22
    76:17,20 101:4,9 146:1
    153:18 154:9 156:9

_____
R
_____
R
3:1 160:1
raise
51:15 75:4 98:1
Ranbume
21:15 24:1,11 25:6,8,12,19
    26:4 28:7,23 31:1 32:1
    32:5 33:7 34:14 35:15
    36:6,22 42:10 46:15
    47:13 59:21 60:17 61:8
    66:21,23 67:11,19 68:7
    73:8,19 74:3 77:23
    84:12 87:16 90:20 92:7
    95:8 97:19 98:2,5
    103:22 105:2 125:23
    130:23 135:20 136:6
    152:6 154:11 156:3
    157:4,22
Randolph
9:12 10:15
rate
15:6 30:14 50:22 51:6
    117:18
read
69:23 70:5,7 109:7,9
    127:12 158:2,4 159:4
real
36:12 49:12 86:2 87:21
    105:15 128:9 151:15
really
96:17 108:10 134:20
    146:18 149:12 151:16
Realtime
1:21 2:7 5:2
reason
41:21 42:16 44:8 63:5
    71:2 83:12 114:15
    138:22 139:9 151:21
    157:23
recall
17:17 18:15 26:2 31:19
    50:16 67:3 77:3 78:17
    78:23 79:16,21 80:14

81:12 93:20 94:13,21
    95:14,23 96:14 125:21
    132:12,19 154:13
receive
32:22 61:6 65:5 114:5
received
32:20 33:3,7 38:15 39:17
    39:21 67:5 86:22 98:1
    98:4 147:12
recognition
125:7
recognize
37:9 39:2 63:1 68:20
    127:8 136:18 141:13
    143:18
record
8:11 24:21 34:2,3 54:20
    57:23 58:23 65:4 70:7
    111:3 126:20 129:19
    158:4
records
18:7 26:8 51:5 66:4 77:9
    109:14
recovering
94:16
recovery
78:4
reduced
150:8 160:10
Red–headed
28:16
REEXAMINATION
4:5 151:5
referencing
58:2
referring
23:23 24:4
reflect
18:8 139:5
refunds
140:17
refused
64:4 148:15
regard
55:22 57:12 59:2 61:7
    67:6 68:3 71:5 77:5
    82:8 86:18 92:13 93:15
    136:1 143:6
register
52:2,4 126:2 140:18
Registered
1:22 2:7 5:2
regular
9:13 90:7 125:8
related
69:12
Relations
43:7
relationship
23:16

relied
103:20
remark
101:21 102:1 150:22
remarks
56:15
remember
13:11 26:5,14 28:2 33:3
    36:3,6 38:1 40:4 45:8
    54:18 56:4,5,10 67:14
    67:16 71:9 72:12 73:7
    73:11 75:3 76:10,13
    81:9,22,22 85:21 86:2,6
    94:1,12 95:1 96:2,19,20
    96:22 97:1 102:16
    106:15,15 107:17,20
    108:9 109:20 126:9,11
    126:14,18 127:14,15
    130:9 133:14 134:20,20
    135:8 140:6 146:19
    154:17 156:5
rephrase
8:7
report
57:14 152:15
reported
1:20 57:13
reporter
1:21,23 2:7,8 5:2,3,22
    7:12
represent
40:2,7 138:4
representing
112:13
represents
6:7 160:12
reprimands
61:6
request
109:13 141:15,22
requesting
142:22
requests
142:8
residence
15:19
resign
74:7 86:5,7
resigned
15:23 31:16 72:3 156:3
respective
2:4
respond
42:4 81:15 120:12
responding
95:16
response
43:8,14,23 54:9 59:18
    128:5 141:14,22
responses

143:18
responsibility
52:7
responsible
61:19 64:20 79:18 93:17
    140:14,21
responsive
66:16
rest
155:22
restaurant
71:23
result
32:23 160:18
results
49:22
retail
14:7 34:4
retained
29:7 83:5 90:18 91:11
    157:21
retaining
92:6
retest
48:18
retested
48:20
return
138:7,18
returns
136:19
Reviewing
39:6,10,23 69:23 140:4
    141:17
Richard
13:4
rid
88:23 150:19
ridiculous
53:5
right
7:4 8:10 10:3 11:11,13
    16:23 17:17 18:9,11,20
    19:21,23 20:6 21:10,11
    24:7 25:22 26:10,13
    31:16 32:12 36:23 47:11
    48:1 49:17 51:1,18,20
    53:20 57:6 60:11,13
    61:2 68:4 69:6 70:8
    72:9 73:9 77:12,13,18
    78:13 80:21 87:7 88:20
    90:12 91:3,8,18 93:8
    95:18 97:17,19 99:18
    100:9 102:21 103:4
    105:4 108:18 110:17
    112:2,4,6,19 114:8
    115:15 116:15 119:20
    121:22 122:18 124:16
    129:5 132:10 139:3,13
    140:6 143:9 153:21

Tyler Eaton Morgan Nichols & Pritchett, Inc.

**JOY CREWS**
DOLGENCORP, INC.

**JOY CREWS**
September 14, 2006

155:18
Rilla
8:12,15,17 9:6
rip
59:6
ripped
59:5
Road
10:7
Robin
68:10 107:18,20 145:12,15
Robin's
145:18
Roger
16:20
rolled
36:8
Roman
3:4 17:22 131:13 147:5
150:13
room
133:8
rotated
121:11
rotten
13:19
rule
85:5
rules
5:7 84:22
run
53:14 68:10,11 96:4
103:21 110:21 135:10
running
122:13
runs
53:3
rush
110:11

—————————
S

S
2:1 3:1 4:7
safe
35:5 54:17 61:18 65:13,18
67:7 93:13 94:2 95:15
95:17 96:3,7,8,9
SAITH
158:10
salaried
30:10
salary
15:7 17:10 97:15 108:3,6
sales
30:20
Saling
146:4
Sally
135:13,16 147:19 148:9
Samantha

144:3
sat
6:21 49:10,16
saw
71:12,19 108:9 131:10
154:8
saying
7:16 77:17 81:6 82:11
96:16 117:21 126:18
says
127:18 140:10 143:4
schedules
103:7
scheme
108:13
school
19:10,11 20:4,5
seal
159:16
second
50:12 58:1 65:2 127:11
130:2
section
24:23
Security
8:23 9:3,5 52:6
see
37:14 43:23 44:2 45:13
45:20 54:22 58:22
66:1 69:9,14 70:8 90:6
109:5 114:17 127:17
131:21 140:8,14 142:14
142:21 143:3 154:10
seeing
14:22
seen
18:18 48:3,10 53:13 65:14
65:18 68:12 71:16 140:1
141:21
self–employed
16:18
sell
128:20
sense
23:12 40:14
sent
138:11
sentence
69:9
separately
159:8
September
1:17 5:13 158:14
series
7:11
served
30:22
service
135:1
setup

26:16 27:1,21 28:23 29:4
29:14 30:21 32:1,8
47:16 60:19 73:20
87:21 152:9 157:5,7,20
157:22
seven
15:11 26:22 30:15 33:13
50:23 51:5,9,12,16
59:10 133:15
seventy–five
125:2
Shaking
89:2
Shaul
3:4 4:4 6:2 12:11 17:23
24:19 40:23 55:18
57:23 58:8,11,14,20
82:13,18 104:9 112:15
113:14 114:1 115:6,10
122:19 125:9 129:13,16
147:7,10 151:1 158:8
sheet
109:1 125:22 126:5
Shelton
135:16
shelves
27:4 34:18 45:2 79:2
shift
128:20
short
65:7,10
shortly
66:17
show
26:8 37:5 38:21 39:15
43:16 51:5 62:21 68:17
77:10 78:14,16 80:5,7
80:12 84:2 127:5
129:21 130:2 136:16
138:1 139:21 141:10
143:16
showed
46:7 127:16
showing
42:2 130:18 138:16 149:8
149:13
shutdown
137:19
sick
49:4,5 105:16 110:19
side
40:12 56:14
sidewalk
71:21
sign
63:2,6 64:4 109:8 122:13
126:19
signed
38:13 39:4 42:22 43:19
45:13,21 62:1 63:4

65:6,21,23 66:19 69:3
108:23 126:5 127:11
143:22
signing
140:17
similar
101:17
sir
7:9 9:4,10,18,23 10:22
11:2,8,14,14,18,23 12:13
12:14 13:10,19,22 14:9
14:18 15:5,15 16:2 17:8
18:12 19:5,9,11,14 20:7
20:13,22 21:2,6,12,17
22:9,15,18 23:20 24:2,5
24:14,18 25:23 26:6,17
28:19,21 29:3,9,12,20
30:6 31:2,9 32:6,14
33:1,9 34:1,7,11 35:21
36:18 37:1,11,15 38:11
38:17 39:7,11,19 40:16
41:13 42:21 43:12 44:2
44:7,14,19,23 45:20,23
46:4,13 47:17 49:16,20
49:23 51:2,13,19 52:11
54:3,4,19 55:2 56:1,21
57:16,20 58:13 60:4,9
60:13 61:14,20 62:2
65:7 67:2,20 68:2 69:1
69:8 70:9 71:11,17,23
72:2,6 73:15,17,22 74:5
74:16 75:6,8 78:22
85:8,14 86:21 87:6
91:7,13 92:3,16 94:19
97:16,20 98:3,6,21 99:6
99:17 101:15 102:19
103:17 104:17,22 105:2
106:8 107:1,6,14 109:6
109:16 111:6 112:9 114:7
115:4,21 116:7,13 117:9
117:12,16 119:3,11,15,23
120:18 121:16 122:2,12
123:1,6,10,13,17,22
124:2,12 127:15,22
128:2 130:6 131:1,8,16
131:19 136:10,21 137:2
137:8,11 138:9,10,21
139:3,8,14,17 140:15,23
141:6 143:3,21 144:2
145:7,10 147:15 152:8
152:22
sit
49:9
sitting
24:19 59:16 71:21
six
15:8,20 25:18
sixty
65:11
skim

109:9
sleep
11:21
slip
35:19,22 83:16 92:23
slips
37:10
small
154:12
smaller
25:15
Smoak
3:16
smoke
85:6
smoking
71:21 85:3,4
Social
8:22 9:3,5 52:6
solely
105:3 116:7 125:19 150:19
Soling
146:3
somebody
45:6 88:11 105:16 110:19
110:21
somebody's
23:4
Somewhat
24:18
soon
73:5 118:1
sorry
12:13 25:1 40:19 43:8
47:12 82:17 101:23
141:6
sort
84:6 109:12 116:12 140:19
154:22 155:8
sorts
130:13
sound
18:9 26:10
sounds
21:10,11 134:19
sources
124:4 139:16
so–called
95:11
speak
90:6
speaking
95:15
specific
50:11
specifically
76:11 120:1 135:23 154:14
speeding
122:12
spells

Tyler Eaton Morgan Nichols & Pritchett, Inc.

**JOY CREWS**
**DOLGENCORP, INC.**

28:12,15
spiral
58:3
split
114:19
spot
152:21
Spratlin's
120:10
staff
140:22
stage
87:12
stand
23:8 125:15
Standard
19:18
standing
41:16
Stapler
16:20
start
22:21 55:9,21 56:2,8,12
58:5 70:12 72:15 82:15
117:23
started
16:3 47:13 56:6 86:4,7
87:15 118:2,4,4 130:20
130:21 148:5 153:17
state
5:4 8:11 160:4
statement
136:3
States
1:1 5:8 34:9
stating
38:14 43:20 45:16 69:4
stay
26:22 57:23 84:2 102:19
146:16 152:9,12
stayed
27:6 84:4 101:13 153:3
stealing
53:14 67:22 146:2,17,23
stenotypy
160:9
Stewart
3:16
stickler
84:22
STIPULATED
2:2
stipulation
5:9
stipulations
5:23
stock
14:22
stocked
27:13 45:9 79:2

stocking
34:18 45:2,7,10
stockroom
45:1
stood
100:9
stop
122:13
store
14:8 15:4,14 20:21,23
21:4,5,14,19,23 22:8,13
24:13,14 25:5,6,12,19,22
26:4,9,16 27:3,15 28:7
28:7,23 29:8 30:23
32:1,5,17 34:4,14,16
35:8 36:2,6,17 44:21
45:3 46:15 47:12,13
56:20,21 57:10 59:21
60:2,16 66:21 67:1,19
68:7 70:16,18 71:14,22
75:16 76:2,6,8 77:23
78:2,7,11,13,15,19 79:22
80:3 81:8 83:22 84:2,6
84:7,10 85:4,7 87:14,16
87:19,23 88:11,13 90:19
92:7 94:16 95:12 97:18
98:8 100:8 102:10
103:5,11,13,16,22 104:3
105:1,3,13,19 106:19,23
107:4 108:5 110:16
111:1 114:5 116:5,8,10,12
116:18 118:15,20,22
119:2,7 121:5,8 125:1
126:1 127:10,20 130:23
136:6 140:3,11,13,20,22
144:8,22 145:6 146:11
146:12,15 147:21 148:13
148:23 149:17 152:7
154:16 155:16 156:4
157:4,13,22
stores
14:5 34:8 103:23 116:10
straight
52:22,22 63:15 105:19
106:7,8 110:17 115:14,15
Street
3:9
strict
105:14
strictly
148:3
strike
66:15 96:13
strives
125:6
stuff
53:2 55:7,13 56:18 57:5
93:7 119:8
styles

84:14,17
subjected
53:10
submit
109:12
submitted
37:13
subscribed
159:14
subsequent
9:21
substance
61:15
substandard
75:22 77:22
sue
60:14
sued
123:4,9,13,15
suit
78:2 141:18
Suite
3:17 5:11
suited
78:12
summer
131:20 144:15
Sunday
62:2,5 63:11 122:2
Sundays
121:21
Super
14:1,6,11 15:16,17,19,22
16:5 124:11
supervision
160:11
supervisor
15:2 81:19
supporting
136:20 138:8,19
supposed
33:19 52:23 53:8 65:13
65:17 95:19 126:2
134:3 157:16
sure
26:17 36:13,19 54:12
74:17 77:15 80:2
116:15 118:9 145:9,17
surprise
91:20,22
Sutton
9:6 13:4 123:2
Swapping
35:6
swear
26:13 77:13 81:21 94:11
108:8 145:1,13,16
swept
36:7
swimming

144:18,19
sworn
5:19 159:14
S-a-l-i-n-g
146:4

---
T
---

T
2:1,1 4:7 160:1,1
take
7:17 8:3 10:22 15:9
25:10 27:15 35:4 39:1
46:17 47:4 48:17 49:7
51:4 57:21 62:23 63:18
68:19 101:22 102:2
103:1 110:2 122:19
129:11,17 135:23 139:23
141:12 148:13 153:1
taken
2:5 86:18 160:8
Talisha
62:14 107:16 145:2
talk
7:21,22 24:20 66:8 72:1
81:7,23 92:20 93:9,12
132:1 144:16
talked
24:4 38:7 66:6 79:5
82:10 83:16 89:6 90:17
92:22 94:6,17,20 100:7
112:22 113:4 133:6
144:13
talking
7:17 16:6 43:11 56:15
72:20 80:19 82:20
94:2 96:2,20 104:8
112:23 137:6 147:19,21
148:8,21 156:22
task
80:2
tax
136:19 138:7,18
team
71:1 73:2 75:19 77:6
86:19 103:2,21
technical
104:11
technically
97:18,20
telephone
74:20
tell
16:16 25:2,2 26:23 34:12
44:15 47:3 50:2,5
52:13 66:3 67:8,10
70:20 74:6,18 82:5
83:23 85:16 89:11 98:7
104:18 105:4,23 115:16
119:18,21,21 120:2,2
122:18 124:10 125:3

132:17 135:23 154:5
158:1
telling
125:20 126:13 151:22
temperature
49:7
ten
52:19 124:8 128:9,11
135:19 157:15
Tennessee
34:5
terminate
50:19
terminated
48:12,15 50:16 156:3
test
46:3,18,23 47:5,10,14,22
48:2,9,12 49:2,19,22
50:9,12,17 100:12
tested
46:10,12,13 48:7
testified
5:20 12:22 29:1 50:22
58:18 59:4 65:8 83:20
93:3 118:16 151:7
testify
11:6 64:6 99:22 100:5
testimony
44:3 79:4 80:6 81:1 83:9
92:18 94:5 119:4
126:10 156:1 159:4
thank
70:10 127:18
thanked
127:20
theirs
62:15
them's
99:11
thereabout
72:7 73:22
thereto
2:16 160:10
thick
40:5
thicker
40:13
thing
6:13 78:16 80:12 81:17
104:11 110:4 131:2
144:20
things
22:21 23:13 34:15 45:18
56:5,7,8,12,23 59:23
105:21 125:5 140:13,16
141:2 142:9
think
10:22 14:3 16:21,23 17:12
28:23 29:1 44:19 50:21
57:6 58:14 60:21,22,23

JOY CREWS
DOLGENCORP, INC.

61:2,3  72:8  74:13,16,17
81:16  85:11  90:11,13,15
90:22  93:3  95:6  106:14
106:16  108:4,8  113:7
117:10  118:5,13,15
135:10  137:9  143:9
144:23  145:1,15  146:15
147:5,15  150:16,17
151:6  152:1  154:22
157:15
**thinking**
59:13,13
**third**
30:1  43:18  46:16  88:17
89:17,17  97:4,8  145:20
**thirty**
33:18  46:9,11  47:2  134:2
**thirty-day**
33:19,20
**thirty-two**
106:4  110:9  111:8,23
112:3  117:15
**thought**
24:10  31:12  51:9  63:16
64:1  65:9,12
**thousand**
124:8
**threats**
75:7
**three**
18:3  19:2  27:17,18  32:11
45:9  58:9  66:9,10,18
73:10  76:16  95:8
131:22  143:10
**ticket**
122:13
**tickets**
122:14
**tight**
53:4,5
**time**
2:14,15  7:1,18  9:19  12:1
15:13  16:10  19:18,18,20
19:20  20:2  21:21  22:8
22:14  27:1  28:8  29:23
30:14  32:7  33:6  35:16
36:18  37:22  38:5  43:15
44:22  51:1  52:18,23
54:12  55:11  60:16  61:4
61:4,11,21,23  63:22
64:23  65:15,15  66:14
71:12,19  75:19  76:21,21
77:2  78:10  82:19  83:19
84:1,1  89:20  91:9  96:5
97:19  98:2  100:6
102:23  103:3,6,12,19
104:6,16  106:7,8,13,18
107:7,22  108:18  109:12
109:13,14  110:15,23
111:2,17  112:3,17,21

113:9  114:4,10  115:3,9
115:14,15,20,21,23  116:4
118:6,9,20,23  119:5,9
120:4,20  121:4  122:5,13
123:2,23  129:8  131:9,13
134:3  140:5  144:12
147:12  148:12  153:19
154:23  156:4  157:9,10
157:20
**times**
33:13  52:22  65:19  66:11
68:12  105:9  107:2
110:18  120:23  133:15
136:4
**title**
29:22
**today**
11:7  24:17  44:4  55:6
57:19  59:16  81:2  92:19
129:7  142:19
**told**
18:7  21:8,23  24:10  25:10
26:7  30:2  34:23  35:13
35:18  42:2  46:22  47:1
48:14  49:5,6  50:1,3,13
50:18  56:16  61:11  63:3
63:22  64:4  66:7,10,13
67:20  70:1,22  74:8,21
75:17,20  76:9  77:9
78:1  79:6,8  80:9  81:16
81:17  87:8,23  88:16
91:10,18  92:8  100:11,17
102:23  107:8  109:17
112:6  113:6  121:23
132:13  133:2,14  134:15
135:11  147:22  148:3,7
149:17  155:5  157:18
**tolerate**
82:6
**toll-free**
43:9,22
**top**
43:23  45:13  142:8
**touched**
44:5
**touching**
41:5
**town**
132:15,23  134:11,12
**to-do**
127:9
**track**
123:1  134:17
**train**
75:20  83:19
**training**
76:5  149:3,10
**transcript**
159:4  160:13
**transfer**

21:18  26:9  67:19
**transferred**
21:15  25:11  26:3  66:20
68:7
**transferring**
24:11  25:5
**trash**
36:8,14,20  78:20,21  79:1
79:6,8
**trial**
2:14
**tried**
25:9  125:17
**Trintex**
122:10
**trouble**
136:11  138:12
**truck**
34:17  62:2,4,5  63:11
121:17,21
**trucks**
27:11
**true**
40:15  69:6,15  92:11
112:10  136:23  138:6
140:18  159:5  160:12
**trunk**
62:13
**truthfully**
11:7
**try**
7:14,21,22  8:1  91:2
**trying**
77:2  86:13  106:19
**tryouts**
25:8
**turn**
62:7
**turned**
17:21  42:6
**turns**
62:4
**TV**
19:23
**twelve**
12:20  157:19
**twenty**
10:11  12:21  18:17  87:12
89:18  98:17  99:13
114:22  151:22  155:12,12
**twenty-five**
51:6,12,16
**twenty-one**
89:20  98:18
**twenty-year-old**
89:10,13
**two**
13:19  21:6,21  22:17  32:10
34:1  35:14  45:9  48:21
48:23  49:1  55:8  65:18

65:19  74:19  84:9  95:8
103:18,22  107:23  119:6
119:10  121:12  130:7
157:11,16
**two-page**
62:23  127:7
**two-week**
120:21
**type**
148:14
**typewriting**
160:11
**typically**
14:20  17:10  34:15  120:16
121:5,14

---
**U**
---
**U**
2:1
**ugly**
56:6,9,13,17  105:15
**uh-huh**
7:3  8:9  9:12  12:10  16:9
18:6,21  19:1  20:11,22
22:12  30:3  31:18  32:18
37:18  38:9  40:1,4
45:15  47:20,23  52:9
63:8  66:22  70:19  71:8
72:21  73:22  74:13  77:8
87:17  88:15  93:7  103:4
117:22  124:20  128:7
131:7  134:14  141:4
143:1  156:23
**uh-huhs**
8:1
**uh-uh**
12:7  48:19,21,22  57:9
71:17  90:12  94:1  119:19
144:18
**uh-uhs**
8:1
**ultimately**
21:14  33:11  106:6  132:9
134:8
**understand**
6:12,15  7:5,16  8:6  43:21
86:14  109:11  111:14
**understanding**
45:16  75:10  109:3
**understood**
38:15  53:8,11,16,22
**under-forty**
156:2
**unemployment**
122:3
**United**
1:1  5:8
**Unites**
34:9
**unload**

62:3
**unloaded**
27:5,12  62:6  63:12
**unloading**
34:17
**unprofessional**
90:4
**unwanted**
41:5,6
**upset**
83:15  86:2
**use**
7:23  20:2  35:17
**Usual**
5:22
**usually**
45:9  121:12,19

---
**V**
---
**vacation**
31:15,20  33:10,21  46:22
73:13  86:5,9  132:2,6,20
133:10,16,18,21,23  134:2
134:9,12,17
**valid**
9:20
**Vanessa**
68:11  107:22  146:13
**Variety**
14:2,3  15:14
**various**
39:3
**vendors**
27:8  32:21
**Vent**
137:13,13
**Ventilation**
137:12
**verbally**
77:22  82:8  92:12
**Verelan**
10:23  11:5
**versa**
111:12
**vice**
111:12
**view**
44:4
**vindictive**
53:13
**violating**
113:12
**violation**
45:17  109:4  113:22
**Vivian**
22:6,7,10,10,13  28:17
41:10  45:4  52:11,14
53:12  54:11,16  56:14
61:13  62:14  63:22
65:14  67:21  71:18

JOY CREWS
DOLGENCORP, INC.

104:19,21  107:8  108:2
110:16  111:10  118:19
119:20  146:1,17,22
**Vivian's**
105:1  106:19
**voice**
75:4
**voicemail**
133:19
**voicemails**
33:14
**voluntarily**
68:6
**vs**
1:9

---

**W**

**W**
3:13
**Wage**
45:14  108:23
**wait**
47:1  114:16
**wake**
12:1
**walk**
78:13
**walked**
78:15  80:3
**walking**
78:19  79:21
**want**
23:13  66:2  68:17  70:3,23
71:6  73:1  83:17  90:14
94:3  109:7  129:5
145:16  152:14
**wanted**
23:15  36:21  49:9  67:18
74:7  75:18  84:3  87:8
87:22  88:1,1,19,22
105:18  110:17  113:5
128:1  136:1  149:8,13,18
149:19  150:18  157:12
**wanting**
77:5
**wants**
126:19
**Warehouse**
14:2,3
**warm**
49:3
**wasn't**
27:18,22  32:11  33:9
36:19  64:1  76:15,19
78:4,21  80:18  82:6,12
85:3  92:9  93:1  95:12
100:16  102:14  128:9
132:14  133:23  145:14
154:4
**wasting**

---

66:14
**water**
49:10,12,18
**way**
15:21  28:17  33:17  46:8
54:4  64:12  68:10,11
69:3  77:14  78:3  82:7
82:11  84:12,21  86:21
87:6  90:4  95:13  99:15
99:16  108:19,20  116:12
149:8  150:5
**weather**
131:19
**Wednesday**
121:23
**weeding**
150:19  151:8  153:7,9
155:20
**week**
16:3,14  17:15  30:17  31:17
31:22  72:17,18  74:2
95:7,10  105:6,11  106:4
106:5  107:5  110:2,6,7,8
111:7,8,12,18,22  115:1,5
115:5  116:22  117:7,11,14
120:17  121:12,15,19
133:17  147:13
**weekly**
114:6,7,16
**weeks**
19:2  27:18,18  32:11,11
34:1  66:18  73:7  75:16
76:16  78:6  95:8  111:4,5
111:9  114:12  155:14
157:11
**week's**
110:2
**welcome**
49:7
**welder**
12:16  16:17
**went**
14:17  16:12  19:1  23:21
25:8  26:23  27:7  28:22
30:1  31:15,20,23  34:21
41:17  42:10  46:14,18
48:22  49:16,18  62:8
63:14,15  70:15,17  73:13
73:19  76:22  86:9,11
101:8  144:18  148:11,20
151:10,21
**weren't**
48:8,11  102:17  115:17
**we've**
73:23
**whatsoever**
105:9
**white**
28:19,21
**Wiggins**

---

107:21  145:12
**wish**
59:17,22
**witness**
5:14  44:18  159:3,16
160:14
**woman**
22:22,23  28:16  53:13
56:17
**word**
51:4  109:10
**words**
23:6  51:22  111:16,17
114:18
**work**
13:23  14:8  18:13  19:1
20:1  52:21  57:13,14
62:7,12  63:15  73:8
102:15  103:9,15  106:2,4
106:22  107:19,20
109:18  110:1,7,8  111:21
112:7,12  113:2  116:11
121:14,20  137:18,19
144:21  145:5,10,15,21
148:15,20  153:17  157:21
**worked**
15:12  18:15,18  20:8  22:14
51:23  55:8  60:1,16,19
61:5  73:11,12  84:5
87:20  95:8  102:9  104:6
104:7,16  105:6  106:3
107:23  110:6  111:4,5,7
111:11,18  114:10  115:4,9
116:4  117:15  121:16
144:7  146:7,11,14,15
147:13  156:6  157:19
**worker**
151:15,20
**working**
29:14  45:17  62:4  74:22
80:15  107:4,10  109:3
112:3  113:21  114:20
118:2,11  120:10  124:18
157:3
**works**
17:14  99:19
**workweeks**
157:17
**world**
100:11
**worry**
137:16
**worrying**
33:23  134:21
**wouldn't**
36:21  38:5  91:22  112:2
117:17  121:7
**write**
59:12  63:19,23  64:2,2,3,8
**write-up**

---

61:16
**writing**
37:12  58:5  126:8
**written**
17:23  43:20  67:5,12
**wrong**
37:23  40:9  75:9
**wrote**
17:22  54:19  55:12  61:12
62:1  125:22  126:4
135:5

---

**X**

**X**
4:1,7
**Xerox**
40:3

---

**Y**

**yard**
36:13,15,20
**yeah**
18:5,10,11  19:22  23:3
32:10  35:10,12  57:16
59:21  63:11  68:9  70:15
77:13  82:6  85:2  86:11
93:6  103:6  108:6  110:3
111:20  116:1  117:2
124:17  129:16  132:7
139:13  145:9  146:1
**year**
13:7,11  14:12  17:11  42:9
105:19  124:8  135:9
139:6
**years**
10:11  12:20,21  17:3,4,4,5
17:5  18:3,17  55:8  84:9
87:12  89:18  98:17
99:13  119:6  135:19
151:15,22  155:12
**year-old**
155:13
**young**
87:21  88:20  136:11
150:20  151:21  152:12
155:23
**younger**
130:15  152:15
**y'all**
13:8  22:17  74:19  113:3
120:12

---

**O**

**02**
17:21
**03**
18:4,5,14  20:18
**05**
20:10,13  32:2

---

**1**

**1**
4:8  37:3,7
**10**
4:17  14:1,6,11  15:16,17,19
15:23  16:5  21:9  124:11
138:14,17  139:4
**10:50**
126:23
**10:57**
126:23
**1000**
3:17
**1020**
5:11
**11**
4:18  139:19,22  140:10
141:3
**11:33**
158:14
**12**
4:19  141:8,12
**127**
4:13
**129**
4:14
**13**
4:20  143:14,17
**136**
4:15
**137**
4:16
**138**
4:17
**139**
4:18
**14**
1:17  158:14
**14th**
5:12
**141**
4:19
**143**
4:20
**147**
4:4
**15**
72:5
**15th**
20:11,14  31:21  46:20,20
72:6,10  73:15,16
**151**
4:5
**17**
18:8  20:9
**18th**
14:12  18:11  20:13  46:20
46:20  72:7,12
**1819**
3:18  5:11

JOY CREWS
DOLGENCORP, INC.

JOY CREWS
September 14, 2006

**1963**
10:2,4

---
**2**

2
4:9  38:19,22  39:9  43:1
  43:17,19  45:12  109:2,5
20/20
59:22  116:2
2000
67:13
2003
18:8,23  20:9  21:9  38:13
  45:22  118:17  119:6
  136:19
2004
138:7
2005
1:17  20:12,14  26:10  29:2
  47:7,19  51:17  68:22
  69:4  72:5  73:14,21
  77:11  85:12  91:10  92:13
  95:5  119:2,6  135:22,22
  138:18  139:7
2006
5:13  124:5  144:1  158:15
  159:15
27
143:23
281
3:9
29
69:3

---
**3**

3
4:10  39:13,16,20
3rd
77:10
3:06-CV-00047-MEF-V...
1:5
30th
26:10  73:20
35203
3:19
36103-4160
3:10
36263
10:8
37
4:8
38
4:9
39
4:10

---
**4**

4
4:11  11:22  52:22  62:19,22
  63:7  65:3

**401-K**
76:22
4160
3:8
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
8:23
435
10:7
4800
20:23  22:14

---
**5**

5
4:12  12:3  68:15,18  69:21
5th
3:18  5:11  10:2,4
5842
21:15  60:16

---
**6**

6
4:3,13  127:3,7  128:4
6/9/05
130:19
6:00
63:13,14
62
4:11
68
4:12

---
**7**

7
4:14  129:3,9,23  130:12
  131:6,10  132:4  135:6
  142:18
773
10:7

---
**8**

8
4:15  52:22  136:14,17
8:30
121:18
81
19:12
83
13:13
84
13:13
86
122:7
87
122:7

---
**9**

9
4:16  73:14  135:22  137:22
  138:2
9:10

5:13
9:30
121:18
96
12:19



DEFENDANT'S
EXHIBIT
1
Crews



Joy Crews/DG 00052, Docs. Produced to Plaintiff

CONFIDENTIAL

